UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

333 Constitution Avenue, NW
Washington, DC 20001-2866
Phone: 202-216-7000 | Facsimile: 202-219-8530

ORIGINAL

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED

AUG 20 2014

CLERK

Case Caption:   Anthony W. Perry

Petitioner

v.

Case Number 14-1155

Merit System Protection Board

Respondent

## PETITION FOR REVIEW OF AN AGENCY, BOARD, COMMISSION, OR OFFICER

Notice is hereby given this the  20  day of  August  20 14 that petitioner(s)

Anthony W. Perry  hereby petitions the United States Court of Appeals for the District

of Columbia Circuit for review of the order of the respondent(s)  Merit System Protection Board  entered

the  6  day of  August  20 14 .

Attorney for Petitioner(s)/Pro Se Party,

Anthony W. Perry, MBA, MSIT, CIO Cert.

Address:   5907 Croom Station Road

Upper Marlboro, MD 20772

Telephone: ( 301 )  928-2305

USCA Form 12
AUGUST 2009 (Revised)

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

ANTHONY W. PERRY,
        Appellant,

    v.

DEPARTMENT OF COMMERCE,
        Agency.

DOCKET NUMBERS
DC-0752-12-0486-B-1
DC-0752-12-0487-B-1

DATE: August 6, 2014

## THIS FINAL ORDER IS NONPRECEDENTIAL[1]

<u>Anthony W. Perry</u>, Upper Marlboro, Maryland, pro se.

<u>Tyree P. Ayers</u>, Esquire, Washington, D.C., for the agency.

### BEFORE

Susan Tsui Grundmann, Chairman
Anne M. Wagner, Vice Chairman
Mark A. Robbins, Member

### FINAL ORDER

¶1      The appellant has filed a petition for review of the initial decision, which dismissed for lack of jurisdiction his suspension and involuntary retirement appeals because of a settlement agreement entered into before the U.S. Equal Employment Opportunity Commission (EEOC). Generally, we grant petitions

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

such as this one only when:  the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed.  *See* Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115).  After fully considering the filings in this appeal, and based on the following points and authorities, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review.  Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision.     5 C.F.R. § 1201.113(b).

¶2        In August 2011, the appellant and the agency entered into a settlement agreement before the EEOC wherein the appellant agreed, inter alia, to voluntarily resign or retire no later than September 4, 2012, to serve a 30-day suspension which the agency would issue in lieu of effectuating a removal action it proposed in June 2011, and to waive his Board appeal rights with respect to the aforementioned actions.  MSPB Docket No. DC-0752-12-0486-I-1 (0486-I), Initial Appeal File (IAF), Tab 14, Subtab 1 at 15-20.  After he served the 30-day suspension and retired pursuant to the settlement agreement, the appellant filed an appeal with the Board regarding the 30-day suspension and his retirement, which he alleged was involuntary.  0486-I, IAF, Tab 1 at 6, ¶ 20; MSPB Docket No. DC-0752-12-0487-I-1 (0487-I), IAF, Tab 1 at 5, ¶ 20.

¶3        The administrative judge docketed the suspension and involuntary retirement claims as two separate appeals and later dismissed both appeals

3

without a hearing,[2] finding that the Board lacked jurisdiction because the appellant validly waived his Board appeal rights in the August 2011 settlement agreement. 0486-I, Initial Decision (July 30, 2012); 0487-I, Initial Decision (July 30, 2012).

¶4      The appellant then filed petitions for review of the aforementioned initial decisions. 0486-I, PFR File, Tab 1; 0487-I, PFR File, Tab 1. The Board joined the two appeals and granted the appellant's petitions for review. 0486-I, Remand Order (June 12, 2013). The Board found that the appellant's claim, that the agency coerced him into signing the settlement agreement by misinforming him that he would not have Board appeal rights if it effectuated his removal, constituted a nonfrivolous allegation of involuntariness entitling him to a jurisdictional hearing. Remand Order at 6-7. Thus, the Board remanded the appeals for a jurisdictional hearing, so that the appellant would have an opportunity to explain, and present evidence in support of, that nonfrivolous allegation. Remand Order at 9. The appellant raised several other claims of coercion—i.e., that the agency coerced him into signing the settlement agreement by threatening to remove him, by proposing adverse action that was discriminatory and that it knew it could not sustain, and by failing to inform him of his Board appeal rights—all of which the Board considered and rejected. Remand Order.

¶5      On remand, the administrative judge conducted a hearing, at which the appellant declined to testify. MSPB Docket Nos. DC-0752-12-0486-B-1 and DC-0752-12-0487-B-1 (0486-B), Remand File (RF), Tab 26, Hearing Compact Disc (HCD), Track 4; see 0486-B, RF, Tab 28, Remand Initial Decision (RID). The administrative judge thereafter issued an initial decision, again dismissing

---

[2] The administrative judge concluded that the appellant waived his right to a hearing, in part because of conflicting statements the appellant made, but we ultimately concluded that the appellant did not waive his right to a hearing. See 0486-I, Remand Order (June 12, 2013).

the appeals for lack of jurisdiction based on the August 2011 settlement agreement.  The appellant then filed the instant petition for review, again arguing that he did not voluntarily enter into the settlement agreement.  0486-B, Remand Petition for Review (RPFR) File, Tab 12.

¶6      As an initial matter, the appellant seeks to invalidate the settlement agreement by arguing that: (1) the settlement agreement is invalid because it contains a nondisclosure provision, purportedly restricts his ability to communicate with Congress and the Office of Special counsel, and required him to waive his "non-waivable" rights under Title VII; (2) he did not receive any consideration under the settlement agreement for waiving his rights under Title VII; (3) he signed the settlement agreement under duress because the agency presented him with the agreement immediately after proposing his removal; (4) the agency coerced him into signing the settlement agreement by proposing an action which it knew it could not sustain; and (5) the deciding official intentionally withheld her decision on the proposed removal, which mitigated the proposed removal to a 30-day suspension, in order to coerce the appellant into signing the settlement agreement.  *Id.*  We will not consider these arguments because they all exceed the scope of the Board's remand order, some have already been raised before the Board and rejected, and some are being raised for the first time.[3]  *See Zelenka v. Office of Personnel Management*, 110 M.S.P.R. 205, ¶ 15 n.3 (2008) (refusing to address an appellant's arguments which exceeded the

_____

[3] On July 23, 2014, the appellant filed a request to submit evidence which he contends is new and material.  0486-B, RPFR File, Tab 17 at 3.  Specifically, he seeks to submit a letter by the U.S. House of Representative's Committee on Science, Space, and Technology, as well as a report of investigation regarding the agency's Inspector General's alleged failure to remove two employees who coerced other employees into signing a nondisclosure agreement.  *Id.*  He also states that the Inspector General is, as a result, under investigation for retaliation and questionable hiring practices.  *Id.*  The appellant's request is DENIED.  As previously stated, the appellant's claims regarding the validity of the settlement agreement are outside the scope of our remand order.  Further, as explained in more detail below, the merits of his appeal are not before us because we do not have jurisdiction in this matter.

Case 1:17-cv-01932-TSC   Document 1-1   Filed 09/20/17   Page 6 of 87
USCA Case #14-1155   Document #1508610      Filed: 08/21/2014   Page 6 of 87

5

scope of the issues to be addressed on remand), *rev'd on other grounds*, No. 2009-3065 (Fed. Cir. 2010); *see also Sanchez v. Department of Justice*, 14 M.S.P.R. 79, 82 (1982) (the presiding official properly limited the scope of the hearing to those issues discussed in remand order, where the appellant was granted a fair opportunity on his initial appeal to present the issues he attempted to litigate at the remand hearing); *Banks v. Department of the Air Force*, 4 M.S.P.R. 268, 271 (1980) (the Board will not consider an argument raised for the first time in a petition for review absent a showing that it is based on new and material evidence not previously available despite the party's due diligence).

¶7       On remand, the appellant again alleged that the agency misled him by stating that he would have no right of appeal if the agency removed him. 0486-B, RF, Tab 20 at 18. However, he presented no evidence regarding this issue, which was the sole issue to be addressed on remand, and does not raise any such argument on review. The evidence in the record contradicts the appellant's claim that the agency misled him with respect to his potential appeal rights. The agency attorney who assisted in negotiating and drafting the settlement agreement,[4] a management official who represented the agency during negotiations, and the appellant's union representative who assisted the appellant during negotiations, all testified that: (1) they did not advise the appellant that he would not have appeal rights if he failed to sign the settlement agreement and the agency removed him; and (2) they were not aware of anyone at the agency who so informed the appellant. HCD, Track 3. The appellant's union representative testified that he informed the appellant that he (the appellant) could choose not to

---

[4] The administrative judge noted in the initial decision that, according to the agency's attorney, the parties continued discussing settlement even after they reached an impasse before an EEOC settlement judge in or around April 2011. RID at 8; *see* 0486-I, IAF, Tab 5. The appellant argues that no additional communication occurred until after the agency provided him with the proposed settlement agreement. 0486-B, RPFR File, Tab 12 at 5, 13. Assuming arguendo that the administrative judge misstated these facts, such an error would be irrelevant to the question of whether the agency provided the appellant with misinformation regarding his potential appeal rights.

sign the terms of the settlement agreement, "take[ ] the punishment" the agency selected, and then file a union grievance or an appeal with the Board. *Id.* Further, the union representative testified that he believed the appellant "knew exactly what he was signing." *Id.* We also note that, according to the union representative, he and the appellant jointly devised retirement as a possible settlement term, and this term was later proposed to the agency.[5] *Id.* The union representative's testimony is consistent with contemporaneous notes of the deciding official regarding a conversation she had with the appellant after the agency proposed his removal, wherein he stated that he was "willing to make any concession to remain employed until September 2012," when he would be "eligible to retire at 30 years." 0486-B, RF, Tab 21 at 12.

¶8        The administrative judge found the aforementioned witnesses' testimony credible, noting that: (1) all of the witnesses corroborated each other's testimony on every major point and their testimony was consistent in all material respects with the documentary evidence of record; (2) the witnesses' testimony at the hearing was straightforward, genuine and believable, and their demeanor gave no indication of dissembling; and (3) the appellant offered no plausible reason why these witnesses would fabricate their testimony. RID at 13. We must give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing, and may overturn such determinations only when there are "sufficiently sound" reasons for doing so. *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). We discern no basis to disturb the administrative judge's credibility determinations in this case. Based on the

---

[5] The appellant claims that he was unaware that the agency proposed settlement terms to his representative, that his representative did not provide him with any assistance, and that his representative did not propose any alternatives and informed him that he would be removed if he did not sign the settlement agreement. 0486-B, RPFR File, Tab 12 at 6. None of these arguments are relevant to the limited jurisdictional issue in this appeal.

foregoing, we find that the appellant has failed to establish that he detrimentally relied on misinformation regarding his potential appeal rights when entering into the settlement agreement and, therefore, that we lack jurisdiction over his appeal because the appellant validly waived his appeal rights therein.

¶9      The appellant alleges that the administrative judge committed several errors in adjudicating his appeal on remand, including: (1) failing to consider whether the agency proved its charges; (2) denying him discovery of documents from the deciding official regarding the proposed removal and her decision to sustain the charges, as well as other documents relating to "current & past misconduct" and "other causes for action against" him, and information regarding other employees' time and attendance; (3) denying his request for two witnesses—his first- and second-line supervisors—to testify regarding his time and attendance; and (4) exhibiting bias in favor of the agency and abusing his discretion by not sanctioning the agency for its failure to comply with the acknowledgement order and considering the agency's request to remove medical documentation from the record.  0486-B, RPFR File, Tab 12 at 5, 7-9.

¶10      The merits of the agency's charges are not at issue in this appeal because the appellant has not established the Board's jurisdiction over it.  *See Evans v. Department of Veterans Affairs*, 119 M.S.P.R. 257, ¶ 5 (2013) (the Board must first resolve the threshold issue of jurisdiction before proceeding to the merits of an appeal).  We therefore find that the administrative judge acted properly in not reaching, and in denying the appellant's discovery requests which all relate to, the merits of the agency's charges.[6]  Regarding the appellant's request to call his

---

[6] We also agree with the administrative judge that the appellant failed to comply with the Board's procedures regarding discovery, and that his discovery requests could therefore have been denied on that basis.  *See* 0486-B, RF, Tab 25 at 3.  In particular, the appellant submitted his discovery requests directly to the administrative judge, rather than to the agency.  *See* 0486-B, RF, Tab 8 at 3-4, Tab 14 at 3; *see also* 5 C.F.R. § 1201.71 (discovery requests and responses thereto are not to be filed in the first instance with the Board).

8

first- and second-line supervisors as witnesses, we note that the administrative judge did not deny this request, but rather, the appellant withdrew it. 0486-B, RF, Tab 22 at 5, Tab 25 at 2; *see* HCD, Track 1 (the appellant did not object to the prehearing conference summary, insofar as it stated that he withdrew his request for his first- and second-line supervisors to testify). In any event, testimony regarding the appellant's time and attendance is irrelevant as it relates to the merits of the agency's charges, so we discern no error or harm.[7] As to the appellant's assertion that the administrative judge was biased, he has not overcome the presumption of honesty and integrity that accompanies administrative adjudicators. *See Oliver v. Department of Transportation*, 1 M.S.P.R. 382, 386 (1980). The administrative judge stated below that he did not suggest to the agency's representative that he would delete any information from the appellant's pleadings and, moreover, "grant[ed] the appellant's motion to not delete any documents he submitted." 0486-I, IAF, Tab 26 at 3; *see* 0486-I, IAF, Tab 21 (the appellant's opposition to the agency's alleged request to have "all of the medical documents removed from [his] response file"). Further, even if the agency failed to submit documentation relating to the merits of its charges, the appellant has not suffered any harm because such information does not relate to the threshold issue of jurisdiction in this matter, and the administrative judge's decision not to sanction the agency for failing to produce irrelevant evidence does not establish bias.

---

[7] The appellant attaches evidence which he contends is new and was previously unavailable because he received it via a Freedom of Information Act request. 0486-B, RPFR File, Tab 12 at 6. Specifically, he submits time and attendance records for the time period when he was charged with receiving pay for time not worked in the proposal notice, and Standard Form 50s documenting his suspension, reassignment, and retirement pursuant to the settlement agreement, as well as various performance awards he has received. *Id.* at 6, 17-46. These documents are not material, as they have no bearing on the Board's jurisdiction over this appeal. *See Russo v. Veterans Administration*, 3 M.S.P.R. 345, 349 (1980) (alleged new evidence must be of sufficient weight to warrant an outcome different than that in the initial decision).

9

¶11     The appellant raises claims of discrimination on various bases under Title VII. 0486-B, RPFR File, Tab 12 at 4-5, 10, 13. As explained in our remand order, wherein we specifically addressed the appellant's claim that the proposed removal action was motivated by discriminatory animus, the Board may consider Title VII discrimination claims only after a finding of jurisdiction is made. 0486-I, PFR File, Tab 9 at 9-10 n.10; *see Cruz v. Department of the Navy*, 934 F.2d 1240, 1245 (Fed. Cir. 1991) (en banc). To the extent that the appellant is attempting to raise an affirmative defense, we clarify that the Board has no authority to consider affirmative defenses where it cannot hear an appeal on its merits because it lacks jurisdiction to do so. *See Martin v. Department of Defense*, 70 M.S.P.R. 653, 657 (1996). Moreover, contrary to the appellant's contention that he is entitled to mixed appeal rights, his appeal is not a mixed case because we lack jurisdiction over it. 0486-B, RPFR File, Tab 12 at 4; *see Conforto v. Merit Systems Protection Board*, 713 F.3d 1111, 1118 (Fed. Cir. 2013) (a case is mixed only if the Board has jurisdiction to decide the employee's appeal from the adverse action at issue); *see also Cunningham v. Department of the Army*, 119 M.S.P.R. 147, ¶¶ 8, 13-14 (2013) (providing notice of non-mixed appeal rights because although the appellant alleged that her termination was based on disability discrimination, she did not have the right to appeal her termination to the Board because she failed to make a nonfrivolous allegation of jurisdiction).

## NOTICE TO THE APPELLANT REGARDING
## YOUR FURTHER REVIEW RIGHTS

You have the right to request review of this final decision by the United States Court of Appeals for the Federal Circuit. You must submit your request to the court at the following address:

United States Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

10

The court must receive your request for review no later than 60 calendar days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11.

If you are interested in securing pro bono representation for your court appeal, you may visit our website at http://www.mspb.gov/probono for a list of attorneys who have expressed interest in providing pro bono representation for Merit Systems Protection Board appellants before the court. The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

FOR THE BOARD:                    _____
                                 William D. Spencer
                                 Clerk of the Board

Washington, D.C.

 **U.S. MERIT SYSTEMS PROTECTION BOARD**

**Office of the Clerk of the Board**
1615 M Street, N.W.
Washington, D.C. 20419-0002

Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

**July 23, 2014**

Notice to:

Anthony W. Perry
5907 Croom Station Road
Upper Marlboro, MD 20772

Re: Anthony W. Perry v. Department of Commerce
MSPB Docket Numbers:        DC-0752-12-0486-B-1
                            DC-0752-12-0487-B-1

The Board acknowledges your filing dated July 23, 2014 in which you request leave to file an additional pleading. The Board's regulations do not provide for pleadings other than a petition for review, a cross petition for review, a response to the petition for review or cross petition for review, and a reply to a response. 5 C.F.R. § 1201.114(a)(5). A description of these pleadings and the time limits for filing them are set forth in the Board's regulations. 5 C.F.R. § 1201.114(a), (e). For the Board to consider a party's pleading, other than one of those set forth above, the party must describe the nature and need for the pleading. 5 C.F.R. § 1201.114(a)(5). If a party wishes to submit a pleading after the record has closed, the party must also show that the evidence was not readily available before the record closed. 5 C.F.R. § 1201.114(a)(5), (k).

You will be informed at a later date of the Board's decision to grant or deny your request. If the Board grants your request, you will be given 10 days in which to submit your additional pleading to the Board. For more information about the Board's petition for review process, please review the Board's regulations at 5 C.F.R. § 1201.114 - 1201.120.

William D. Spencer
Clerk of the Board

_____

Dinh Chung
Case Management Specialist

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

Electronic Mail        Anthony W. Perry
                       5907 Croom Station Road
                       Upper Marlboro, MD 20772

<u>Agency Representative</u>

Electronic Mail        Tyree P. Ayers, Esq.
                       Department of Commerce
                       Department of Commerce
                       Legal Office
                       U.S. Census Bureau
                       4600 Silver Hill Road, 8H048
                       Washington, DC 20233

_____July 23, 2014_____        _____
          (Date)                        Dinh Chung
                                        Case Management Specialist

ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE
Docket # DC-0752-12-0486-B-1
Motion For Leave To File New Material and Relevant
Summary Page

**Case Title :** ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE

**Docket Number :** DC-0752-12-0486-B-1

**Pleading Title :** Motion For Leave To File New Material and Relevant

**Filer's Name :** Anthony W. Perry

**Filer's Pleading Role :** Appellant

**Details about the supporting documentation**

N/A

# Table of Contents

Pleading Interview ............................................................................................ 3
Certificate of Service ........................................................................................ 5

ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE
Docket # DC-0752-12-0486-B-1
Motion For Leave To File New Material and Relevant
Online Interview

1. Would you like to enter the text online or upload a file containing the pleading?

Enter Online

_____

2. Please enter text of your pleading.

On July 16, 2014, the House Committe on Science, Space, and Technology sent a letter to the U.S. Dept. of Commerce Inspector General, Todd Zinser, reprimanding him for not terminating the 2 top IG Officials who coerced other IG employees into a nondisclosure agreement.  In that letter, the House Committee included the results of the investigation of the use of the nondisclosure agreement to retaliate against Commerce IG whistleblowers.  As a result, the IG himself is under additional scrutiny and investigation of his past and current personnel practices including charges of retaliation against an employee in 1995-1996 and questionable hiring practices.  The nondisclosure agreement, retaliation, and hiring practices at the U.S. Census Bureau are part of my pending matter before MSPB.

This report of the investigation has just come to my attention as I read confidentiality was requested by the IG.  However, the report is now public.  The investigation by the Office of Special Counsel is clear about the use of gag agreements and have dictated corrective action.

This Pleading is a request to include this Material and Relevant information into the records of the pending case files Perry v. Commerce.

I have stated that the nondisclosure agreement imposed upon me is of the same Commerce template and the same scheme was used to impose on me.

This report by the OSC dated September 16, 2013 is material and relevant.  Additionally, whereas the Commerce Office of General Counsel testified that the Commerce IG Office did not submit the nondisclosure agreement to it for its signature, the Office of General Counsel did provide a signature concurring with the actions taken against me in the nondisclosure agreement with no evidence of misconduct.

_____

3. Does your pleading assert facts that you know from your personal knowledge?

No

# Certificate Of Service

e-Appeal has handled service of the assembled pleading to MSPB and all of the Parties.

Following is the list of the Parties in the case:

| Name & Address | Documents | Method of Service |
|---|---|---|
| MSPB: Office of the Clerk of the Board | Motion For Leave To File New Material and Relevant | e-Appeal / e-Mail |
| Tyree P. Ayers, Esq. Agency Representative | Motion For Leave To File New Material and Relevant | e-Appeal / e-Mail |

 **U.S. OFFICE OF SPECIAL COUNSEL**

Report of Prohibited Personnel Practices
OSC File Nos. MA-12-4640 and MA-13-1126

Investigation and Prosecution Division Attorney

Complaints Examining Unit Attorney

September 16, 2013

By providing this report to the Department of Commerce (Commerce) for the sole purpose of aiding its determination of whether to take corrective or disciplinary action, the U.S. Office of Special Counsel (OSC) does not waive any protections or privileges that may apply to information disclosed in the report or to the sources of that information. In addition, neither the report nor the information contained herein may be disclosed to any individual not deemed essential to the determination of whether to take corrective or disciplinary action, unless OSC consents in writing to such disclosure. Specifically, it is requested that Commerce not disseminate any information provided by OSC to the subject officials of this investigation to potential witnesses in any future litigation that may arise should this matter not be resolved informally. Moreover, if Commerce receives a Freedom of Information Act (FOIA) request to which this report is responsive, Commerce shall not release the report to the requester, but rather promptly advise OSC of the FOIA request and advise the FOIA requester that OSC will provide a reply with respect to the report. Please contact OSC immediately and return this report if Commerce objects in any way to these conditions. Questions regarding this paragraph should be directed to OSC's Office of General Counsel at (202) 254 – 3600.

## REPORT OF PROHIBITED PERSONNEL PRACTICES

### OSC CASE NOS. MA-12-4640 and MA-13-1126

### I.    INTRODUCTION

This Prohibited Personnel Practices Report (Report) contains the investigative findings in Office of Special Counsel (OSC)[1] File Nos. MA-12-4640 and MA-13-1126. These complaints were filed on behalf of two former Department of Commerce, Office of Inspector General (OIG) employees, hereafter referred to as John Doe 1 and John Doe 2, or collectively, the whistleblowers.[2] The complaints allege that the whistleblowers were coerced into signing separation agreements containing non-disparagement provisions preventing them from going to OSC, Congress, or the media in retaliation for their perceived whistleblowing and engagement in the Equal Employment Opportunity (EEO) process. OSC's investigation uncovered strong evidence of retaliation warranting corrective and disciplinary action.

Pursuant to 5 U.S.C. §§ 1214 and 1215, OSC is charged with independently investigating prohibited personnel practice (PPP) retaliation cases and, if warranted, seeking appropriate corrective and disciplinary action. This investigation concerns three types of PPPs: whistleblower retaliation (5 U.S.C. § 2302(b)(8)), retaliation for the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation (5 U.S.C. § 2302(b)(9)), and taking a personnel action in violation of a law, rule, or regulation implementing a merit system principle (5 U.S.C. § 2302(b)(12)) (collectively, protected activity). The non-disparagement provisions at issue essentially functioned as "gag clauses" which prevented the whistleblowers from making protected disclosures to OSC, Members of Congress, or the media. The use of gag clauses to chill employees from engaging in further whistleblowing runs directly counter to the purpose and intent of the Whistleblower Protection Act. While the Department of Commerce, at OSC's request, ensured that going forward the gag provisions would not be enforced, the willful retaliation in this case warrants additional action to discipline the wrongdoers and to deter future retaliation. Agency officials must be held accountable for committing PPPs, especially retaliation for engaging in protected activity.

This Report summarizes OSC's investigative and legal findings in these cases. OSC provides this Report to assist the Department of Commerce and the Department of Commerce OIG in determining the appropriate corrective and disciplinary action in these matters. OSC is not waiving any protections or privileges that may apply to the information included in this Report or the sources of that information.

---

[1] OSC investigates allegations of prohibited personnel practices and is authorized to seek corrective action from the Merit Systems Protection Board to remedy abuses of the merit system, and to initiate disciplinary action against civilian government officials who commit prohibited personnel practices. In establishing OSC, Congress emphasized OSC's mandate to protect whistleblowers. S. Rep. 95-969, at 24 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2746.

[2] John Doe 1 filed the complaint identified as OSC File No. MA-13-1126. John Doe 2 is considered a primary witness in this investigation. Due to the sensitivity of these cases, John Doe 1 and John Doe 2 have requested that they not be identified by name in this report.

The evidence demonstrates that the whistleblowers were coerced into signing the separation agreements at the heart of this case. Moreover, the record shows that OIG management knew that both employees had engaged in protected activity, and several witnesses described the employees as "perceived whistleblowers" who were trying "to report the abuse" within the OIG.

The two primary management officials involved in the separation agreements were Richard C. ("Rick") Beitel, Principal Assistant Inspector General for Investigation and Whistleblower Protection (PAIGI), and Wade Green, Chief Counsel to the OIG. PAIGI Beitel and Mr. Green engaged in retaliatory acts after being informed that the whistleblowers had obtained new positions outside of the OIG. In short, Wade Green and PAIGI Beitel worked together to ensure that the whistleblowers would leave the OIG on Mr. Green's and PAIGI Beitel's terms—quietly and with no recourse to make protected disclosures about the OIG. After the whistleblowers found jobs at other federal agencies, PAIGI Beitel drafted unfounded, failing performance appraisals as leverage to get the employees to sign separation agreements. While there were numerous departing OIG employees in 2011, only the whistleblowers were issued failing interim appraisals or presented with separation agreements containing non-disparagement clauses, indicating that these actions were taken because of protected activity and/or perceived whistleblowing.

Mr. Green drafted the separation agreements and negotiated the gag clauses. OIG management used its authority, including the threat of failing performance ratings and delayed release dates, to effect these separation agreements. In return, the employees gave up their right to make disclosures to OSC, Congress, or the media and they withdrew their pending EEO complaints and/or Freedom of Information Act (FOIA) requests. The whistleblowers would not have signed such agreements if not for the retaliatory and coercive acts by management.

Section II sets forth the relevant facts OSC gathered in its investigation. Section III provides a legal analysis of the alleged PPPs in this matter. Section IV sets forth OSC's recommendations regarding the respective culpability of the two subject officials. Finally, Section V concludes this report.

## II.    SUMMARY OF RELEVANT FACTS

### A. Background

Todd Zinser was appointed Inspector General (IG) of the Department of Commerce (Commerce) on December 26, 2007, following Senate confirmation. His appointment succeeded Johnny Frasier, who resigned from the position after concerns of fiscal improprieties and whistleblower reprisal were raised by Congress and OSC.

Prior to IG Zinser's arrival, the OIG was fragmented between employees who supported IG Frasier and those who were involved in the investigations concerning his alleged wrongdoing. Several members of IG Frasier's senior staff, including his Chief

Counsel and Assistant Inspector General for Investigations (AIGI), left the OIG within the first two years of IG Zinser's tenure.

IG Zinser filled several of the OIG Senior Executive Service (SES) positions with former colleagues from the Department of Transportation, Office of Inspector General (DOT OIG), where he was employed from 1991 to 2007. Because these selections involved unusual circumstances and were effected with little transparency, many OIG employees and witnesses in OSC's investigation believed the selections violated the merit system principles. One of these selections was the hiring of Rick Beitel in October 2009 for a temporary detail from DOT OIG, and his later selection for the Principal Assistant Inspector General for Investigation and Whistleblower Protection (PAIGI) position in or around June 2010.[3]

## B.  Protected Activity and Adverse Actions

This section provides the significant facts relating to the reprisal allegations, arranged in approximate chronological order.

### I.  *Protected Activity*

#### a.  *John Doe 1*

##### 1.  *EEO:*

John Doe 1 filed an EEO complaint with ███████████████████████████████████████████████ on or around June 14, 2011. In his complaint, he alleged discrimination based on age and disability. ████████ forwarded a summary of John Doe 1's allegations to IG Zinser, ████████ PAIGI Beitel, and Mr. Green on or around June 30, 2011. In her e-mail, she explained that John Doe 1 was in the "informal or pre-complaint" EEO process.

On July 1, 2011, Mr. Green forwarded ████████ June 30, 2011, e-mail to IG Zinser, ████████ and PAIGI Beitel. He asked them to review John Doe 1's complaint and to provide him with their recollection of events so that he could formulate a response on behalf of the OIG.[4]

---

[3] Rick Beitel accepted a detail to Commerce OIG, in part because of an ongoing EEO complaint filed against him at the DOT OIG. During PAIGI Beitel's detail, IG Zinser petitioned OPM for another SES position. The request claimed that PAIGI Beitel would create a whistleblower protection division for the OIG. From 2009 to the present, no designated staff has been hired for whistleblower protection, and these duties are collateral to PAIGI Beitel's function as the PAIGI. Nevertheless, the hiring was a non-competitive transfer, and OSC did not find that this selection violated any of the PPPs.

[4] It is unusual for an agency to provide a written response at the informal stage of the EEO process.

4

████████ testified that IG Zinser "made disparaging comments" about John Doe 1 filing an EEO complaint and that he believed that IG Zinser was "angry" that John Doe 1 filed the complaint. PAIGI Beitel testified that "there was mutual consensus that the complaint had no merit." Filing an EEO complaint is protected activity under 5 U.S.C. § 2302(b)(9).

### 2. *FOIA Request*:

On August 9, 2011, John Doe 1 submitted a FOIA request to Mr. Green. In his request, John Doe 1 asked for copies of all documents relating to the hire of an independent computer forensics firm, which was tasked with identifying and searching the e-mail files of OIG employees in June or July 2011. John Doe 1 was concerned that the forensics firm was hired through a sole-source contract and believed that responsive documents to his FOIA request would potentially implicate IG Zinser, ████████ PAIGI Beitel, and/or Mr. Green in Federal Acquisition Regulation (FAR) violations or violations of other laws, rules, or regulations.

### b. *John Doe 2*

### 1. *EEO*:

In or around June 2011, John Doe 2 drafted an EEO complaint alleging discrimination based on age, race, and veteran status. In the draft complaint, he reported "a pattern of abusive conduct and hostile management practices directed towards [him] and other OI [Office of Investigation] managers." He specifically discussed hiring improprieties, mismanagement of PAIGI Beitel's Office of Special Investigations (OSI), and concerns about a firearms investigation.

Although John Doe 2 did not file his EEO complaint, Mr. Green testified that he knew that John Doe 2 "had an informal [EEO complaint] ... if not, he had a threatened one, I think." ████████ additionally testified that he discussed a draft complaint with IG Zinser, Mr. Green, and possibly PAIGI Beitel. He was unsure if it was an EEO complaint or a complaint to the Council of the Inspectors General on Integrity and Efficiency (CIGIE).

### 2. *FOIA Request*:

John Doe 2 submitted a document request in or around July 2011 for documents related to an acquisition of MP5 fully-automatic submachine guns (MP5) and the OIG's Special Purpose Firearms (SPF) policy. The OIG Office of Counsel (OC) refused to comply with this request. The following month, through his attorney, John Doe 2 submitted a FOIA request for these documents, including various drafts of the SPF policy and e-mail communications between himself and several OIG supervisors and attorneys related to the drafting and supervisory/counsel review process for that policy. John Doe 2 requested documents that he believed would show that he did not unilaterally change the SPF policy to circumvent the prior OIG approval process. John Doe 2 testified that

he submitted the draft SPF policy to counsel in 2009 for review. John Doe 2 believed that it was an abuse of authority by OIG management to hold him responsible for changes to the SPF policy that were reviewed by OIG counsel and more senior OIG management officials, and that the requested documents would support this belief.

### 3. *Draft CIGIE Complaint:*

In or around May 2011, John Doe 2 drafted a CIGIE complaint and provided a copy to several co-workers for their review and comment. The complaint concerned his belief that IG Zinser, Mr. Green, PAIGI Beitel, and ▆▆▆▆▆ were "engaged in a pattern of abusive conduct toward employees, favoritism and prohibited personnel practices in the discipline, hiring and selection of managers and other employees." Although this complaint was never submitted to CIGIE, ▆▆▆▆▆ testified that he discussed John Doe 2's draft EEO complaint or draft CIGIE complaint with IG Zinser, Mr. Green, and possibly PAIGI Beitel.

### c. *John Doe 1 and John Doe 2 were Perceived Whistleblowers*

John Doe 1's and John Doe 2's participation in the above activities led to the perception that they were whistleblowers. When asked whether he/she would describe John Doe 1 and John Doe 2 as perceived whistleblowers, a witness responded, "[Y]eah absolutely, yeah." The witness further testified that "everybody knew … that there were all kinds of different avenues that they [John Doe 1 and John Doe 2] were trying to go down to report the abuse." The witness noted that these avenues included EEO complaints. The witness testified that he/she believed that PAIGI Beitel and others "went apoplectic" when John Doe 1 filed a FOIA request based on the office atmosphere the day the FOIA request was filed. ▆▆▆▆▆ a Senior Analyst with the OIG, also testified that he would describe John Doe 1 and John Doe 2 as perceived whistleblowers and that non-disparagement language was added to their separation agreements to keep them quiet.

### 2. *PAIGI Beitel and Wade Green Refused to Provide Timely Release Dates to the Whistleblowers*

John Doe 1 and John Doe 2 both accepted positions outside of the OIG in August 2011. ▆▆▆▆▆ OIG Senior Human Resources (HR) Specialist, e-mailed PAIGI Beitel on August 12, 2011, concerning John Doe 1's acceptance of a position at another federal agency. In his e-mail, he told PAIGI Beitel that the agency had requested an August 28, 2011, release date, and asked if PAIGI Beitel approved the release date or wanted to counter with a different date. PAIGI Beitel forwarded ▆▆▆▆▆ e-mail to IG Zinser, ▆▆▆▆▆▆▆▆▆ Assistant Inspector General for Administration (AIG), and Mr. Green later that day. Mr. Green immediately responded that OIG "invokes our 30 day right."

6

Several days later, on August 15, 2011, PAIGI Beitel e-mailed John Doe 1's first-level and second-level supervisors,  to inform them that John Doe 1 had accepted a position with another federal agency and that he would be "coordinating with HR and OC on the release date; same with John Doe 2." ███████████ responded that he had already spoken with John Doe 1 and ███████████ OIG HR Specialist, and had approved John Doe 1's request for an August 27, 2011, release date based on John Doe 1's minimal workload. PAIGI Beitel then replied that he "just asked ████ to hold off for the time being pending internal coordination." PAIGI Beitel later forwarded the e-mail chain to ███████████ supervisor.

███████████ counseled ███████████ for providing John Doe 1 with a release date before obtaining PAIGI Beitel's approval. In her August 15, 2011, e-mail to AIG Leiphart, ███████████ explained that ███████████ had approved the August 27, 2011, release date, and that she was used to "calling the immediate supervisor for the release date." She additionally testified that, prior to John Doe 1, the release date process did not require SES approval or involvement.

On August 29, 2011, ███████████ e-mailed her staff, including ███████████ and ███████████ that "[i]f John Doe 2 gets a release date, HR staff needs to let Wade Green know ASAP before proceeding with further action."

███████████ testified that she was relaying requests from the front office and that she assumed that they were considering some sort of action if OC was involved. However, other OIG employees being investigated by OC were given release dates without SES interference.

In fact, another OI supervisor was being investigated by OC for alleged Government Owned Vehicle (GOV) violations. This supervisor did not engage in any protected activity or make protected disclosures. His release date was not delayed by Mr. Green or PAIGI Beitel. The OC was also investigating an OI Special Agent for her alleged role in the acquisition of Glock handguns and shotguns. This employee did not engage in protected activity or make protected disclosures. Her release date was not delayed by Mr. Green or PAIGI Beitel

### 3. *The Whistleblowers Were Issued Failing Interim Performance Appraisals*

On August 24, 2011, almost two weeks after John Doe 1 informed the OIG that he had obtained a new position, PAIGI Beitel presented John Doe 1 with a failing interim performance appraisal. The regular performance cycle ended on September 30, 2011. PAIGI Beitel rated John Doe 1 as a "Level 1" performer, with a total score of 115/500 points.

The following month, again weeks after John Doe 2 informed the OIG that he had obtained new employment, PAIGI Beitel gave him a failing interim performance

---
[5] ███████████████████

appraisal.  He was also rated a "Level 1" performer with a total score of 100/500 points.
Unacceptable performance, such as a "Level 1" rating can be cause for removal under
5 C.F.R. Part 752 or placement on a Performance Improvement Plan (PIP) under 5 C.F.R.
Part 432.

The evidence indicated that in 2011, despite the high number of departing
employees, only the whistleblowers were issued failing interim appraisals.  In fact, no
other departing employee received any appraisal at all, much less a career-threatening
failing appraisal.  Thus, issuing a rating to a departing employee outside of the regular
rating cycle was highly unusual.  As noted in section "c." below, PAIGI Beitel, who was
aware of the whistleblowers protected activity, acknowledged that he was primarily
responsible for coming up with the idea to issue failing interim ratings to the
whistleblowers.

    *a.*   *2011 Interim Failing Rating is Unfounded*

    *1.*   *Summary Rating Narratives Did Not Accurately Describe Whistleblowers'*
         *Performance for the 2010 – 2011 Performance Period*

    a.  <u>John Doe 1</u>:

In the interim failing appraisal, in his summary rating narrative for John Doe 1,
PAIGI Beitel discussed alleged performance deficiencies that occurred "in the current
and previous rating periods."  The majority of these alleged deficiencies involved John
Doe 1's failure to timely close four investigations.  PAIGI Beitel stated that John Doe 1
kept these cases open "during current and previous rating periods" to justify his "robust
staffing level and/or to avoid scrutiny from the upcoming CIGIE peer review."  Even
though John Doe 1 credibly denied that this was his intention, PAIGI Beitel included his
theory in John Doe 1's appraisal. .

PAIGI Beitel also cited John Doe 1's failure to "properly use OIG's authorized
system of records for case management (IG CIRTS)."  However, PAIGI Beitel knew that
John Doe 1's unit's primary focus was providing assistance to open investigations and
that IG CIRTS was not used to track investigation support.  In fact, PAIGI Beitel directly
received John Doe 1's weekly spreadsheet of work performed. This spreadsheet was
created to track his work in lieu of IG CIRTS.  PAIGI Beitel also cited John Doe 1 for not
providing his spreadsheet to OC for legal review.  However, PAIGI Beitel never
instructed John Doe 1 to submit his spreadsheet to OC prior to his August 24, 2011,
interim rating, even though he had received a copy of the weekly spreadsheet for several
months.

Finally, PAIGI Beitel held John Doe 1 responsible for not being timely placed on a
performance plan.  He stated, "[I]f [John Doe 1] thought he was not on an approved plan,
he should have asked his former supervisor to provide an approved plan and elevated the
issue within OIG as necessary."  The evidence indicates that John Doe 1 notified his
previous supervisor, ▓▓▓▓▓▓▓▓ on several occasions that he was not on an

8

approved performance plan, and reported to [redacted] on May 26, 2011, that he did not believe he was on a "signed plan despite asking for one several times." He further noted that, although he was not on an approved plan, [redacted] did give him a signed mid-year review. John Doe 1 forwarded this e-mail chain to PAIGI Beitel later that day, prior to PAIGI Beitel citing the lack of an approved performance plan as a basis for the failing interim appraisal.

Collectively, the evidence does not support any of the cited bases for the retaliatory interim appraisal issued to John Doe 1 after his announced departure from the OIG.

   b. *John Doe 2*:

PAIGI Beitel similarly discussed alleged performance deficiencies that occurred outside of the performance period in his summary rating narrative for John Doe 2. His narrative concentrated on three areas: (1) the CIGIE peer review; (2) OIG policies; and (3) the acquisition of MP5 fully automatic submachine guns (MP5s).

Specifically, PAIGI Beitel held John Doe 2 responsible for his alleged failure to track recommendations from the 2008 CIGIE peer review. PAIGI Beitel wrote that John Doe 2 was "shirking what clearly were his responsibilities," even though the record demonstrates that OIG senior management never informed John Doe 2 that he was expected to track these recommendations. Accordingly, John Doe 2 was held responsible in a 2011 interim performance appraisal for a duty that he was never instructed to perform and that was not included in his performance plan in any year following the 2008 CIGIE peer review. Moreover, since PAIGI Beitel contended that John Doe 2 should have performed these tracking functions beginning in 2008, the majority of these alleged violations occurred outside of the 2010-2011 performance period, and should have not been included in the interim appraisal.

PAIGI Beitel further claimed that John Doe 2's Quality Assurance Review (QAR) report, drafted in preparation for the 2011 peer review, was deficient because it stated that OIG was "fully compliant" on several QAR entries without providing qualifying notations. When John Doe 2 was questioned about these entries, the record indicates that he agreed to provide qualifying notations. [redacted] a former Department of Justice SAC hired by OIG on a temporary basis to prepare for the 2011 peer review, testified that John Doe's QAR had identified deficiencies, but that the real problem was lack of direction from OIG management.

In addition, the interim failing performance appraisal cited John Doe 2 for failing to accurately report an OIG recovery. However, the recovery took place in a previous performance period, and John Doe 2's prior performance appraisals, which occurred prior to his protected activity, did not address this issue. The interim failing performance appraisal cited John Doe 2 for not conducting a revision of the OIG's Government Owned Vehicle (GOV) policy. The record indicates that he was never tasked with conducting such a revision by his chain of command, and PAIGI expected the revisions to be done *sua sponte* by John Doe 2.

PAIGI Beitel concentrated most of his critique in the failing interim appraisal on John Doe 2's role in the OIG's acquisition of MP5s and his revision of OIG policy related to that acquisition. Specifically, PAIGI Beitel cited John Doe 2 for acquiring the MP5s without IG approval, and for deleting the requirement for IG approval from the OIG policy. However, the evidence indicates that OIG management was aware that John Doe 2 informed his first-level supervisor about the acquisition, and thus reasonably assumed that his management appropriately notified IG Zinser. PAIGI Beitel attributed all responsibility for the MP5 acquisition and policy change to John Doe 2, even though several other employees were involved. In what became a highly charged matter in the OIG, the lowest level employee involved was held accountable in an interim failing appraisal for an issue that other managers knew of and for which they held greater responsibility. Finally, both of these events occurred in 2009, well outside of the 2010-2011 performance period.

Collectively, the evidence does not support any of the cited bases for the retaliatory, interim appraisal issued to John Doe 2 after his announced departure from the OIG.

### c. Rick Beitel was Primarily Responsible for Interim Performance Appraisals

Although ▮▮▮▮▮▮ signed the whistleblowers' interim performance appraisals, the weight of the evidence shows that PAIGI Beitel was primarily responsible for drafting and issuing the interim appraisals. ▮▮▮▮▮▮ testified that PAIGI Beitel wrote the interim appraisals. Although he did not disagree with PAIGI Beitel's assessment of the whistleblowers' performance, he felt the ratings were "harsh." He further testified that he signed the appraisals as the approving official, and believed that, as the approving official, his role was to defer to the rating official's judgment. He testified that he "recognized that he had little to no power or authority to do anything" concerning the treatment of the whistleblowers, and that he was "actively looking for another job." ▮▮▮▮▮▮ additionally testified that, in retrospect, he felt he could have "come out stronger" in disagreeing with PAIGI Beitel's interim performance ratings for the whistleblowers.

PAIGI Beitel testified that both he and ▮▮▮▮▮▮ felt that the interim appraisals were appropriate, and that the issuance of the appraisals was "our idea, but I certainly take a measure of ownership of that." He further testified that "it was a decision obviously that I made ... you know, I prepared it, signed it."

### 2. The Summary Rating Narratives are not Based on the Whistleblowers' Performance During the 2010-2011 Performance Period

The Code of Federal Regulations provides that "a rating of record shall be based only on the evaluation of actual job performance for the designated appraisal period." *See* 5 C.F.R. § 430.208(a)(1). As mentioned above, the majority of the whistleblowers' alleged performance issues cited in PAIGI Beitel's summary narratives occurred outside of the 2010-2011 appraisal period. All of the cited cases in his summary narrative for

10

John Doe 1 were investigated and resolved during prior appraisal periods – some as early as 2006 – and were not reviewed and rated during those periods, prior to John Doe 1's protected activity.  Similarly, many of the issues raised in PAIGI Beitel's summary narrative for John Doe 2 occurred in previous rating periods, including the MP5 acquisition and associated policy change, and were not reviewed and rated during those periods and prior to John Doe 2's protected activity.

A key witness familiar with the OIG rating process testified that OIG senior staff "constantly do performance appraisals for things that happen outside of the performance period ... particularly during this period when they're trying to nail people on stuff."  The witness further testified that PAIGI Beitel did so in an effort to discourage employees from reapplying to the OIG or to deter legal action.  The witness testified that PAIGI Beitel specifically told him/her that he would "write this really negative appraisal and we'll put it in our drop file so that ... if anything happens where [the employee] sues us or whatever the case may be, we can bring [it] out."  OSC found this witness highly credible.

3.   *There Was No Legitimate Basis to Issue the Whistleblowers Interim Performance Appraisals*

Although one witness estimated a seventy percent OIG employee attrition rate from May 2011 to December 2012, of the departing employees only the whistleblowers were given "interim" or "close-out" performance appraisals.  PAIGI Beitel testified that he and ▮▮▮▮▮▮ decided to write interim performance appraisals for the whistleblowers because the Office of Personnel Management (OPM) OIG peer review team was coming in and there were a "number of deficiencies that the various OIG senior management, senior leadership reviews had disclosed and identified" and that it was "something that we needed to memorialize appropriately."

This testimony appears disingenuous because several employees, including one manager, who were also described as poor performers were not given interim appraisals when they left OIG.  More significantly, PAIGI Beitel drafted John Doe 1's and John Doe 2's failing performance appraisals *after* they gave notice that they were leaving the OIG.  If there were legitimate concerns about the whistleblowers' performance, PAIGI Beitel and/or ▮▮▮▮▮ should have addressed these deficiencies when they occurred, and/or should have taken steps to place John Doe 1 and John Doe 2 on PIPs.  Moreover, since interim appraisals are not typically included in employees' Official Personnel Folders (OPFs), providing John Doe 1 and John Doe 2 with interim appraisals would not effectively warn new employers of their alleged performance deficiencies.

4.   *The Whistleblowers Have Historically Been – and Currently Are – Highly Rated Federal Employees*

For the majority of their extensive government careers, the whistleblowers have received the highest numerical rating, "Level 5," or "Outstanding" performance reviews.  John Doe 1 was consistently rated 500/500 – the highest rating possible under the OIG's

performance system. Under ▓▓▓▓▓ John Doe 1's and John Doe 2's ratings dropped slightly, but never below a "Fully Successful" level.

Before departing the OIG in or around May 2011, ▓▓▓▓▓ provided the whistleblowers and his other subordinates mid-year progress reviews. On April 26, 2011, ▓▓▓▓▓ rated John Doe 1 as performing at Level 3 or higher on all critical elements, providing that he was performing his assigned duties well. ▓▓▓▓▓ provided John Doe 2 with a mid-year progress review on or around April 26, 2011, also rating him as performing at Level 3 or higher on all critical elements. These mid-year progress reviews were issued only four months before PAIGI Beitel's interim appraisals, and prior to the whistleblowers' protected activity. PAIGI Beitel asserted that he did not endorse ▓▓▓▓▓ reviews, but provided no credible basis for issuing the interim appraisals to the whistleblowers and no other departing OIG employees.

Since leaving OIG for other federal agencies, the whistleblowers have been again rated as "Level 5" or "Outstanding" employees, and have received 500/500 total performance points.

### 4. *The Whistleblowers Executed Separation Agreements in Order to Leave the OIG with Clean Performance Records*

Mr. Green placed undue pressure on the whistleblowers to sign separation agreements before they could be released from their OIG positions. Even though numerous employees left the OIG for positions with other federal agencies during this timeframe, the whistleblowers were the only OIG employees presented with separation agreements[6] and were coerced into signing the agreements under the threat of interim failing performance appraisals.

The separation agreements, which Mr. Green and his staff drafted, reviewed, edited, and negotiated , required John Doe 1 and John Doe 2 to withdraw their FOIA requests and John Doe 1's EEO complaint and to agree to release their rights to future administrative relief before the EEO, Merit Systems Protection Board (Board), and Congress. The separation agreements additionally contained the non-disparagement provisions/gag clauses at issue. These provisions provided that John Doe 1 and John Doe 2 could not:

> [D]isparage the Agency in any communications to any person or entity, including but not limited to Members of Congress and their staff, the **Office of Special Counsel**, and the media. However, nothing in this Agreement shall prevent, prohibit or impair [John Doe 1 and John Doe 2] from responding truthfully to direct questions posed to him in writing or in the course of a formal hearing before any legislative, executive, or judicial body. (Emphasis added).

---

[6] An OC employee, Employee X, executed a 'settlement agreement' containing similar non-disparagement language in 2011. A discussion of this agreement is located on page 14 of this Report.

In exchange for withdrawing their EEO complaints and/or FOIA requests, releasing their rights for any future administrative relief, and waiving their rights to contact Members of Congress and/or the media or file complaints with OSC, John Doe 1 and John Doe 2 received release dates to leave the OIG and guarantees that their new agencies would not see their failing interim performance appraisals. PAIGI Beitel and Mr. Green made it clear that if they did not execute separation agreements, their new agencies would be provided with copies of the failing interim appraisals, which could potentially devastate their careers as federal employees.

a.  *The Non-Disparagement Provisions Prevented the Whistleblowers From Making Protected Disclosures to OSC, Congress, or the Media*

Both John Doe 1 and John Doe 2 testified that they interpreted the non-disparagement provisions in their separation agreements as prohibiting them from filing complaints with OSC, Congress, or the media. John Doe 1 testified that his separation agreement "says that I'm not allowed to file any complaints or anything like this." As reason for not filing a complaint with OSC, he testified, "even though I firmly believe that I had grounds to do so, [I didn't file a complaint] because I believe and I still, and I still do to some extent, that my hands are tied and I could not come to [OSC] and file a complaint because of that stupid separation agreement." John Doe 2 testified that "the day I went in to sign that separation agreement I had never been more scared in my life." He explained that he believed the separation agreement prevented him from filing complaints and that "it wasn't worth the risk of bringing [complaints to OSC or Congress]... I just saw them coming after me."

Wade Green testified that the non-disparagement provisions did not interfere with the employees' whistleblowing rights because those rights are something that "everybody knows you have and that can't be interfered with." He further testified that disparagement is "different from whistleblowing," because it is "about truthfulness, veracity," and stated that this definition of disparage is "common in the IG community." Mr. Green did not define disparage in the separation agreements, however, and made no effort to explain to John Doe 1, John Doe 2, or their respective counsels, that it was not the OIG's intention to prevent them from blowing the whistle.

In contrast, the evidence indicates that Mr. Green intended to prevent the whistleblowers from contacting Congress or the media, or from filing complaints with OSC. Mr. Green's stated understanding of the scope of the non-disparagement language is not supported by the text of the provision when read in its entirety. The second half of the non-disparagement provision, states:

> *However, nothing in this Agreement shall prevent, prohibit or impair [John Doe 1 and John Doe 2] from responding truthfully to direct questions posed to him in writing or in the course of a formal hearing before any legislative, executive, or judicial body.*

13

This section carves out instances when John Doe 1 and John Doe 2 would be allowed to contact Congress, OSC, or the media under the terms of the agreement. By specifically listing parameters for permissible contact with these bodies, it indicates that all other contact, including making protected disclosures, is prohibited under the agreement.

Second, Mr. Green provided no evidence to suggest that his stated definition of "disparage" was commonly used within the OIG, or necessary to include in the whistleblowers' separation agreements. In fact, a former OC employee directly contradicted the definition put forth by Mr. Green, testifying that "disparage" is a "negative statement" that "does not have to be false." Moreover, Mr. Green offered no credible basis to conclude that either John Doe 1 or John Doe 2 had made any false accusations against the OIG. To the contrary, witnesses consistently described the whistleblowers as men of integrity. Mr. Green presented no evidence suggesting a need to insert the non-disparagement provision into the agreement, even if it was limited to untrue statements.[7] In contrast, as described above, the whistleblowers had engaged in protected activity. The weight of the evidence suggests that Mr. Green's intent was to prohibit further protected activity, rather than inaccurate statements.

Third, the non-disparagement provision was extremely important to Mr. Green. Indeed, the evidence shows that he insisted that the non-disparagement provisions remain in the separation agreements. The non-disparagement language was initially drafted for use in a settlement agreement between the OIG and another employee who engaged in protected activity (Employee X).[8] This agreement was negotiated between Mr. Green and Employee X's attorney. Employee X's attorney removed the non-disparagement language twice, and both times, Mr. Green reinserted it. Mr. Green testified that he "certainly put [the non-disparagement provision] in there" and "probably required that it stay in there as a negotiation point." Significantly, Mr. Green also removed a provision drafted by Employee X's attorney, which would have allowed for his client "to file an EEO or Special Counsel complaint." Accordingly, the weight of the evidence suggests that the scope of the agreement precluded protected activity, such as an EEO or Special Counsel complaint, and not only untruthful statements.

Finally, Mr. Green demonstrated a motive to chill protected communications by whistleblowers. To illustrate, in an e-mail to ▆▆▆▆ dated November 17, 2010, Mr.

---

[7] It is worth noting that under 5 U.S.C. § 2302(b)(8), a disclosure does not need to be accurate in order to be protected. This subsection of the statute provides that, for a disclosure to be protected, an employee or applicant must "reasonably believe" that he or she is disclosing a violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. Accordingly, a false or incorrect disclosure could be protected if the employee or applicant had a reasonable belief that the disclosure was true, based on their professional opinion or experience. Therefore, even if "disparage" is defined as a false, untruthful or inaccurate statement, the non-disparagement provisions in the whistleblowers' separation agreements would still prevent them from making lawful protected disclosures to OSC and others.

[8] This settlement agreement is not specifically discussed herein because it differs greatly from those in the separation agreements at issue. For example, Employee X agreed to a $25,000 buy-out payment and was allowed to retire early with a clean record. In addition, the OIG produced substantial evidence going back several years that Employee X had legitimate performance problems.

Green stated the importance of protecting IG Zinser's and the OIG's reputations, and provided advice on how to manage OI employees. He told █████████

> *If there is one thing you can fix in your first year it would be to improve how OI plays with others. It would be one thing if they just self-destructed—but it won't be that clean. When they hit that wall at 100 MPH it will splash on [Todd Zinser] the OIG as an agency, and all our reputations—and we never would have had an opportunity to stop or mitigate the damage because we have no visibility into OI. It is my job to safeguard the Client from these events—and I will.*

The evidence indicates that Mr. Green inserted non-disparagement provisions into the whistleblowers' separation agreements because, as OI employees, he was concerned that they would damage IG Zinser's reputation, his reputation, and the OIG.

b. *The Whistleblowers Were Given Separation Agreements Because They Engaged in Protected Activity*

Three OI managers were identified as having performance deficiencies in 2011. Each of these managers was being investigated by the OC for alleged violations of the SPF and/or GOV policies. Nevertheless, only two managers—John Doe 1 and John Doe 2— engaged in protected activity. Unlike the whistleblowers, the third manager, who did not engage in protected activity or whistleblowing, was not required to execute a separation agreement containing a non-disparagement provision and was not given a failing interim performance appraisal before his departure from the agency. Because all three of these managers had alleged performance issues and were being investigated for purported infractions, the only difference between them was that the third manager was not a perceived whistleblower and did not engage in any protected activity.

The fact that the non-disparagement provisions specifically list Congress, the media, and OSC, further shows that Mr. Green intended to prevent John Doe 1 and John Doe 2 from whistleblowing. In addition to an OIG, the main avenues for federal employees to make protected disclosures are through OSC, Congress, or the media. By preventing the whistleblowers from initiating contact with these bodies, it appears that Mr. Green intended to interfere with the whistleblowers' ability to make disclosures against the OIG.

c. *PAIGI Beitel and Wade Green Appear to Have Coordinated on the Provisions of the Separation Agreements*

PAIGI Beitel provided John Doe 1 with John Doe 1's failing interim performance appraisal on August 24, 2011, the same day that Mr. Green presented him with the separation agreement. As discussed above, PAIGI Beitel decided to give John Doe 1 an interim performance appraisal after he learned that John Doe 1 had accepted a position with another federal agency. PAIGI Beitel presented John Doe 2 with his failing interim

performance appraisal on September 16, 2011, the same day that John Doe 2 left the OIG for a position with another agency.

Section 3 of John Doe 1's separation agreement provides that, in consideration for agreeing to the non-disparagement provision and allowing the OIG to advertise to fill his position, the OIG agrees "to refrain from placing any copies of the close out appraisal completed upon [John Doe 1's] separation from the OIG in his Official Personnel File." The OIG further agreed to "effectuate [John Doe 1's] transfer from his position in OIG on August 28, 2011 to permit him to enter onto duty in a new federal position on that day." Without these provisions, John Doe 1 would have little to no incentive to sign the separation agreement.

John Doe 2's separation agreement, executed on September 6, 2011, mirrored John Doe 1's. Like John Doe 1, John Doe 2 agreed to the non-disparagement provision in exchange for an earlier release date and a guarantee that the OIG would not take adverse action against him. John Doe 2's agreement also contained an additional term in Section (3)(d), that the OIG would "reflect that any transfer by [John Doe 2] from the Agency to another agency will be reflected as voluntary and for personal reasons and to process all relevant personnel actions so that [John Doe 2's] transfer out of the Agency is reflected as 'voluntary and for personal reasons' or its equivalent." Although John Doe 2 received his failing interim appraisal after he had executed his separation agreement, these terms reveal PAIGI Beitel's and Mr. Green's intention to take action against John Doe 2 if he refused to sign the agreement. These actions could not be taken without coordination between Mr. Green and PAIGI Beitel.

PAIGI Beitel denied coordination between himself and Mr. Green. However, he testified, "OC and Wade knew that we were ... planning to do these appraisals," and that "[the appraisals] went through our Office of Counsel" for review and comment. PAIGI Beitel testified, "Wade [Mr. Green] did ask ... that we get him a copy of ... the interim rating. Actually his office had ... reviewed it [the interim rating] along with, later, subsequently, [John Doe 2's]." He further testified, "he [Mr. Green] did ask to have a copy of it [John Doe 1's interim appraisal] once it was done." Mr. Beitel additionally acknowledged that John Doe 1's interim appraisal and the separation agreement work together and were "contemporaneous." The fact that the separation agreements and failing interim performance appraisals were issued contemporaneously indicates that the appraisals were used to compel the whistleblowers to sign the separation agreements containing the non-disparagement provisions.

   *d.   Wade Green Did Not Provide the Whistleblowers' Separation Agreements to the Office of General Counsel for Legal Review*

Commerce Employment and Labor Law Division, Office of General Counsel (OGC), and OGC, testified that, prior to December 2012, their office reviewed and approved every settlement agreement

entered into on behalf of Commerce, including settlement agreements involving the
OIG.[9]

Both ▮▮▮▮▮ and ▮▮▮▮▮ testified that Mr. Green did not submit
John Doe 1's and John Doe 2's separation agreements to OGC for legal review per
standard practice.  In fact, ▮▮▮▮▮ and ▮▮▮▮▮ testified that they first
received John Doe 1's separation agreement from the Commerce Office of Civil Rights
in or around November 2012, and learned of John Doe 2's separation agreement during
OSC's investigation.  To their knowledge, John Doe 1's and John Doe 2's separation
agreements were the first legal agreements entered into by the OIG without OGC
approval or concurrence.

    Mr. Green testified that John Doe 1's and John Doe 2's separation agreements were
not routed through OGC "because it was based on the template that OGC had approved
for [a previous settlement agreement], and I felt that was good enough."  The referenced
settlement agreement had key differences with those signed by the whistleblowers.  It
involved an employee who was already on a PIP, and received fair consideration for
entering into the agreement, to include a $25,000 voluntary buy-out and early retirement.
In contrast, as discussed, the whistleblowers only received timely release dates and notice
that their new employers would not be given copies of their failing interim performance
appraisals.  The only similarity between the agreements was the non-disparagement
provision, which, as previously discussed, was originally drafted by Mr. Green for
inclusion in Employee X's settlement agreement.  In addition, the non-disparagement
provision in Employee X's settlement agreement differed from the provisions in John
Doe 1's and John Doe 2's separation agreements, because it also prohibited the OIG from
"disparaging" the employee.

    Although ▮▮▮▮▮ and ▮▮▮▮▮ both reviewed and signed Employee
X's settlement agreement, they both testified that, to their knowledge, OGC had never in
its practice included such non-disparagement provisions in any Commerce settlement
agreement.  Both testified to their belief that such provisions could chill whistleblowing.
They further testified that Mr. Green did not use the OGC settlement agreement template.
▮▮▮▮▮ testified that he was "dumbfounded" that the non-disparagement provision
was in Employee X's settlement agreement and that he signed it as an OGC department
representative.  He believed it was an oversight and should not have been included in any
Commerce settlement agreement.

---

[9] OGC derives its authority to review all settlement agreements on behalf of the agency from Department of
Commerce Department Organization Order 10-6, which describes the Office of General Counsel.  Mr.
Guenther testified that he has always relied on Section 4.01.b, which delegates to the General Counsel
responsibility for "[t]he preparation, or examination for legal form and effect, of all legal instruments, such
as contracts, cooperative agreements, leases, licenses, and bonds, entered into by the Department," to
support the requirement that his office must concur in settlement agreements and resolution agreements.

e.  *PAIGI Beitel and Wade Green Signed John Doe 1's and John Doe 2's*
     *Separation Agreements*

PAIGI Beitel signed the whistleblowers' separation agreements as "Management Official," and Mr. Green signed the agreements as "Counsel to the Inspector General." By signing the agreements, PAIGI Beitel and Mr. Green represented that they reviewed the agreements and agreed to the terms.

████████ and IG Zinser did not sign the agreements. IG Zinser testified that, prior to OSC's investigation, he had not reviewed the whistleblowers' separation agreements and was unaware of the non-disparagement provisions contained within them. ████████ testified that he first learned of the whistleblowers' separation agreements during OSC's investigation. Both Mr. Green and PAIGI Beitel testified that they neither discussed the terms of the separation agreements with IG Zinser, nor showed him a copy of the agreements.

## III.   LEGAL ANALYSIS

There is compelling evidence of whistleblower retaliation warranting corrective action for John Doe 1 and disciplinary action against PAIGI Beitel and Mr. Green.[10]

## A.  Legal Standard: 5 U.S.C. §§ 2302(b)(8) and (b)(9):

It is a prohibited personnel practice to take or threaten to take a personnel action against an employee because of any disclosure of information that the employee "reasonably believes" evidences a violation of law, rule or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.  5 U.S.C. § 2302(b)(8).  It is also a prohibited personnel practice to take or threaten to take a personnel action against any employee or applicant for employment because of: (1) the filing of an appeal, complaint, or grievance right granted by law, rule, or regulation; (2) testifying for or otherwise lawfully assisting any individual in filing an appeal, complaint, or grievance right granted by law, rule, or regulation; or (3) cooperating with or disclosing information to the Inspector General of an agency or the Special Counsel.  5 U.S.C. § 2302(b)(9).

## B.  Burden of Proof for Corrective and Disciplinary Action

### 1.  *Corrective Action*

To prove violations of 5 U.S.C. §§ 2302(b)(8) or (b)(9) of the Whistleblower Protection Act (WPA) warranting corrective action, OSC must demonstrate with preponderant evidence that: (1) a protected disclosure of information was made or the employee engaged in protected activity; (2) the proposing or deciding officials had actual or constructive knowledge of the protected activity; (3) official(s) with authority to take,

---

[10] Although OSC's investigation demonstrated evidence of whistleblower retaliation against John Doe 2, he did not formally file a complaint with OSC, and therefore, OSC cannot seek corrective action on his behalf.

18

recommend, or approve a personnel action took or threatened to take personnel actions;[11] and (4) the protected disclosure or protected activity was a contributing factor in the personnel action at issue. *See Eidmann v. Merit Sys. Prot. Bd.*, 976 F.2d 1400, 1407 (Fed Cir. 1992) (explains (b)(8)) and Section 101(b)(1) of S. 743, the Whistleblower Protection Enhancement Act of 2012 (Pub. L. 112-199) (amending 5 U.S.C. § 1221(e)(1) to apply to cases involving protected activity under (b)(9)).[12]

Once OSC establishes a *prima facie* case of whistleblower reprisal, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action absent the disclosure. *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1364 (Fed. Cir. 2012). Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. It is a higher standard of proof than preponderance of the evidence, and as the Federal Circuit pointed out in *Whitmore*, "is reserved to protect particularly important interests in a limited number of cases." 5 C.F.R. § 1209.4(d), *Whitmore*, 680 F.3d at 1367.

### 2. *Disciplinary Action*

In any case in which the Board finds that an employee has committed a PPP under 5 U.S.C. §§ 2302(b)(8) or (b)(9)(A)(i), (B), (C), or (D), the Board may impose disciplinary action if it finds that the activity protected under these sections was a significant motivating factor, even if other factors also motivated the decision, for the employee's decision to take, fail to take, or threaten to take or fail to take a personnel action, unless that employee demonstrates by a preponderance of the evidence that the employee would have taken, failed to take, or threatened to take or fail to take the same personnel action in the absence of such protected activity. Section 106 of S. 743, the Whistleblower Protection Enhancement Act of 2012 (Pub. L. 112-199) (amending 5 U.S.C. § 1215(a)(3)).

## C. Establishment of *Prima Facie* Cases of Reprisal

### 1. *Protected Activity*

John Doe 1 filed an EEO complaint on or around June 14, 2011, which constitutes protected activity under 5 U.S.C. § 2302(b)(9). He also submitted a FOIA request on or around August 9, 2011, for documents concerning alleged computer surveillance in possible violation of FAR regulations. The evidence also shows that PAIGI Beitel and Mr. Green viewed John Doe 1 as a possible or perceived whistleblower under 5 U.S.C. § 2302(b)(8) because the FOIA requested information could potentially implicate

---

[11] PAIGI Beitel and Mr. Green both exercised the personnel action authority required under 5 U.S.C. §§ 2302(b)(8) and (b)(9).

[12] The Board has held that, if the evidence establishes that subject officials would have taken the personnel action in the absence of the protected disclosures, the significant factor test cannot be met. *See generally Special Counsel v. Costello*, 75 M.S.P.R. 562, 611 (1997).

IG Zinser, PAIGI Beitel, and/or Mr. Green in wrongdoing if, for example, regulations were not followed, as the whistleblowers reasonably believed.

John Doe 2 submitted a document request in July 2011 and a FOIA request in August 2011 for documents or other information concerning the MP5 acquisition and SPF policy. As with John Doe 1's FOIA request, these requests concerned sensitive issues that John Doe 2 reasonably believed could inculpate IG Zinser, PAIGI Beitel and/or Mr. Green in misconduct. John Doe 2 also drafted an EEO complaint and a CIGIE complaint in or around June 2011. These FOIA requests and draft complaints gave the appearance that John Doe 2 was concerned about issues at the OIG and had either engaged in, or was considering engaging in, protected activity.

The perception of whether an employee is a whistleblower is sufficient to establish engagement in protected activity. *King v. Dep't of the Army*, 116 M.S.P.R. 689, 695-696 (2011). The Board found that whether a perceived whistleblower "made a protected disclosure is immaterial," and focused instead on whether the agency *perceived* the employee to be a whistleblower, *i.e.*, whether agency officials appeared to believe that the employee engaged or intended to engage in whistleblowing activity. *Id.*

Here, the record is replete with evidence showing that Mr. Green, PAIGI Beitel, IG Zinser, and ▬▬▬▬ perceived John Doe 1 and John Doe 2 as whistleblowers based on the substance of their FOIA requests and EEO complaints. As discussed above, several witnesses described them as "perceived whistleblowers." This perception is further demonstrated by the inclusion of the gag clauses in their separation agreements and the requirements that they withdraw their FOIA requests and EEO complaints.

## 2. *Knowledge*

Shortly after receiving John Doe 1's EEO complaint, ▬▬▬▬ contacted Mr. Green on June 30, 2011, to notify him of the complaint and to invite him to provide a written response. Even though John Doe 1's EEO complaint was in the informal stage, Mr. Green forwarded ▬▬▬▬ e-mail to IG Zinser, ▬▬▬▬ and PAIGI Beitel— the named subject officials in the complaint—and asked them to "formulate [their] recollection of the events described" in order to "respond on behalf of the Agency." Accordingly, Mr. Green, PAIGI Beitel, IG Zinser, and ▬▬▬▬ all had knowledge of John Doe 1's engagement in protected activity.

Although John Doe 2 did not file his draft EEO complaint or submit his draft CIGIE complaint, ▬▬▬▬ testified that he discussed a draft complaint of John Doe 2's with Mr. Green, IG Zinser, and PAIGI Beitel. Mr. Green further testified that he believed that John Doe 2 had either filed an informal EEO complaint or had threatened to do so. This testimony indicates that, even though he did not actually file his EEO complaint or submit his CIGIE complaint, OIG management viewed him as a perceived whistleblower.

In addition, as OIG Chief Counsel, Mr. Green processed all agency FOIA requests. He testified that he had knowledge of John Doe 1's and John Doe 2's FOIA requests, and

that his office sent out FOIA search requests to individuals identified as potentially having responsive documents or information. A key witness testified that PAIGI Beitel and others "went apoplectic" when John Doe 1 filed a FOIA request. Thus, the evidence indicates that Mr. Green and PAIGI Beitel had knowledge of the FOIA requests.

3. *Personnel Actions Were Taken Against John Doe 1 and John Doe 2 Because of Their Perceived Whistleblowing and/or Engagement in Protected Activity*

The evidence clearly shows that John Doe 1's and John Doe 2's EEO complaints and/or perceived whistleblowing significantly factored into the personnel actions OIG management took or threatened.

a. *Failing Interim Performance Appraisals*

The failing interim performance appraisals, as chapter 43 performance evaluations, constitute personnel actions under 5 U.S.C. § 2302(a)(2)(A)(viii), or at a minimum, threatened personnel actions.

As discussed above, PAIGI Beitel issued John Doe 1 and John Doe 2 failing interim performance appraisals in conjunction with their separation agreements. These appraisals were drafted and issued after OIG management learned that John Doe 1 and John Doe 2 had accepted positions with other federal agencies. The timing and content of these appraisals shows that they did not reflect PAIGI Beitel's honest assessment of their performance. Both employees had received outstanding performance evaluations in previous years, and had recently received satisfactory appraisals. Neither had been placed on a PIP. The failing appraisals were issued neither at the usual time nor in the usual manner. The unfounded failing appraisals reflected that, despite recent satisfactory performance, John Doe 1's and John Doe 2's performance had suddenly dropped to failure in every element.

PAIGI Beitel issued the whistleblowers failing interim performance appraisals approximately one month after they engaged in protected activity, *i.e.* engaging in the EEO process and/or submitting FOIA requests potentially implicating OIG management in wrongdoing. The law presumes that a disclosure is a contributing factor in a personnel action when the official who took or recommended the action had knowledge of the protected disclosure and took the personnel action within a period of time that would lead a reasonable person to conclude that the disclosure was a contributing factor. *Reid v. Merit Sys. Prot. Bd.*, 508 F.3d 674, 678-79 (Fed. Cir. 2007). The Board has held that a connection exists between a disclosure and a personnel action even in cases where the personnel action occurs more than a year after the disclosure. *See e.g.*, *Inman v. Dep't of Veterans Affairs*, 112 M.S.P.R. 280, 283-4 (2009) (personnel action occurred 15 months after disclosure); *Redschlag v. Dept of Army*, 89 M.S.P.R. 589, 626-27 (2001) (personnel action occurred 18 months after disclosure).

Here, based on the knowledge-timing test, the whistleblowers meet the contributing factor standard. The failing performance ratings were issued approximately one month

after John Doe 1 and John Doe 2 filed EEO complaints and/or submitted FOIA requests. Accordingly, the protected activity was a contributing factor in the retaliatory ratings.  5 U.S.C. § 1221(e)(1).

b.  _Non-Disparagement Provision/Gag Clauses_

The separation agreements' non-disparagement provisions constitute a personnel action under 5 U.S.C. 2302(a)(2)(A)(xi).  As set forth below, the provision significantly changed the whistleblowers' "duties, responsibilities, or working conditions."

Specifically, it is a fundamental condition of federal employment that an employee has a right, and an ethical duty, to report wrongdoing to appropriate authorities.  *See* Whistleblower Protection Act of 1989, Pub. L. No. 101-12, Sec. 2(b) (1989) (purpose of the WPA is "to strengthen and improve protection for *the rights of Federal employees,* to prevent reprisals, and to help eliminate wrongdoing within the Government[.]") (emphasis added); 5 C.F.R. § 2635.101(b)(11) (2012) ("Employees *shall disclose* waste, fraud, abuse, and corruption to appropriate authorities.") (emphasis added); *see also* E.O. 12674, Sec. 101(k)(1989)(same).[13]

Contractually requiring an employee to give up that fundamental right, or not to perform that required duty, constitutes a "significant change in duties, responsibilities, or working conditions" within the meaning of 5 U.S.C. § 2302(a)(2)(A) (defining "personnel action").  The legislative history of the 1994 WPA amendments indicates that the term "any other significant change in duties, responsibilities, or working conditions" should be interpreted broadly, to include "any harassment or discrimination that could have a chilling effect on whistleblowing or otherwise undermine the merit system." *Covarrubias v. Social Sec. Admin.,* 113 M.S.P.R. 583, ¶ 15 n.4 (citing 140 Cong. Rec. H11, 421 (daily ed. Oct. 7, 1994) (statement of Rep. McCloskey); *Roach v. Department of the Army,* 82 M.S.P.R. 464, ¶ 24 (1999)).  The non-disparagement provisions in John Doe 1's and John Doe 2's separation agreements have a chilling effect on whistleblowing.

Under the *per se* knowledge/timing test, the whistleblower's perceived whistleblowing was a contributing factor in Mr. Green's issuance of the separation agreements.  Mr. Green, who coerced the whistleblowers into signing the separation agreements, had knowledge of their protected activity and presented the separation agreements in close temporal proximity to their protected activity.

---

[13] Federal employees also have a statutory obligation to report criminal wrongdoing by other employees to the Attorney General.  28 U.S.C. § 535(b) (2012).  In addition, there are a variety of other statutes and regulations that mandate particular types of reporting and/or reporting by certain categories of employees. *See, e.g.,* 48 C.F.R. § 3.104-7 (2011) (violations of the Federal Acquisition Regulation); 31 U.S.C. §§ 1351, 1517(b) (2012) (violations of the Antideficiency Act); 38 C.F.R. § 1.201 (2011) (employee's duty to report violations of Veterans Affairs laws or regulations); 45 C.F.R. §§ 73.735-1301, -1302 (2011) (employee's duty to report violations of fraud, waste or abuse in programs of the Department of Health and Human Services); 40 U.S.C. § 611 (2006) (General Services Administration).

### c.   *Per-se Retaliation*

Non-disparagement provisions/ gag clauses have been deemed *per se* retaliation in analogous circumstances.  For example, as discussed in "Enforcement Guidance on non-waivable employee rights under Equal Employment Opportunity Commission (EEOC) enforced statutes":

> *Agreements that attempt to bar individuals from filing a charge or assisting in a Commission investigation run afoul of the anti-retaliation provisions because they impose a penalty upon those who are entitled to engage in protected activity under one or more of the statutes enforced by the Commission.  By their very existence, such agreements have a chilling effect on the willingness and ability of individuals to come forward with information that may be of critical import to the Commission as it seeks to advance the public interest in the elimination of unlawful employment discrimination.*

Enforcement Guidance, EEOC Notice No. 915.002 (April 10, 1997), *available at* http://www.eeoc.gov/policy/docs/waiver.html (emphasis added).

EEOC has consistently recognized in federal sector cases that an agency's restraint of or interference with the EEO process, including attempts to chill EEO activity through prior restraint, constitutes *per se* retaliation for protected EEO activity – *even though no personnel action has been taken and no protected activity has occurred.*  For example, in *Jasper v. Runyon*, the Postmaster stated generally at a supervisors' meeting that too many managers were filing EEO complaints and that these filings would do the managers no good.  The Commission found that such a statement would have a potentially chilling effect on the filing of EEO complaints.  Based on its duty to insure the integrity of the EEO process, the Commission found that the Postmaster's statement constituted *per se* retaliation. *Jasper v. Runyon*, EEOC Request No. 05920370, 1992 WL 1374793, at *4 (Aug. 7, 1992).[14]

OSC reasonably believes that an agency's prior restraint or interference with whistleblowing and/or going to OSC constitutes *per se* retaliation under 5 U.S.C. § 2302(b)(8) and/or (b)(9), and thus a prohibited personnel practice.  The non-disparagement provisions in the separation agreements on their faces constitute a prior restraint against a signing employee's whistleblowing and/or going to OSC.  Moreover,

---

[14] *See also Donahue v. Holder*, EEOC Appeal No. 0120073680, 2009 WL 591068, *1 (Feb. 26, 2009) (finding *per se* reprisal where manager made statements at meeting that employees had the right to challenge his recent assignments and "could file grievances or EEO complaints, but they will lose"); *Bensing v. Danzig*, EEOC Appeal No. 01970742, 2000 WL 33541925, *3-4 (Oct. 3, 2000) (supervisor's objections to employee's contacts with EEO office and union representatives constituted *per se* reprisal); *Simpson v. Rubin*, EEOC Request No. 05930570, 1994 WL 1841189, *5 (March 11, 1994) (agency policy that precluded employee from serving in acting supervisory capacity solely because employee was an EEO counselor constituted *per se* reprisal); *Marr v. Widnall*, EEOC Appeal No. 01941344, 1996 EEOPUB LEXIS 2637, *18 (June 27, 1996) (finding unlawful interference where supervisor attempted to dissuade witness from testifying in EEO matter by calling her to private meeting in smoking area and stating that it was "in [her] best interest not to get involved.").

since the non-disparagement provisions also restrain or interfere with a signing employee's exercise of the right to petition Congress, the agreements also constitute a *per se* violation of 5 U.S.C. § 2302(b)(12), and thus a prohibited personnel practice. As the Second Circuit reasoned in similar circumstances: "Although the act of inducing an employee to relinquish his rights as provided by the [Energy Reorganization Act] through means of a settlement agreement is less obvious than more direct action, such as termination, it is certainly aimed at the same objective: keeping an employee quiet." *Connecticut Light & Power v. Secretary of Labor*, 85 F.3d 89, 95-96 & n.5 (2d Cir. 1996) (affirming Dep't of Labor ruling that act of offering settlement agreement which would restrict individual from reporting unlawful conduct to the government violated anti-retaliation provision of Energy Reorganization Act of 1974).

Here, the evidence demonstrates that Mr. Green included the non-disparagement provisions in the whistleblowers' separation agreements with the specific intention of keeping the whistleblowers quiet. He drafted the separation agreements that clearly provided that the whistleblowers' new employers would receive copies of their failing interim performance appraisals unless they agreed to waive their rights to make disclosures to OSC, Congress, and the media.

## D. OIG Cannot Meet its Rebuttal Burden

In order to rebut a *prima facie* case of reprisal under 5 U.S.C. § 2302(b)(8), the OIG must show by "clear and convincing" evidence that it would have issued John Doe 1's and John Doe 2's failing interim performance appraisals and executed separation agreements containing non-disparagement provisions even if they had not engaged in protected activity.

The "clear and convincing" evidentiary standard imposes a high burden on the agency that is difficult to satisfy. In *Whitmore*, the Federal Circuit quoted the following from the WPA legislative history:

*"Clear and convincing evidence" is a high burden of proof for the Government to bear. It is intended as such for two reasons. First, this burden of proof comes into play only if the employee has established by a preponderance of the evidence that the whistleblowing was a contributing factor in the action – in other words, that the agency action was "tainted." Second, this heightened burden of proof required of the agency also recognizes that when it comes to proving the basis for an agency's decision, the agency controls most of the cards – the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases. In these circumstances, it is entirely appropriate that the agency bear a heavy burden to justify its actions.*

The evidence demonstrates that the OIG will not be able to meet this high burden. First, the OIG will not be able to show that John Doe 1's and John Doe 2's interim performance appraisals were justified. As discussed in section II(b)(6) above, PAIGI Beitel decided to draft and issue the interim performance appraisals after John Doe 1 and

John Doe 2 gave notice that they had accepted positions with other federal agencies. They were the only departing OIG employees given "interim" or "close-out" appraisals, despite the fact that numerous employees left the OIG in 2011. The appraisals were, in part, based on events that occurred outside of the performance period, and the ratings do not appear to be based on their actual performance, especially considering the fact that they were given satisfactory progress reviews less than four months earlier. Moreover, PAIGI Beitel's testimony that the interim appraisals were drafted to explain the OI's alleged issues to the peer review committee is not credible, in that several reports had already been drafted by himself and ████████ to address these alleged concerns.

The OIG has also asserted that John Doe 1 and John Doe 2 were represented by counsel when they executed their separation agreements and that they willingly entered into the agreements. Whether John Doe 1 and John Doe 2 were represented by counsel, however, does not by itself establish that the agreements were not coercive.

To prove coercion, John Doe 1 and John Doe 2 must show that: (1) they involuntarily accepted the terms of the agreements; (2) circumstances permitted no other alternative; and (3) such circumstances were the result of coercive acts. *See Kent v. Dep't of the Air Force*, 2013-3034, 2013 WL 1352582, *2 (Fed. Cir. April 5, 2013); *Candelaria v. U.S. Postal Service*, 31 M.S.P.R. 412, 413 (1986). Here, there is sufficient evidence to establish that the OIG coerced John Doe 1 and John Doe 2 into signing the separation agreements.

First, the evidence indicates that John Doe 1 and John Doe 2 involuntarily accepted the terms of the separation agreements. The Federal Circuit has noted that the most probative evidence of involuntariness is the length of time between the employer's alleged coercive act and the action. *Terban v. Department of Energy*, 216 F.3d 1021, 1024 (Fed. Cir. 2000).[15] Here, Mr. Green provided John Doe 1 with his separation agreement—the same day PAIGI Beitel gave him his failing interim performance appraisal—just four days before he was expected to begin his new position at a different federal agency. John Doe 2 received his separation agreement before receiving his failing interim performance appraisal; however, the terms of his agreement denote that he would not be given a timely release date, that OIG would potentially tell his future employer that his departure from OIG was not voluntary, and that some adverse action would likely be taken against him if he failed to sign the separation agreement. He received his failing interim performance evaluation on his last day with OIG.

Next, the complainants had no alternative but to sign the agreements. If they did not sign them immediately, their release dates to their new employers would be postponed, and their new employers would receive the failing performance appraisals. Potentially, the new employers had the option of rescinding the employment offers. Additionally, if the whistleblowers chose not to sign the agreements and instead challenged the failing appraisals, the agency made clear its intent to postpone the release dates and issue the failing appraisals. Unlike in *Kent*, where the employee remained free

---

[15] While *Terban* involves retirement, it has also been cited in cases involving settlement agreements. *See Parrott v. Merit Sys. Prot. Bd.*, 519 F.3d 1328, 1334 (Fed. Cir. 2008).

to refuse to sign a settlement agreement and insist on a ruling by the administrative judge on his removal, John Doe 1 and John Doe 2 would have suffered immediate, negative consequences if they refused to sign the agreements. *Id* at *3.

Finally, the failing interim performance appraisals and the separation agreements were the result of coercive acts. In *Bowie v. U.S. Postal Serv.*, the Board held that "a threatened action by an agency is 'purely coercive' if an employee can show that the agency knew or should have known that the reason for the threatened action could not be substantiated." *Bowie*, 72 M.S.P.R. 42, 44 (1996) (threatened removal in settlement discussion before the Board) (citing *Schultz v. United States Navy*, 810 F.2d 1133, 1136-37 (Fed.Cir.1987) (employee's resignation was involuntary where agency improperly denied leave and threatened adverse action for AWOL).[16]

In this case, Mr. Green told John Doe 1 and John Doe 2 that if they entered into the separation agreements, the OIG would agree not to provide their new employers with copies of their failing interim performance appraisals. He further threatened that if they refused to sign the separation agreements, the OIG would not provide their requested release dates, and would instead hold them at OIG for the maximum time allowed, despite the fact that they had minimal work to perform and no outstanding projects.

Equally significant, the failing interim performance appraisals were unfounded. Prior to these appraisals, John Doe 1 and John Doe 2 worked at the agency for many years and had never received appraisals below "Fully Successful". Their performance at the time these failing appraisals were issued was at least at the "Fully Successful" level. The OIG knew that it could not substantiate the failing interim appraisals. In addition, the ratings were issued out of cycle. It is not the OIG's common practice to issue "interim" or "close-out" ratings before an employee leaves the agency. In fact, no employee, with the exception of John Doe 1 and John Doe 2, has received a close-out appraisal. The evidence shows that the failing performance appraisals were presented to John Doe 1 and John Doe 2 solely to coerce them into signing the separation agreements, and thus, prevent them from engaging in further protected activity.

In addition, the OIG did not have a legitimate reason to threaten to postpone John Doe 1's and John Doe 2's release dates. The evidence shows that there was no reason to require John Doe 1 and John Doe 2 to remain at the agency. They no longer had work to complete and would be lingering at the agency with nothing to do. PAIGI Beitel did not assert that he or anyone at the OIG was considering postponing the release dates for some legitimate reason, such as the need for John Doe 1 and John Doe 2 to complete an assignment. Where an agency's action does not have a solid or substantial basis in personnel practice or principle it is an unjustifiable coercive act. *See Michael Roskos v. the United States*, 549 F.2d 1386 (Fed. Cir. 1977) (where there was no acceptable good-of-the-service rationale for employee's reassignment, the reassignment was a coercive act

---

[16] The Board has applied *Schultz* in the context of a settlement agreement. *See Merriweather v. Department of Transportation*, 64 M.S.P.R. 365, 371 (1994), *aff'd*, 56 F.3d 83 (Fed.Cir.1995) (last chance agreement).

26

and employee's subsequent retirement was involuntary); *Caveney v. Office of Administration*, 57 M.S.P.R. 667 (1993) (employee's retirement was involuntary where the reassignment preceding retirement had no solid or substantial basis in personnel management or management principles). The failing interim performance appraisals and threats to postpone the whistleblowers' release dates have no substantial basis in personnel practice or principle, and are thus coercive acts. Lastly, the whistleblowers were targeted for disparate treatment. A similarly situated employee who did not engage in protected activity was not issued a failing interim performance appraisal or a separation agreement when he departed the OIG during the same time period.

Accordingly, for all of these reasons, the OIG cannot meet its burden of showing by "clear and convincing" evidence that it would have issued John Doe 1 and John Doe 2 failing interim performance appraisals and separation agreements, absent their perceived whistleblowing or participation in protected activity.

### E.  Significant Factor Burden-Mosaic of Retaliation

OSC's investigation uncovered compelling evidence of a pattern of retaliation against the complainants for whistleblowing, perceived whistleblowing, and engaging in protected activity. Evidence showing a pattern or "convincing mosaic" of retaliation can be used to prove the significant factor element in a retaliation case. Such mosaic includes pieces of evidence that "[w]hen taken as a whole, provide strong support if all [pieces] point in the same direction...." *Crump v. Dep't of Veterans Affairs*, 114 M.S.P.R. 224, 229-230 (2010). As a general rule, this mosaic has been defined to include three general types of evidence: (1) evidence of suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of retaliatory intent might be drawn; (2) evidence that employees similarly situated to the appellant have been better treated; and (3) evidence that the employer's stated reason for its actions is pretextual. *Rhee v. Dep't of Treasury*, 117 M.S.P.R. 640, 653 (2012) (quoting *Kohler v. Department of the Navy*, 108 M.S.P.R. 510, 515 (2008)).

There is strong evidence of suspiciously close timing between John Doe 1's and John Doe 2's protected activity and the interim failing appraisals and separation agreements. John Doe 1 and John Doe 2 engaged in protected activity over a period of several months from May through September 2011. The whistleblowers were issued "Level 1" interim appraisals and presented with separation agreements containing non-disparagement language in August and September 2011. The proximity between the protected activity and the agency's actions is very close—including actions taken within just days or weeks of the protected activity—giving rise to a strong inference of retaliation.

In addition, John Doe 1 and John Doe 2 were treated less favorably than a similarly situated employee. Like John Doe 1 and John Doe 2, another OI manager was identified as having performance deficiencies in 2011 and was being investigated by the OC for alleged violations of agency policy. This manager, however, was not required to execute a separation agreement containing a non-disparagement provision and was not given a

failing interim performance appraisal before his departure from the agency. Unlike John Doe 1 and John Doe 2, this manager did not engage in protected activity. The only difference between these three OI managers was that John Doe 1 and John Doe 2 engaged in protected activity.

Moreover, there is evidence that the agency's stated reasons for its actions are pretextual. The interim appraisals do not accurately describe John Doe 1's and John Doe 2's performance and primarily address issues outside of the 2010-2011 appraisal period. In addition, PAIGI Beitel's reasons for issuing the appraisals are pretextual. He testified that one reason for issuing the failing interim appraisals was to explain deficiencies to the OPM OIG peer review team. However, this explanation also seems disingenuous considering there were several other employees who were not similarly given interim appraisals when they left OIG, despite their poor performance. In sum, PAIGI Beitel did not find it necessary to document the poor performance of other departing employees who were not whistleblowers.

The agency's stated reasons for executing separation agreements containing non-disparagement language was also pretextual. Mr. Green testified that he inserted the non-disparagement language to prevent John Doe 1 and John Doe 2 from being untruthful about the OIG, not to prevent them from blowing the whistle. As noted above, there is no evidence that John Doe 1 or John Doe 2 were dishonest or deceitful; rather, witnesses consistently described them as men of integrity. In addition, while numerous employees left the OIG for employment with other agencies, John Doe 1 and John Doe 2 were the only employees presented with separation agreements. It is suspect that Mr. Green was not concerned with preventing other allegedly poor performing employees from "disparaging" the OIG. Here, the suspicious timing, evidence that similarly situated employees were treated more favorably, and evidence that the agency's stated reasons for its actions were pretextual demonstrates a convincing mosaic of retaliation.

**F. The Separation Agreements Violate 5 U.S.C. § 2302(b)(12) as Violations of the Lloyd-LaFolette Act**

It is also a prohibited personnel practice to take a personnel action if taking such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles. 5 U.S.C. § 2302(b)(12). An employee's right to petition Congress is protected under the Lloyd-LaFollette Act of 1912, 5 U.S.C. § 7211. Several legislators explicitly cited "gag rules" that forbade federal employees to communicate directly with Congress on pain of dismissal as the reason for enacting the Lloyd-LaFollette Act. *Bush v. Lucas*, 462 U.S. 367, 382-84 & nn.19-24 (1983). The non-disparagement provisions in the separation agreements, on their face, violate the Lloyd-LaFollette Act, and thereby 5 U.S.C. § 2302(b)(12).[17] *See* 5 U.S.C. § 2302(b) ("This subsection shall not be construed to authorize the withholding of information from Congress or the taking of any personnel action against an employee who discloses information to the Congress.").

---

[17] The Lloyd-LaFollette Act implements 5 U.S.C. § 2301(b)(9).

## IV.   CULPABILITY OF RESPONSIBLE OFFICIALS AND RECOMMENDATIONS

There is compelling evidence that OIG management engaged in a series of adverse actions against the complainants in retaliation for their protected activity and/or perceived whistleblowing and to chill future whistleblowing. The evidence shows that Mr. Green drafted and/or reviewed, negotiated, and insisted on the inclusion of the non-disparagement language in the separation agreements. However, he did not, and could not, act alone. Without PAIGI Beitel's failing interim performance appraisals, the agency would have lacked leverage to coerce the whistleblowers into signing the separation agreements, in which they waived their rights to make protected disclosures to OSC, Members of Congress, and the media.

Although there is inconsistent testimony regarding the involvement of Mr. Green, PAIGI Beitel, and other members of OIG senior management, the weight of the testimony and documentary evidence demonstrates that Mr. Green and PAIGI Beitel were the key players in drafting the separation agreements, signing the agreements, and issuing the failing interim performance appraisals. More significantly, the evidence shows that Mr. Green and PAIGI Beitel manifested the strongest motive to retaliate against John Doe 1 and John Doe 2.

### A. Wade Green

The record is replete with evidence establishing that Wade Green retaliated against the whistleblowers. He admitted to drafting or directing that an OC attorney draft the whistleblowers' separation agreements, and signing the agreements. He testified that he drafted and/or reviewed the non-disparagement provisions, and that he insisted that they remain in the agreements. Importantly, in negotiating Employee X's settlement agreement—the agreement upon which the non-disparagement provisions in the whistleblowers' separation agreements were based—he removed a provision drafted by Employee X's attorney, which would have allowed for his client "to file an EEO or Special Counsel complaint."

The evidence also shows that Mr. Green reviewed John Doe 1's and John Doe 2's failing interim performance appraisals before drafting the separation agreements, and included the provisions that the failing appraisals would not be provided to John Doe 1's and John Doe 2's future employers if they agreed to the terms of the agreements. Mr. Green also made clear to John Doe 1 and John Doe 2 that the OIG would hold them for 30 days if they refused to sign the agreements—despite the fact that their workloads were minimal and there was no justification to delay their release dates.

The evidence demonstrates that Mr. Green was motivated to retaliate against the whistleblowers for two reasons: (1) he wanted to protect IG Zinser, himself, and the OIG from potential damaging statements and (2) he wanted the whistleblowers to withdraw their EEO and FOIA requests. The documents sought from the requests could potentially implicate him and/or IG Zinser or PAIGI Beitel in wrongdoing.

29

Mr. Green testified that if OSC found a violation based on the separation agreements, he accepted responsibility for the violation due to his position as "Chief Legal Officer." As such, particularly for an Inspector General's office, Mr. Green would have been familiar with the WPA and should have prevented violations of the Act by the OIG. Instead, the evidence shows that he used his position to draft separation agreements containing non-disparagement provisions aimed at keeping whistleblowers quiet, and used retaliatory failing performance appraisals as leverage to compel the whistleblowers to sign the agreements.

Based on the preceding, OSC recommends that Commerce take substantial disciplinary action against Wade Green.

**B. PAIGI Beitel**

The record is also replete with evidence establishing that PAIGI Beitel retaliated against the whistleblowers by drafting their unfounded failing interim performance appraisals. The evidence indicates that he coordinated with Mr. Green on the separation agreements. Specifically, he drafted and provided Mr. Green with copies of their failing interim performance appraisals. In addition, he testified that the interim appraisals and the separation agreements work together and are "contemporaneous." Finally, in his capacity as an OIG management official, he signed the separation agreements containing the non-disparagement provisions.

The evidence demonstrates that PAIGI Beitel was motivated to retaliate against the whistleblowers for their engagement in protected activity and/or their perceived whistleblowing. In particular, he was named as a subject official in John Doe 1's EEO complaint, and, according to a key witness, went "apoplectic" when John Doe 1 submitted a FOIA request concerning sensitive documents that could potentially implicate him in wrongdoing.

PAIGI Beitel's behavior is particularly egregious based on his position as the OIG's expert on whistleblower protection. He has worked on whistleblower issues for well over a decade, has received training on prohibited personnel practices, and was allegedly selected for an SES position at OIG in order to establish a whistleblower protection unit. Based on this knowledge and experience, PAIGI Beitel was clearly familiar with the WPA and should have taken steps to prevent retaliatory actions.

As to the appropriate penalty for PAIGI Beitel, because he neither drafted nor was consulted on the non-disparagement provision, his involvement in the separation agreements was less than Mr. Green's. Thus, OSC recommends that a lower level of discipline be taken against PAIGI Beitel.

**C. Todd Zinser and **

There is insufficient evidence to establish that IG Zinser reviewed the separation agreements prior to OSC's investigation or was informed about the non-disparagement

clauses. Wade Green testified that he neither provided IG Zinser with a copy of the separation agreements, nor informed him that the separation agreements contained non-disparagement provisions. PAIGI Beitel additionally testified that IG Zinser was not involved with the drafting or issuance of the whistleblowers' failing interim performance appraisals. IG Zinser did not sign any of these documents, and OSC found no documentary evidence showing IG Zinser's knowledge or involvement with the whistleblowers' interim performance appraisals or separation agreements. Accordingly, OSC has insufficient evidence to seek disciplinary action against IG Zinser for a violation of 5 U.S.C. §§ 2302(b)(8), (b)(9), or (b)(12).

Similarly, OSC has insufficient evidence to establish that ███████ committed a prohibited personnel practice. Although ███████ signed the whistleblowers' interim performance appraisals, the evidence indicates that his role in these appraisals was minor as compared to PAIGI Beitel's. Further, ███████ credibly testified that he was unaware of the whistleblowers' separation agreements prior to OSC's investigation. Although ███████ failed to protect the whistleblowers from retaliatory actions, there is insufficient evidence to seek disciplinary action against him for a violation of 5 U.S.C. §§ 2302(b)(8), (b)(9) or (b)(12).

## V.   CONCLUSION

Congress included protection for whistleblowers in the Civil Service Reform Act to assure federal employees "will not suffer if they help uncover and correct administrative abuses." S. Rep. No. 95-969, at 8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2730. In this matter, OSC's investigation uncovered willful, concerted acts of retaliation that necessitate disciplinary action. Holding management accountable for engaging in prohibited personnel practices is essential to assuring employees that they can blow the whistle or engage in other protected activity without fear of reprisal.

Accordingly, and for the reasons set forth herein, the Department of Commerce should take appropriate disciplinary action against PAIGI Beitel and Mr. Green for their retaliatory actions in violation of 5 U.S.C. §§ 2302(b)(8), (b)(9), and (b)(12).

ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE
Docket # DC-0752-12-0486-B-1
Petition for Review
Summary Page

**Case Title :** ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE

**Docket Number :** DC-0752-12-0486-B-1

**Pleading Title :** Petition for Review

**Filer's Name :** Anthony W. Perry

**Filer's Pleading Role :** Appellant

**Details about the supporting documentation**

| # | Title/ Description | Mode of Delivery |
|---|---|---|
| 1 | Official Personnel Action | Uploaded |
| 2 | Certified Time and Attendance | Uploaded |

## Table of Contents

Pleading Interview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Uploaded Pleading Text Document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
Official Personnel Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
Certified Time and Attendance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Pleading Number : 2014008445        Submission date : 2014-01-26 22:28:41        Confirmation Number: 795511777        page 2 of 47

ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE
Docket # DC-0752-12-0486-B-1
Petition for Review
Online Interview

1. Would you like to enter the text online or upload a file containing the pleading?

See attached pleading text document

2. Does your pleading assert facts that you know from your personal knowledge?

Yes

3. Do you declare, under penalty of perjury, that the facts stated in this pleading are true and correct?

Yes

**UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE**

| | | |
|---|---|---|
| ANTHONY W. PERRY, | ) | DOCKET NUMBERS: |
| Appellant | ) | DC-0752-12-0486-B-1 |
| | ) | DC-0752-12-0487-B-1 |
| | ) | |
| vs. | ) | **REVIEW BOARD** |
| | ) | |
| | ) | |
| DEPARTMENT OF COMMERCE, | ) | DATE: January 26, 2014 |
| Agency | ) | |

## Petition For Review

Appellant timely submits a Petition for the Review of the Administrative Judge's decision, denying Appellate Jurisdiction before the Board.

On December 23, 2013, the Administrative Judge erroneously denied jurisdiction of the Appellant's claims before the Board, to include a forced retirement (constructive retirement/discharge) and forced suspension (constructive suspension).

Appellant's complaint is intertwined with disability discrimination, along with other prohibited personnel practices. The prohibited personnel practices include fraudulent charges of misconduct, coercion, retaliation, reprisal, retribution, misinformation, misrepresentation of facts and the use of an unlawful Non-Disclosure agreement to conceal the constructive actions and to conceal other prohibited practices.

## Appellant's Argument

Appellant's initial claims states that the adverse actions are intertwined with disability discrimination, due to the Agency rescinding of prior provided accommodations (IAF Tab 4). Appellant suffered ongoing race, gender and age discrimination, along with retaliation, retribution and reprisal. This is by definition a mixed case appeal.

1

Judge Turbitt's decision is not in accordance with the law, policy, and guidance or documentary evidence provided by the Appellant.  The Judge repeatedly denied the admission of material and relevant information toward the coercion of Appellant into an unlawful nondisclosure agreement.  The decision contains erroneous findings of fact and is based in favor of the Agency, and contains erroneous interpretation and erroneous application of the law, statute, policy guidance and regulation.  Judge Turbitt's failure to utilize Appellant's documentary records is flawed, is a continuation of a process to violate Appellant's *Due Process*, and is in disregard of Appellant's uncontested evidence.  There is no evidence of cause for the adverse actions taken by the Agency.

A distinct timeline of evidenced documentation provides *Procedural Errors, Coercion, Prohibited Personnel Practices and Misrepresentation*, which are in clear contradiction of the process in the proposed removal (IAF Tab 1 at 1).  The timeline provides a revelation of prohibited personnel practice, along with the Administrative Judge's abuse of discretion.

   a.  2007 Informal disability accommodation provided by supervisors of record, Patricia Musselman and Dale Reed.

   b.  On May 19, 2011, Appellant certified Motion in Opposition to the Agency Motion to Dismiss" pending EEOC claims (IAF Tab 6 at 1).
       **No other communication between the Agency and Appellant occurred, concerning the pending claims until after the Agency's Non-Disclosure agreement was served on Appellant.  There is no evidence provided in the record of any communication and it clearly contradicts Judge Turbitt's assertion of Ronda Brown's active settlement discussions with Appellant.**

   c.  June 6, 2011 email to Census Bureau Director reporting ongoing discrimination with regard to promotion, performance reviews, and awards.

   d.  June 7, 2011 Proposal to Remove by an employee who was NOT Appellant's supervisor states in part … [Deciding Official will decide based on Appellant's response…there is no reference to an EEOC agreement or any other agreement as part of the proposed removal].

   e.  June 9, 2011/June 13, 2011 submission of formal disability accommodation and medical records dating back to 2007 up to 2011 submitted to Agency Disability Program Office. Total hip replacement February 27, 2012 (IAF Tab 4).

   f.  June 21, 2011 Dale Reed notified by Disability Program Office that an employee, in his group, submitted a reasonable accommodations request (IAF Tab at 17, 18 and 19).

2

g.  June 26, email from HR employee Ben Felder to Johnny Zuagar dictating Appellant's retirement, suspension, reassignment, forfeit of pending EEOC claims, and forbid to work at Commerce.  **This action was without Appellant's knowledge and wasn't witnessed by the Appellant until Agency submitted it with Remand documents** (Agency Remand File, Exhibit 3)

h.  August 22, 2011, Appellant was served a Non-Disclosure settlement agreement with the basis of the agreement being in lieu of termination for misconduct *without* a decision on Appellant's response to the charges.
    **The Agency violated the procedure stated in the *Proposal to Remove*,** (Tab 1 at 1).
    The violation of the Proposal violates Appellant's *Right to Due Process*. Furthermore, the Non-Disclosure Agreement is invalid.
    The Appellant involuntarily accepted the terms and conditions of the Agency's adverse actions as stated in the Non-Disclosure agreement dated August 22, 2011 and Agency remand (Remand Exhibit 3).  **Appellant's representative provided no assistance or no alternative to Appellant, pending Appellant's required signature on the Non-Disclosure agreement.   Appellant's representative clearly communicated, if the Non-Disclosure agreement was not signed or if the Appellant went to the EEO office, Appellant will be terminated.**
    No alternative was provided to the Appellant and the Agency's actions are deemed coercive.  (SAtaats v. U.S. Postal Service, 99 F.3d 1120, 1124 (Fed Cir. 1996).

i.  August 26, 2011, Deciding Official issued decision stating, "She substantiated the charges but a lesser penalty of suspension was appropriate." (Tab 3 at 1) (Deciding Official verbally admitted to assisting with drafting the Non-Disclosure agreement) and withheld decision until the Non-Disclosure agreement was signed.

j.  Reasonable Accommodations were approved November 9, 2011.

**New evidence attached** are Notification of Personnel Action-SF-50 (not submitted by Agency and acquired via FOIA by Appellant) and supervisor certified Time and Attendance Sheets for the period of the charge of receiving pay for time not worked.  The official personnel actions show agency imposed adverse actions in accordance with the August 22, 2011 nondisclosure agreement.

3

Appellant's Remand Exhibits are titled "Supervisor Code, Work Performance and Responsibilities", "John Does v. Dept of Commerce/EEOC Guidance and Relevant Docs", and Exhibit E and F.

## Perceived Bias, Failure to Address, and Denial of Discovery

Judge Turbitt provided an umbrella for the Agency to argue their case, while utilizing his discretion to undermine the law.

*Example:* In the telephonic conference, Judge Turbitt asked the Agency Representative "What files do you want removed from Mr. Perry's file?"   The Agency's Attorney replied, "The medical records Judge."

    **A.** Judge Turbitt failed to address the August 22, 2011 Non-Disclosure agreement (IAF Tab 1 at 2), is from the same template used by the Commerce IG in Office of Special Counsel REL John Does (1-4) v. Commerce IG and should not have been ruled valid.

The agreement template utilized, *coerced* Appellant into the agreement without recourse. The litany of actions and coercive tactics used, clearly denied the Appellant's rights to report prohibited personnel practices to the OSC, equal protection under the law, due process, and property rights and are in violation of *5 USC 2302 (b)(8), (b)9), (b)(10), (b)(12), and (b)(13).*

The evidentiary documents submitted by Appellant did not offer to settle or waive claims pending before the EEOC and no consideration was received for the coerced and dictated forfeiture of non-waivable Title VII Rights (Agency Remand File Exhibit 3). Therefore, the statement of Judge Turbitt's interpretation of Appellant's submitted evidence is a clear misrepresentation of the facts and of the documentation on record.

    **B.** Judge Turbitt failed to address, the Agency did not substantiate the charges against Appellant, which lead to the Appellant's suspension and removal. The Agency's charges were the basis for imposition of the Non-Disclosure agreement. Therefore, the Agency failed to meet its obligation, under the law, to have reasonable grounds for the proposed removal. On this basis, the threatened removal was purely coercive (Schultz v. U.S. Navy)

    **C.** The decision rendered by Judge Turbitt, failed to address the Agency committed harmful procedural errors and prohibited personnel practice. The Agency decision to terminate, suspend, and dispose of Appellant's pending claims before the EEOC Baltimore Field Office and impose a Appellant via a nondisclosure agreement, are considered prohibited personnel practices and a violation of EEOC Enforcement Guidance on Non-waivable Rights

4

(Agency Remand Exhibit 3)and thus 5 U.S.C. 2302 (b)(1)(A)(B)(C)(D), (b)(2)(A)(B), (b)(4), (b)(8)(i), (b)(9), (b)(10), (b)(12), and (b)(13).

    **D.**  The Judge failed to sanction the Agency, in accordance with 5 USC 1241.43, for failing to comply with the Acknowledgement Order (IAF Acknowledgement Order). Judge Turbitt provided leniency to the Agency, although the Agency failed to submit the documents required by the Acknowledgement Order.

The Order, critical to Discovery, required the submission of charging documents, current & past misconduct, other causes for action against Appellant, and all related notes.

Judge Turbitt denied discovery of the Deciding Official's notes, emails, or any communications about the proposed removal and how she came to her decision to sustain charges with no evidence of misconduct provided to Appellant or his representative (Remand File Denied Motion).

Because the discovery requests were denied, Appellant was not afforded access to material, relevant and direct evidence, key to the overall decision of Appellant's constructive retirement and constructive suspension.  Also, this is a clear violation of Appellant's due process rights to confront and respond to evidence of the charges.

    **E.**  The Judge failed to address the collusion in Deciding Official's decision and the Non-Disclosure agreement.  The Deciding Official admitted in hearing of assisting with drafting, required Appellant's suspension, retirement, reassignment out of supervisory ranks, forfeiture of pending EEOC claims at Baltimore Field Office, and forbid to ever work for Commerce.

Appellant was also denied witness request of Appellant's first and second line supervisors, Dale Reed and Patricia Musselman who were responsible for Appellant's time and attendance.

The denied discovery, along with denying the Appellant's witness request, directly denies Appellant's right to confront pertinent evidence, along with Agency accusers and due process rights guaranteed by the Constitution.

    **F.**  There was a failure address the actions of Darren Gutschow, an employee who was not the Appellant's supervisor.  Darren Gutschow proposed Appellant's removal (Tab 1) which was acted upon by the Agency.  This action is not only a violation of 5 USC 2301 (2), (4), (5), (6), (8)(A), and (9), it is also a prohibited personnel practice, a violation of the FPM and 5 USC 2302 (b)(2), (b)(8), (b)(9), (b)(10), and (b)(12).  Mr. Gutschow had no knowledge of supervisor provided accommodations for Appellant.

The Judge also failed to then rule the Agency withdrew Appellant's prior accommodations for his disabling condition, the medical records of which were available in the Disability Program

Office and therefore intentionally failed to provide Appellant minimum due process and in violation of 5 U.S.C. 2302 (b)(1)(D) and specifically the Rehabilitation Act of 1973 and the ADA Amendments Act of 2008 (ADAAA) (Tab 1 at 1; Tab 4) (Pledger v. Department of the Navy, 50 M.S.P.R. 325, 330-31 (1991)).

The charged times for misconduct were certified by supervisors of record, Dale Reed and Patricia Musselman, and were justified to the Agency in IAF Tab 4 and 5. *The Agency did not contest these facts.* Therefore, the Agency's harmful procedural error allowed the management official to serve Appellant a Non-Disclosure agreement imposing adverse actions and prohibited personnel practices prior to the Deciding Official rendering a decision on Appellant's response to the charges of misconduct .

Discovery request were denied for material recording clock information of other IT employees. The requested information would show that accommodations are provided for other employees, who have not been charged for misconduct.  This information includes employees who smoke, run, jog, disabled, etc.

The Agency used recording clock information to charge Appellant with misconduct but failed to extract recording clock information outside of regularly schedule times.  Appellant was allowed a flexible work schedule and informal accommodations by first and second line supervisor which the management officials were made aware (IAF Tab 5).

Judge Turbitt failed to address the restriction *against* the use of a recording clocks in Executive Agencies in Washington D.C. except at the Bureau of Engraving and Printing which is a violation of 5 USC 28  6106 through 6123.

Overall, the Agency submitted no evidence of misconduct.
The Agency committed fraud, harmful procedural error, coercion, misrepresentation and prohibited personnel practices to secure a Non-Disclosure agreement and prevent Appellant from filing a complaint with OSC and EEOC in violation of 5 USC (b)(8), (A)(i), (ii), (B)(i), (ii), (b)(9), (b)(10), (b)(12), and (b)(13).

## More Rules of Law and Evidence Ignored

**1.** Judge Turbitt failed to address that Appellant's flexible work schedule was due to a prior approved informal accommodation for Appellant's documented and well known disability (Tab 4 and Tab 5) and therefore the Agency rescinded an accommodation that had been prior provided without informing Appellant and providing minimum due process (Crutch v U.S. Postal Service, 2013 MSPB 38).

**2.** Judge Turbitt failed to protect Appellant from an arbitrary action that required only Appellant, with 29 years of supervisory experience and pending discrimination & prohibited personnel practices claims, to start signing in April 2011.  Although the sign in discontinued shortly thereafter, Appellant was never required to sign in throughout his professional career. The Agency tactics were harassing and in violation of 5 USC 2301 (2), (8), and (9); 5 USC 2302 (b)(8), (9), (b)(10), (b)(12).

**3.** The OSC has since been notified of the Deciding Official's interference with Appellant's right to approach the OSC and Congressional representative, along with prior prohibited personnel practices.  The Deciding Official communicated to Appellant, to inform her of any other actions Appellant had pending or intended to file.  Appellant withdrew OSC complaint after being coerced into the Non-Disclosure agreement, a violation of 5 USC 2302 (b)(8), (b)(9), and (b)(10), (b)(12) and (b)(13) for fear of further retaliatory action.

**4.** Judge Turbitt failed to acknowledge Appellant's FSLA classification was exempt and therefore flexible work time is common and charges of misconduct for prior approved time and attendance was discriminatory, retaliatory, retribution, and abuse of power.  In fact, Appellant has worked several thousand hours without pay over his 29 year career.


## Illegality of Non-Disclosure Agreement & More Prohibited Personnel Practices

The timeline of events submitted by Appellant in this matter is critical to showing coercion of Appellant into the unlawful Non-Disclosure agreement.

The Agency Attorney stipulated to the fact, the Agency drafted agreement it called an EEOC Settlement Agreement, contains a Non-Disclosure clause (IAF Tab 1 at 2 pg 4).

**The Non-Disclosure agreement contains a waiver of Title VII Rights (Tab 1 at 2 pg 3).**
Title VII Rights are non-waivable in this type of Non-Disclosure agreement, according to EEOC Enforcement Guidance on non-waivable employee rights under EEOC enforced statutes (Appellant Remand Exhibit: John Does v. Dept of Commerce/EEOC Guidance and Relevant Docs, pg 24).
Non-Disclosure agreements must comply with 5 USC 2302 (b)(13).  The Non-Disclosure agreement, in the Appellant's case, is a prohibited personnel practice and was utilized to accomplish the Agency's overall mission, to "dispose" of Appellant's pending EEOC file in the Baltimore Field Office and to terminate the Appellant for exercising his Title VII Rights.

     **A.** Immediately after charging Appellant with misconduct, the Management Official Brian McGrath presented Appellant with a Non-Disclosure agreement. The agreement required

7



suspension, retirement or resignation, reassignment, and forbid to work at Commerce. The agreement submitted to the Appellant, under the threat of termination is a violation of 5 USC 2302 (b)(8), (b)(9), (b)(12) and (b)(13).

     **B.** Appellant's Non-Disclosure agreement constitutes as a "**Gag Agreement/Order**" and forbids employee from communicating directly with Congress and is a prohibited personnel practice per 5 USC 2302 (b)(12) and (b)(13). The "Gag" agreement has been deemed void and unenforceable, and against public policy (EEOC v. Astra USA., 94 F.3d 738, 744-745 (1st Cir 1996).Id at 744; EEOC v. Morgan Stanley & Co., Inc., 2002 WL 31108179(S.D.N.Y. 2002); DEC v. Lipson, 1997 WL 801712 (N.D.Ill. 1997); cf. Fomby-Denson v Dept of the Army, 247 F.3d 1366, 1368 (Fed. Cir.2001). Also, the agreement violates the *Lloyd-LaFollete Act of 1912 and the WPEA.*

     **C.** Due to the surrounding circumstances involved around Appellant, the Non-Disclosure agreement is considered retaliation and discrimination in accordance with EEOC Enforcement Guidance on non-waivable employee rights under EEOC enforced statues, EEOC Notice No. 915.002, a prohibited personnel practice and a violation of 5 USC 2302 (b)(1), (b)(8), (b)(9), (b)(10) and (b)(12) (IAF Tab 1 at 2 pg 3), Tab 6; Appellant Remand Exhibit John Does v. Commerce/EEOC etc).

     **D.** The Non-Disclosure agreement is missing the required clause, which states: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive Order…" and "The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling."

Agency Representative Adam Chandler, stated in the Agency's Response to the Initial Appeal Acknowledgement Order, the Appellant would be facing removal from federal service if he was successful in vitiating the unlawful agreement (Agency Initial Response File Exhibit 1, May 21, 2012, pg.8 of 13).

This is a perceived threat, which is a prohibited personnel practice in violation of 5 USC (b)(8)(A), (B), (b)(9), (b)(12) and should be passed to OSC for further investigation. This goes to the depth of the disregard for employee protected and guaranteed rights, discriminatory animus and disregard for the law.

     **E.** The Agency's *copycat* Non-Disclosure agreement deemed an "abomination" and an "unlawful scheme" by the Office of Special Counsel in the OSC stay Request, OSC Ex Rel John Does 1-4 v Department of Commerce Office of Inspector General. This a direct violation of EEOC Policy Guidance on Non-waivable Rights and prohibited personnel practices under 5 USC

Pleading Number : 2014008445        Submission date : 2014-01-26 22:28:41        Confirmation Number: 795511777

2302 (b)(8), (b)(9), (b)(10), (b)(12), and (b)(13) and an act of malice and a reckless disregard for the law and a violation of Appellant's federally protected Title VII Civil Rights and the deliberate retaliation and per se discrimination Per Enforcement Guidance EEOC Notice No. 915.002 (at www.eeoc.gov) (Exhibit John Does v Dept of Commerce/EEOC Guidance).

**F.** The Non-Disclosure agreement violates annual appropriations law restricting communications with the Office of Special Counsel and Congress since 1988 appropriations law prohibits federal agencies from using any funds appropriated by Congress to implement or enforce any Non-Disclosure agreement absent statement informing employee's right under 5 USC 2302 (b)(8); 7211 of title 5, USC; and 5 USC 2302 (b)(13).

## Harmful Procedural Errors

**1.** The Agency refused to submit into the documentary record, which stated: *Deciding Official would decide Appellant's situation and made no mention of the inclusion of a Non-Disclosure agreement.* Pending a decision from the Deciding Official, the Agency served Appellant a Non-Disclosure settlement agreement in direct violation of the Agency procedure stated in the removal document.

**2.** Prior accommodations for Appellant's disability were made by Appellant's supervisor. An email response from the Management Official, professed his gratitude for the "**disposal**" of Appellant's pending EEOC claims in this adverse action (Tab 1 at 3).
EEOC claims should be voluntarily settled or adjudicated before the EEOC and Title VII Rights are nonwaivable rights. This adverse action is also in violation of EEOC Policy Guidance on non-waivable rights, i.e. Title VII Rights. Coercion by imposition of a Non-Disclosure agreement is not voluntary and is a prohibited personnel practice in violation of 5 USC 2302(b)(8), (b)(9) and (b)(12).

**3.** The Agency Deciding Official's, Terryne Murphy, admitted in the hearing that she assisted with the drafting of the Non-Disclosure agreement. Ms. Murphy assisted in committing a harmful procedural error withholding her decision on Appellant's response to charged misconduct until a nondisclosure agreement was secured. Ms. Murphy's participation in the process and procedure is in contradiction to the procedure stated in the removal document (Tab 1 at 1), which is a clear violation of Appellant's Constitutional Right to Due Process.

## Important Facts of Law

9



Absent the evidence and substantiation charges, The Judge failed to rule the Agency should not prevail on the charges of misconduct and the Agency decision secured by use of prohibited personnel practices should not be sustained.  The Agency's decision to suspend employee and coerce employee to retire should not be sustained, due to the agreement was secured by duress, with coercion, along with utilizing prohibited personnel practices and gross Agency procedural errors.

The Judge failed to rule Appellant was coerced into the Non-Disclosure agreement which is a prohibited personnel practice as in OSC Ex Rel John Does(1-4) v. Commerce, the Board has jurisdiction in this matter and the Appellant also prevails on the merit (Shultz v. U.S. Navy, Covington, Dumas, and Fruhauf,).  The terms and conditions of employment were dictated making Appellant's retirement and suspension adverse actions with no cause of action submitted or sustained by the Agency (Agency Remand Exhibit 3).

The Judge failed to conclude a **nexus** between the July 7, 2011 Proposal to Remove and the July 6, 2011 email to Census Director complaining of continued discriminatory actions against Appellant (IAF Tab 1 at 4);  the nexus to Appellant's disability as Appellant submitted evidence of long term documented disability as Appellant underwent total left hip replacement of February 27, 2012 (Tab 4 at 16-19); and the nexus to Appellant's pending EEOC claims in the Baltimore Field Office awaiting a decision on Appellants May 19, 2011 Motion in Opposition of the Agency's Motion to Dismiss (Tab 6 at 1).

The Judge grossly misstates fact that there was negotiation to forfeit complaints as evidence clearly shows Appellant waiting on a decision from the EEOC.   Appellant's flexible work schedule accommodations had no impact on Appellant's performance and thus no cause for action.

-In *Shultz v. U.S. Navy*, "if an employee can show that the Agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the Agency is purely coercive. Cosby v. United States, 189 Ct.Cl. 528, 417 F.2d 1345, 1355 (1969); Autera v. United States, 182 Ct.Cl. 495, 389 F.2d 815, 817 (1968); Rich v. Mitchell, 273 F.2d 78, 79 (D.C.Cir.1959), cert. denied, 368 U.S. 854 , 82 S.Ct. 91, 7 L.Ed.2d 52 (1961)".

-In *Scharf v. U.S. Air Force*, "with freedom of choice as the guiding principle, it has been held that the element of voluntariness is vitiated when (1) an employee resigns under duress brought on by government action, see, e.g., McGucken v. United States, 407 F.2d 1349, 1351, 187 Ct.Cl. 284 (Ct.Cl.), cert. denied, 396 U.S. 894, 90 S.Ct. 190, 24 L.Ed.2d 170 (1969); (2) an employee unsuccessfully tries to withdraw his resignation before its effective date, see Cunningham v. United States, 423 F.2d 1379, 1384-85, 191 Ct.Cl. 471 (Ct.Cl.1970); (3) an employee submits a resignation under time pressure, see Perlman, 490 F.2d at 932-33; or (4) an

Pleading Number : 2014008445          Submission date : 2014-01-26 22:28:41          Confirmation Number: 795511777          page 13 of 47

employee fails to understand the situation due to mental incompetence, see Manzi v. United States, 198 Ct.Cl. 489, 492 (1972). See Taylor v. United States, 591 F.2d 688, 692, 219 Ct.Cl. 86 (Ct.Cl.1979); Christie v. United States, 518 F.2d 584, 588, 207 Ct.Cl. 333 (Ct.Cl.1975).

-In Perlman v. United States, "whether an action is voluntary or involuntary is determined not by the form of the action, but by the circumstances that produced it. [Federal Personnel Manual Supp. 752-1, subchapter S1-2a(1).] See Ainsworth v. United States, 180 Ct.Cl. 166, 172 (1967), and the recent decision in Manzi v. United States, 198 Ct.Cl. 489, 495 (1972)."

-In McGucken v. United States, supra, in determining whether an employee's resignation was submitted under duress, the three elements necessary to show duress are (1) that one side involuntarily accepted the terms of another, (2) that circumstances permitted no other alternative, and (3) that said circumstances were the result of coercive acts of the opposite party.

-In Fruehauf, "duress involves a step beyond mere illegality and implies that a person has been unlawfully constrained or compelled by another to perform an act under circumstances which prevent the exercise of free will (Fruehauf Southwest Garment Co v. United States).   The Non-Disclosure agreement, the Agency's Exhibit 3, and Union President's testimony show that constraint.

## Conclusion

Due to close proximity time of events shown in the timeline and the documentary evidence, it reasonably implies a causal relationship between all allegations the Appellant asserts. Therefore, the agreement given to Appellant under duress created by Agency actions, the Agency's procedural errors, along with the actions & inactions of Judge Turbitt for redress, and the use of a nondisclosure agreement and other prohibited personnel coerced Appellant into an unlawful agreement and denied Appellant his right to "Due Process" which undermines the entire Merit system.  Appellant should prevail on jurisdiction and thus on the merits.

## Damages

Appellant seeks all allowable damages, including consequential damages.
Damages to include reinstatement, back pay, benefits, actual and future compensatory damages; to include pecuniary and nonpecuniary damages.

11

Respectfully,

/signed/

Anthony W. Perry

12

## Certificate of Service

I hereby certify that a true and accurate copy of the foregoing PETITION FOR REVIEW were sent on January 26, 2014, by the following means indicated:

**Certified Mail:**

Clerk of the Board

The Clerk of the Board

Merit Systems Protection Board

1615 M. Street, N.W.

Washington, D.C.  20419

**Certified Mail:**

Agency Representative

Adam Chandler

Bureau of the Census (8H048)

4600 Silver Hill Road

Washington D.C.  20233

Work: 301-763-6238

Facsimile: 301-763-6238

13

ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE
Docket # DC-0752-12-0486-B-1
Response to Agency Representative's Response To Oppositi dated 2/20/2014
Summary Page

**Case Title :** ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE

**Docket Number :** DC-0752-12-0486-B-1

**Pleading Title :** Response to Agency Representative's Response To Oppositi dated 2/20/2014

**Filer's Name :** Anthony W. Perry

**Filer's Pleading Role :** Appellant

**Details about the supporting documentation**

N/A

# Table of Contents

Pleading Interview ............................................................................. 3
Uploaded Pleading Text Document ...................................................... 4
Certificate of Service ......................................................................... 14

ANTHONY W. PERRY v. DEPARTMENT OF COMMERCE
Docket # DC-0752-12-0486-B-1
Response to Agency Representative's Response To Oppositi dated 2/20/2014
Online Interview

1. Would you like to enter the text online or upload a file containing the pleading?

See attached pleading text document

2. Does your pleading assert facts that you know from your personal knowledge?

Yes

3. Do you declare, under penalty of perjury, that the facts stated in this pleading are true and correct?

Yes

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**WASHINGTON REGIONAL OFFICE**

---

| | | |
|---|---|---|
| ANTHONY W. PERRY, | ) | DOCKET NUMBERS: |
|       Appellant | ) | DC-0752-12-0486-B-1 |
| | ) | DC-0752-12-0487-B-1 |
| | ) | |
|   vs. | ) | **REVIEW BOARD** |
| | ) | |
| | ) | |
| DEPARTMENT OF COMMERCE, | ) | DATE: March 1, 2014 |
|       Agency | ) | |

---

### Response to Agency Opposition to Petition For Review

Appellant timely submits a Response to the Agency's Opposition to Appellant's Petition for Review of the Administrative Judge's decision, denying Appellant Jurisdiction before the Board.

The Agency's opposition to Appellant's PFR is without merit.

**Legal Standards Governing Petitions for Review**

The legal standard for a Petition for Review is codified in 5 C.F.R. 1201.115, including 5 C.F.R. 1201.115(e) notwithstanding the above provisions in this section, the Board reserves the authority to consider any issue in an appeal before it.  In part, the legal standard for review provides that an agency's decision may not be sustained by the Board if the appellant:

(A) shows harmful error in the application of the agency's procedures in arriving at such decision;

(B) shows that the decision was based on any prohibited personnel practice described in 5 U.S.C. 2302(b); or

(C) shows that the decision was not in accordance with law.

The Agency's basis for the adverse actions identified in the complaint and codified in the Proposal to Remove and the nondisclosure agreement before the Board are the Agency's **charges of misconduct**.   The Administrative Judge failed to rule that the Agency has ***not***

1

*produced any evidence of misconduct nor has the Agency sustained any charges of misconduct* and the threat of termination without un-sustained evidence was fraudulent, fraudulent misrepresentation of the facts, misinformation and purely coercive and cannot prevail in the law.  The Judge erroneously ruled the suspension and forced retirement are not within the Board's jurisdiction.

The Administrative Judge failed to rule in favor of Appellant and against the Agency in law that it committed prohibited personnel practices and gross harmful procedural error in securing adverse actions against Appellant by use of the nondisclosure agreement and deciding to suspend and force Appellant to retire.   He failed to rule the nondisclosure document deprived Appellant of his Constitutional guarantee of equal protection under the law, due process, and his right to property and therefore was not in accordance with the law.

Additionally, the nondisclosure agreement is invalid because Appellant did not receive any consideration from the Agency in the settlement.  The settlement was not voluntary as exhibited in Agency Remand Exhibit 3.  The Agency provided nothing by suspending me and forcing me to retire.  It has shown no cause of action in the first place.

The Judge failed to rule the agreement was coerced under duress as the Appellant has shown and further shown below in the law.

Since the pending EEOC claims also contained prior violations of the ADEA, it failed to include the appropriate waiver in accordance with the OWBPA.

The Judge failed to rule no "valuable" consideration for the complainant was given in exchange for the waiver.

The Judge failed to rule no advisement to consult with an attorney was provided

1.   **New and Material Evidence**

The Administrative Judge failed to rule that the Agency unlawfully withheld SF-50 and Certified Time and Attendance documents among other documents required in accordance with 5 USC 1241.43 related to Appellant's adverse action claims and the intertwined with disability discrimination and retaliation.

Below is the correct extraction of the email the Agency's representative, from Ben Felder, refers to in his opposition to the PFR.  It is critical to note that the terms and conditions of Appellant's employment and the adverse actions were involuntary, dictated and coerced upon Appellant and then executed a prohibited personnel practice wrapping it in the unlawful nondisclosure agreement denying Appellant the right of his due process to confront the evidence on the merit of the charges.  The Judge failed to rule documentary evidence provided by Appellant proves no misconduct has ever occurred and that the Agency can't prevail because

2

it provided no evidence of misconduct nor the policy or guidelines which were violated nor the charges.  Appellant provided the charging document and the evidence that refutes the charges.

At the hearing, Union President Johnny Zuagar stated that Appellant had never seen the document nor would I have ever seen it, according to him.  If the Agency had not submitted Exhibit 3 into the Agency Remand File, I would have never known the information below.  There is no discussion or evidence about actual misconduct except to justify the adverse action in the nondisclosure agreement and in the removal document to coerce Appellant into the unlawful agreement.  Yet the Administrative Judge refused to allow discovery of the Deciding Official's, Terryne Murphy, emails, correspondence, and notes related to how she reached her decision on the charges of misconduct.

**Benjamin T Felder/HRD/HQ/BOC**
**Ronda J Brown/POL/HQ/BOC@BOC**
**Terryne F Murphy/ISSRO/HQ/BOC@BOC, Stacy Chalmers/HRD/HQ/BOC@BOC**
Tuesday, July 26, 2011 07:37AM
AP Settlement
FYI - I presented the proposed terms for settlement to Johnny Zuagar yesterday. He advised that he would talk to
AP and get back to me. Hopefully, I will know something or have a counter-offer by the end of this week. I will let
you know as soon as I have something. These were the terms offered:
1. Agree to retire/resign by NLT May 30, 2011. (nonnegotiable)
2. Agree not to apply for or accept any future positions with the BOC. (nonnegotiable)
3. Agree not to engage an any further misconduct. (nonnegotiable)
4. Accept a 60-day suspension.
5. Accept a reassignment to an already identified area.
6. Accept a demotion to a non-supervisory GS-13 position.
7. Withdraw all pending complaints/cases against the Agency. (nonnegotiable)
8. Agree not to file a claim against the Agency concerning this matter. (nonnegotiable)

I respectfully point the Board to item 5 above and to Initial Appeal File Tab 7 for one of several direct evidence of retaliation, reprisal and retribution as Appellant had been requesting reassignment since at least 2009 as the Judge failed to note in his commentary and decision. The reassignment in item 5 is a prohibited personnel practice in violation of 5 USC 2302 as it removed Appellant's supervisory classification imposing significant changes in Appellant's working conditions as had other changes that were pending in OSC-MA-2619 withdrawn when Ms. Murphy notified me to inform her of any other pending actions I might have.

It was clear to Appellant to withdraw else risk whatever action the Agency would take without Appellant's ability to address as the nondisclosure agreement stated the Agency would take whatever action it wanted if additional misconduct occurred.  Since no misconduct had occurred, Appellant to the statement to mean it would terminate Appellant for whatever reason it decided including if it thought Appellant would file a complaint, report to the OSC, Congress, or the Whitehouse.  I have done each since retirement.

3

The Judge wrongfully denied material and relevant witness testimony from supervisors Dale Reed and Patricia Musselman and from Darren Gutschow, an employee who was not Appellant's supervisor but who proposed Appellant's removal from the federal service.

The Agency's opposition to the PFR is without merit as these documents procured by FOIA were received after the August 7, 2013 closing of the Appeal File.  The Judge was required to compel the Agency to submit these documents as they are material to the charges.

The Judge failed to rule in law the Agency submitted no charging documents, evidence, the Deciding Official's notes and records or the nondisclosure agreement as was required by 5 USC 1241.43.  Appellant provided documentary evidence in the record while the Agency argued Appellant voluntarily suspended himself and voluntarily retired.

The SF-50 show adverse action and the Certified Time and Attendance Records show work times were approved by supervisor Dale Reed, Patricia Musselman or designee.  The Judge failed to rule Darren Gutschow's (employee who was not Appellant's supervisor) proposal to remove Appellant from the Federal Service is a prohibited personnel practice in violation of 5 USC 2302, DAO on Discipline and a violation of the Federal Personnel Manual.

The Judge also failed to rule the Agency failed to sustain charges of misconduct because the Agency refused to submit workplace policies or guidelines relevant to the adverse action in effect at the time of the adverse action and therefore has not sustained charges of misconduct.

The Judge failed to infer from the evidence that the purpose of the charges were to retaliate and punish Appellant for prior pending EEOC claims, for complaining to the Census Bureau Director about ongoing discrimination, pending Office of Special Counsel claim, and to inflict as much pain on Appellant as possible.

The Judge failed to address in his decision that in the hearing, the Agency Union President stated with clarity that the Agency was going to terminate Appellant if he did not sign the agreement even never having produced evidence of misconduct when requested by Appellant,

And that in the hearing, the Deciding Official admitted committing a harmful procedural error in contradiction to the procedure stated in the Proposal to Remove which stated she would decide on the basis of Appellant's response.

Appellant's explanation of his conduct and offer to be suspended for 14 days was to end the simultaneous trauma of his progressive disability and of the false accusations of the misconduct of stealing money from the government and proposed removal and was not an admission of any guilt as the evidence show.  The Agency then went further in an egregious and retaliatory

4

act with the nondisclosure agreement in order to hide there was no evidence of charged misconduct.

### 2. Administrative Judge's Erroneous interpretation of statute or regulation

The Administrative Judge failed to rule in accordance with the law that Agency management Brian McGrath, Ronda Brown, Darren Gutschow, Terryne Murphy, and Agency signatories imposing the unlawful nondisclosure agreement committed fraud and/or misrepresentations, prohibited personnel practices and harmful procedural error charging Appellant with misconduct.  There is no evidence in the record or in possession of the Agency of misconduct.

*Fraud is the intentional perversion of truth and use of deceit, a trick or some dishonest means to deprive another of his/her/its money, property or a legal right.*

*Extrinsic fraud occurs when deceit is employed to keep someone from exercising a right, such as a fair trial, by hiding evidence or misleading the opposing party in a lawsuit.*

*Fraudulent misrepresentation occurs if (1) a representation was made; (2) that was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth; (4) that it was made with the intention that the plaintiff rely on it; (5) that the plaintiff did rely on it; and (6) that the plaintiff suffered damages as a result.*

-In *Shultz v. U.S. Navy*, "if an employee can show that the Agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the Agency is purely coercive. Cosby v. United States, 189 Ct.Cl. 528, 417 F.2d 1345, 1355 (1969); Autera v. United States, 182 Ct.Cl. 495, 389 F.2d 815, 817 (1968); Rich v. Mitchell, 273 F.2d 78, 79 (D.C.Cir.1959), cert. denied, 368 U.S. 854 , 82 S.Ct. 91, 7 L.Ed.2d 52 (1961)".

The Administrative Judge failed to rule evidence of Appellant's flexible work schedule and disability was in possession of Agency at the time of misconduct charges and failed to acknowledge undisputed evidence in the record that Appellant's placement under GS-14 Patricia Musselman and then GS-14 Dale Reed in 2007-2008 was a prohibited personnel practice awaiting investigation at the OSC (OSC MA-2619).   Appellant had reported to a GS-15 Division Chief since 1995.

-In *Scharf v. U.S. Air Force*,  "with freedom of choice as the guiding principle, it has been held that the element of voluntariness is vitiated when (1) an employee resigns under duress brought on by government action, see, e.g., McGucken v. United States, 407 F.2d 1349, 1351, 187 Ct.Cl. 284 (Ct.Cl.), cert. denied, 396 U.S. 894, 90 S.Ct. 190, 24 L.Ed.2d 170 (1969); (2) an employee unsuccessfully tries to withdraw his resignation before its effective date, see Cunningham v. United States, 423 F.2d 1379, 1384-85, 191 Ct.Cl. 471 (Ct.Cl.1970); (3) an

5

employee submits a resignation under time pressure, see Perlman, 490 F.2d at 932-33; or (4) an employee fails to understand the situation due to mental incompetence, see Manzi v. United States, 198 Ct.Cl. 489, 492 (1972). See Taylor v. United States, 591 F.2d 688, 692, 219 Ct.Cl. 86 (Ct.Cl.1979); Christie v. United States, 518 F.2d 584, 588, 207 Ct.Cl. 333 (Ct.Cl.1975).

-In Perlman v. United States, "whether an action is voluntary or involuntary is determined not by the form of the action, but by the circumstances that produced it. [Federal Personnel Manual Supp. 752-1, subchapter S1-2a(1).] See Ainsworth v. United States, 180 Ct.Cl. 166, 172 (1967), and the recent decision in Manzi v. United States, 198 Ct.Cl. 489, 495 (1972)."

-In McGucken v. United States, supra, in determining whether an employee's resignation was submitted under duress, the three elements necessary to show duress are (1) that one side involuntarily accepted the terms of another, (2) that circumstances permitted no other alternative, and (3) that said circumstances were the result of coercive acts of the opposite party.

-In Fruehauf, "duress involves a step beyond mere illegality and implies that a person has been unlawfully constrained or compelled by another to perform an act under circumstances which prevent the exercise of free will (Fruehauf Southwest Garment Co v. United States).

-In Covington v. Department of Health and Human Services and Shutltz v. U.S. Navy, "...the board's jurisdiction and the merits of an alleged involuntary separation are inextricably intertwined. Dumas v. Merit Systems Protection Board, 789 F.2d 892, 894 (Fed.Cir.1986). Thus, if it is established that a resignation is involuntary, the board not only has jurisdiction, but also the employee wins on the merits and is entitled to reinstatement. See Covington v. Department of Health and Human Services, 750 F.2d 937, 943 (Fed.Cir.1984)., ".   "A resignation is not voluntary where an agency imposes the terms of an employee's resignation, the employee's circumstances permit no alternative but to accept, and those circumstances were the result of improper acts of the agency. See Edgerton v. Merit Systems Protection Board, 768 F.2d 1314, 1317 (Fed.Cir.1985); Scharf v. Department of the Air Force, 710 F.2d 1572, 1574 (Fed.Cir.1983); Taylor v. United States, 219 Ct.Cl. 86, 591 F.2d 688, 691 (1979).

...where an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act. **On the other hand**, inherent in that proposition is that the agency has reasonable grounds for threatening to take an adverse action. If an employee can show that the agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the agency is purely coercive. Cosby v. United States, 189 Ct.Cl. 528, 417 F.2d 1345, 1355 (1969); Autera v. United States, 182 Ct.Cl. 495, 389 F.2d 815, 817 (1968); Rich v. Mitchell, 273 F.2d 78, 79 (D.C.Cir.1959), cert. denied, 368 U.S. 854, 82 S.Ct. 91, 7 L.Ed.2d 52 (1961).

The Appellant claimed in the PFR that the non-disclosure agreement, the Agency's Remand Exhibit 3 (which the Agency unlawfully withheld from the Initial Appeal requirement by 5 USC

6

1241.43) showing suspension, retirement or resignation, forfeiture of pending EEOC claims as **non-negotiable**, Appellant's hours worked outside of regular schedule with supervisory approval (IAF Tab 5) and Union President's testimony that the Agency was going to terminate Appellant if he did not sign the agreement without evidence show that constraint.  The nondisclosure agreement violated Appellant's right to due process and is a violation of 5 USC2302 (b)(8), (b)(9), (b)(10), (b)(12) and (b)(13), minimally.  The Judge failed to rule in accordance to the law on this matter.

The Judge failed to rule in accordance with the law, 5 USC 2302 (b)(13) that it is a prohibited personnel practice to "implement or enforce any nondisclosure policy, form, or agreement, if such policy, form, or agreement does not contain the following statement: "These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.".

The Administrative Judge's ruling violates EEOC Notice Number 915.002, "Enforcement Guidance on non-waivable employee rights under Equal Opportunity Commission (EEOC) enforced statutes."

Volume II of the EEOC Compliance Manual states: An employer may not interfere with the protected right of an employee to file a charge, testify, assist, or participate in any manner in an investigation, hearing, or proceeding under Title VII of the Civil Rights Act of 1964 (Title VII), 42 **U.S.C.** § 2000e et seq., the Americans with Disabilities Act (ADA), 42 **U.S.C.** § 12101 et seq., the Age Discrimination in Employment Act (ADEA), 29 U. S. C. § 621 et seq., or the Equal Pay Act (EPA), 29 **U.S.C.** § 206(d). These employee rights are non-waivable under the federal civil rights laws.

### (a) Coercion to Enter Unlawful Nondisclosure Agreement

The documentary evidence and the relevant law in this case and testimony by Union President and Terryne Murphy at the hearing dispute the Judge's conclusion of voluntary entry into the settlement agreement.

Appellant's PFR addresses the Agency's violations of 5 USC 2302 and the commission of harmful procedural errors and the Judge's failure to rule accordingly.

In all of the paragraphs below, the PFR states that Administrative Judge failed to rule that the Agency decisions and nondisclosure agreement were secured by prohibited personnel practices described in 5 U.S.C. 2302(b), Merit System Principles in 5 USC 2301, harmful procedural error,

7

not in accordance with the law in violation of equal protection, due process, and property rights, statute and regulations.

Requiring a federal employee to enter into a nondisclosure agreement that forbids the employee to exercise his statutory rights or fulfill his ethical duty to make protected disclosures constitutes a prohibited personnel practice under 5 U.S.C. 2302(b)(1), (b)(8), (b)(9), (b)(12), and (b)(13).

The Judge failed to infer OSC charges in OSC-MA-2619 were withdrawn because of Ms. Murphy's intervention is stated in the record and remains undisputed by the Agency.

An employee's right to petition Congress is protected under the Lloyd-LaFollette Act of 1912, 5 U.S.C. 7211. "Gag rules" that forbid federal employees from communicating directly with Congress, on pain of dismissal, were explicitly cited by several legislators as the reason for enacting the Lloyd-LaFollette Act. *Bush v. Lucas,* 462 U. 367, 382-84 & nn.19-24 (1983). The nondisclosure agreement on its face violate the Lloyd-LaFollette Act, and thereby 5 U.S.C. 2302(b)(l2).

The Administrative Judge poses commentary and argument even complimenting Appellant on his intelligence and then proceeds to attack Appellant's credibility to the benefit of the Agency in the "catch all" credibility proposition he thinks the Agency can use to prevail before the Board.   I am aware he no longer has the title of Administrative Judge.

For a credibility assessment of Appellant, I respectfully request the Board review Appellant's exhibits, accomplishments, pursuit of and repeated denial of promotional opportunities and statement of having worked thousands of hours without pay over Appellant's career.

The case before the MSPB is not about credibility.  If it is, Judge Turbitt asking Agency lawyer in the telephonic conference about the documents the Agency wanted removed from Appellant's file is most incredible.

The Judge's refusal to compel and the Agency's failure to comply with the law in 5 USC 1241.43 goes to credibility.  The Judge confers credibility on Agency employees committing documented prohibited personnel practices including disability discrimination .

The Judge and the Agency further misstates and misrepresents the facts that the 30 day suspension was a mitigation of any other action.  A suspension greater than 14 days is an adverse action.  There is no evidence for cause of action in the record submitted by Agency.

In MSPB Stay granted in OSC EX REL John Does (1-4) v. Department of Commerce IG and a near identical nondisclosure agreement, some Commerce employees signed that agreement as well because in the OSC brief it stated that the employees were coerced into the agreement.

As in *Perlman v. United States*, "whether an action is voluntary or involuntary is determined not by the form of the action, but by the circumstances that produced it. [Federal Personnel

8

Manual Supp. 752-1, subchapter S1-2a(1).]  See Ainsworth v. United States, 180 Ct.Cl. 166, 172 (1967), and the recent decision in Manzi v. United States, 198 Ct.Cl. 489, 495 (1972)."

Appellant was served a removal proposal which described the procedure that would occur. Appellant responded as required.  Shortly thereafter, the Agency management presented Appellant with the nondisclosure agreement and communicated to Appellant by way of the Union President Johnny Zuagar, which he testified to at the hearing, that the Agency was going to terminate Appellant if he did not sign the agreement.

It cannot be that the Agency using identical tactics in securing the nondisclosure agreement, the Commerce IG employees can be considered coerced into a near identical nondisclosure agreement and Appellant voluntarily entered a "copycat" coercive agreement but with an added egregious intention to permanent inflict Appellant with grief, despair and impoverishment.

### (b) AJ Improperly Failed to Render a Decision on the Merits

Appellant made the case that where the adverse actions are intertwined with the cause of action, the board's jurisdiction and the merits of an alleged involuntary separation are inextricably intertwined. Dumas v. Merit Systems Protection Board, 789 F.2d 892, 894 (Fed.Cir.1986). Thus, if it is established that a resignation is involuntary, the board not only has jurisdiction, but also the employee wins on the merits and is entitled to reinstatement. See Covington v. Department of Health and Human Services, 750 F.2d 937, 943 (Fed.Cir.1984).

Further in Covington, It is established that erroneous advice by the agency can rebut the presumption of voluntariness, and that such evidence must be considered. Covington, supra.

## <u>Conclusion</u>

The Agency's opposition to Appellant's Petition for Review is without merit and therefore per the Petition For Review, Appellant should prevail on jurisdiction and thus on the merits in the instant case and should receive maximum allowable damages and prohibited personnel practices passed on to OSC for corrective action and disciplinary action.


Respectfully,

/signed/

Anthony W. Perry


9

## Certificate of Service

I hereby certify that a true and accurate copy of the foregoing PETITION FOR REVIEW were sent on March 1, 2014, by the following means indicated:

**Certified Mail:**

<u>Clerk of the Board</u>

The Clerk of the Board

Merit Systems Protection Board

1615 M. Street, N.W.

Washington, D.C.  20419

**Certified Mail:**

<u>Agency Representative</u>

David J. Spence

Department of Commerce

14th and Constitution Ave. N.W.

Washington D.C.  20230

Work: 301-763-6238

Facsimile: 301-763-6238

10

# Certificate Of Service

e-Appeal has handled service of the assembled pleading to MSPB and all of the Parties. Following is the list of the Parties in the case:

| Name & Address | Documents | Method of Service |
|---|---|---|
| MSPB: Office of the Clerk of the Board | Response to Agency Representative's Response To Oppositi dated 2/20/2014 | e-Appeal / e-Mail |
| David J. Spence Agency Representative | Response to Agency Representative's Response To Oppositi dated 2/20/2014 | e-Appeal / e-Mail |

*This document is the Agency dictated terms and Conditions of employment without evidence of misconduct*

| | |
|---|---|
| **From:** | Benjamin T Felder/HRD/HQ/BOC |
| **To:** | Ronda J Brown/POL/HQ/BOC@BOC |
| **Cc:** | Terryne F Murphy/ISSRO/HQ/BOC@BOC, Stacy Chalmers/HRD/HQ/BOC@BOC |

**Date:**      Tuesday, July 26, 2011 07:37AM
**Subject:**   AP Settlement

FYI - I presented the proposed terms for settlement to Johnny Zuagar yesterday. He advised that he would talk to AP and get back to me. Hopefully, I will know something or have a counter-offer by the end of this week. I will let you know as soon as I have something. These were the terms offered:

1. Agree to retire/resign by NLT May 30, 2011. (nonnegotiable)
2. Agree not to apply for or accept any future positions with the BOC. (nonnegotiable)
3. Agree not to engage an any further misconduct. (nonnegotiable)
4. Accept a 60-day suspension.
5. Accept a reassignment to an already identified area.
6. Accept a demotion to a non-supervisory GS-13 position.
7. Withdraw all pending complaints/cases against the Agency. (nonnegotiable)
8. Agree not to file a claim against the Agency concerning this matter. (nonnegotiable)

**EXHIBIT**
**3**

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

|  |  |  |
|---|---|---|
| ANTHONY W. PERRY, | ) | EEOC Case No. 531-2010-00351X |
| Complainant, | ) | Agency Complaint Nos. 09-63-01027, |
|  | ) | 10-63-00197 & 11-63-00080 |
| v. | ) |  |
|  | ) | EEOC Docket No. 0120111784 |
| GARY LOCKE, SECRETARY, | ) | Agency Complaint Nos. 07-63-00080 |
| U.S. DEPARTMENT OF COMMERCE, | ) | & 07-63-00145 |
|  | ) |  |
| Agency. | ) | EEOC Docket No. 0120111034 |
|  | ) | Agency Complaint No. 10-63-02671 |

## SETTLEMENT AGREEMENT

1.   **PARTIES.**  The parties, Anthony W. Perry (Complainant) and the U.S. Department of Commerce (Agency), through the undersigned, voluntarily enter into this Settlement Agreement (Agreement), to resolve all existing matters concerning Complainant's employment with the Agency, including the issues raised in EEOC Case No. 531-2010-00351X / Agency Complaint Nos. 09-63-01027, 10-63-00197 & 11-63-00080 and any outstanding appeal rights stemming from EEOC Docket No. 0120111784 / Agency Complaint Nos. 07-63-00080 & 07-63-00145 and EEOC Docket No. 0120111034 / Agency Complaint No. 10-63-02671.  By this Agreement, the parties resolve all disputes between them concerning Complainant's employment with the Agency, regardless of the forum, in existence on the effective date of this Agreement.

2.   **COMPLAINANT.**  In consideration of the Agency taking the actions described in Paragraph 3 below, Complainant agrees to:

a.   Retire voluntarily effective no later than September 4, 2012.  Complainant acknowledges that by entering into this Agreement his decision to retire is both voluntary and irrevocable.

b.   Voluntarily resign from his employment with the Agency, effective September 4, 2012, in the event Complainant has not retired by the close of business, September 4, 2012.  Complainant will do this by completing Part E of the Standard Form 52 attached to this Agreement and submitting this completed form to the Agency at the

Initials:

_(signature)_  Complainant                          _(signature)_  Management Official

_(signature)_  Complainant's Representative          _(signature)_  Management's Representative

Page 1 of 6

same time that he submits this Agreement with his signature. Complainant agrees that the reason given for his resignation will not be adverse or hostile to the Agency.

c. Except as set forth in this Agreement, not apply for or accept any positions with the Agency at any time in the future from the effective date of this Agreement. If Complainant applies for employment in violation of the Agreement and the Agency hires him, the Agency, at its discretion, may remove him immediately. Complainant further agrees to voluntarily waive all appeal rights he has and not to litigate in any forum, judicial or administrative, any claims arising from a removal pursuant to this paragraph.

d. Refrain from engaging in any acts of misconduct from the effective date of this Agreement until his retirement or resignation, which will be no later than September 4, 2012. If the Agency determines in its sole discretion that Complainant has engaged in any acts of misconduct during the time period established in this paragraph, Complainant will be subject to immediate removal without any right to reply. The waiver of rights contained in Paragraph 2.h. below applies to any removal implemented pursuant to this paragraph.

e. Serve a suspension for thirty (30) calendar days in lieu of the removal proposed on June 7, 2011, for receipt of pay for time not worked and failure to follow supervisory directive. The suspension will be served nine (9) consecutive calendar days per pay period between Saturday of the preceding week and Sunday of the following week, beginning Saturday, August 27, 2011.

f. Accept, at the Agency's sole discretion, a reassignment from the effective date of this Agreement until his retirement or resignation, which will be no later than September 4, 2012. Complainant agrees and understands that he will be reassigned to the position of Information Technology Specialist, GS-14, with no supervisory title, status or duties. There will be no change to Complainant's salary and/or benefits as a result of this reassignment. The Agency retains the right to change Complainant's supervisor or work unit at its sole discretion.

g. **WITHDRAWAL.** Withdraw EEOC Case No. 531-2010-00351X / Agency Complaint Nos. 09-63-01027, 10-63-00197 & 11-63-00080, EEOC Docket No. 0120111784 / Agency Complaint Nos. 07-63-00080 & 07-63-00145, and EEOC Docket No. 0120111034 / Agency Case No. 10-63-02671 with no right to raise these issues again, except as provided in Paragraph 7, below. These withdrawals will take effect on the effective date of this Agreement.

Initials:

_____ Complainant

_____ Complainant's Representative

_____ Management Official

_____ Management's Representative

h. **WAIVER.** Waive, release, and forever discharge the Agency, its officers, agents, employees, and representatives (in their official and/or personal capacities) from any claims, demands, or causes of action, which Complainant has or may have, arising from his employment, including issues raised in EEOC Case No. 531-2010-00351X / Agency Complaint Nos. 09-63-01027, 10-63-00197 & 11-63-00080, EEOC Docket No. 0120111784 / Agency Nos. 07-63-00080 & 07-63-00145, and EEOC Docket No. 0120111034 / Agency Case No. 10-63-02671.  Complainant specifically waives any and all rights and claims arising out of the issues raised in the above-cited formal complaints of discrimination and/or related to any action taken pursuant to any provision of Paragraph 2, above, and Paragraph 3, below.  Complainant waives any and all rights and claims arising from Complainant's employment under the Age Discrimination in Employment Act, 29 U.S.C. § 633a et seq., as amended by the Older Workers' Benefit Protection Act, the Rehabilitation Act, 29 U.S.C. § 791 et seq., as amended, and/or Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq., as amended, as applicable.  This release includes but is not limited to a release of any right to administrative, judicial, or congressional relief, or any other type of relief, or of any claim to back pay, attorneys' fees and costs, or other type of compensation, except what is specifically set forth in paragraph 3, below.  However, by entering into this Agreement, Complainant does not waive rights or claims that may arise after the effective date of the Agreement.

3.     **AGENCY.**  In consideration of Complainant taking the actions described in Paragraph 2, above, the Agency agrees to:

a.  Not remove Complainant from his position or from the Federal service based upon the charges outlined in the June 7, 2011, proposal to remove letter.

b.  Issue a decision on the proposal to remove letter issued on June 7, 2011, suspending Complainant for thirty (30) days.  The suspension will be served nine (9) consecutive calendar days per pay period between Saturday of the preceding week and Sunday of the following week, beginning Saturday, August 27, 2011.  Complainant understands that the wording of the letter suspending him is within the sole and exclusive discretion of the Agency.

c.  At the Agency's sole discretion, reassign Complainant from the effective date of this Agreement until his retirement or resignation, which will be no later than September 4, 2012.  Complainant agrees and understands that he will be reassigned to the position of Information Technology Specialist, GS-14, with no supervisory title, status or duties.  There will be no change to Complainant's salary and/or benefits as a result of this reassignment.  The Agency retains the right to change Complainant's supervisor or work unit at its sole discretion.

Initials:

_Complainant_

_Complainant's Representative_

_Management Official_

_Management's Representative_

Page 3 of 6

d.  Process Complainant's voluntary resignation effective September 4, 2012, in the event Complainant has not retired by the close of business, September 4, 2012.

e.  Expunge Complainant's Official Personnel Folder of all records of disciplinary action taken pursuant to Paragraph 3.b. above if as of the date of his retirement or resignation, which will be no later than September 4, 2012, Complainant has not engaged in any further acts of misconduct, in accordance with Paragraph 2.d. above. Pursuant to this subparagraph, the Agency agrees to provide any prospective employer with a reference consisting of the dates of Complainant's employment with the Agency; the title, grade, series, and salary of the position held by Complainant at the time of his retirement or resignation; and that Complainant retired or resigned voluntarily from his position with the Agency. However, failure to comply with this subparagraph due to ignorance of the Agreement and its terms by any Agency employee does not give rise to a claim of breach of contract by Complainant.

4.    **NON-ADMISSION.**  This Agreement does not constitute an admission by the Agency of any wrongdoing on its part, and the Agency expressly denies that it, its officers, agents, employees, or representatives, violated any law, regulation, contract, or employment practice with regard to the treatment of Complainant, or that it discriminated, harassed and/or retaliated against Complainant in any way. Similarly, this Agreement does not mean that Complainant's allegations are without merit. Rather, the Agreement reflects the parties' interest in reaching an agreement to the satisfaction of both parties.

5.    **NOT PRECEDENTIAL.**  The parties agree that this Agreement has no precedential effect. Neither the Agreement, nor any term(s) herein may be used as a basis, by any person(s), to justify similar terms in any subsequent matter. This Agreement shall not be used, cited, or relied upon by any party in connection with any other judicial or administrative procedure.

6.    **NON-DISCLOSURE.**  The parties agree to keep the nature and terms of this Agreement confidential. The terms of the Agreement may not be disclosed to any person or entity beyond the persons signing below, except to Complainant's spouse as applicable, as required by law, as necessary to implement the terms of the Agreement, or as ordered by a court or administrative body of competent jurisdiction.

7.    **BREACH OF AGREEMENT.**  If either party believes that the other party has failed to comply with the terms of the Agreement, the party shall notify Roy Castro, EEO Officer, U.S. Department of Commerce, or Suzan J. Aramaki, Director, Office of Civil Rights, U.S. Department of Commerce, in writing, of the alleged noncompliance within thirty (30) days of when the party knew or should have known of the alleged noncompliance. Pursuant to 29 C.F.R.

Initials

_(signature)_ Complainant

_(signature)_ Complainant's Representative

_(signature)_ Management Official

_R.JB_ Management's Representative

Page 4 of 6

§ 1614.504(c), allegations that subsequent acts of harassment, discrimination and/or retaliation violate this Agreement shall be processed as separate complaints.

In accordance with 29 C.F.R. § 1614.504(a), in the event of failure by the Agency to carry out the terms of this Agreement for any reason other than for noncompliance or waiver of this Agreement by Complainant, Complainant may request:

    a.    Implementation of the terms of the Agreement; or

    b.    Reinstatement of the formal complaint(s) for further processing.

**8.**     **EFFECT OF SIGNATURE.** By signing this Agreement, Complainant agrees that Complainant has read and understands the entire Agreement, the effect(s) of each provision, especially the provisions relating to the withdrawal of the formal complaint(s), thereby foreclosing further litigation on the matters raised in the formal complaint(s), and the waiver set forth in Paragraph 2, above, and that Complainant has signed this Agreement voluntarily and was in no way coerced. Complainant shall have twenty-one (21) days from the date of receipt of this Agreement to consider its terms. Should Complainant sign this Agreement before the twenty-one (21) day time period has expired, Complainant attests that Complainant's decision to accept such a shortening of this period is knowing and voluntary, and was not induced by the Agency through fraud, misrepresentation, and/or threat to withdraw or alter the terms of the Agreement.

**9.**     **TOTALITY OF AGREEMENT.** This Agreement constitutes a fair, full, and final resolution of all aspects of Complainant's allegations, and contains all terms and conditions of the Agreement between the parties. No other conditions or assurances, expressed or implied, are included.

**10.**     **JOINT PRODUCT.** This Agreement is a joint product and will not be construed against any party on the grounds of sole authorship.

**11.**     **EFFECTIVE DATE.** This Agreement becomes effective when fully executed by the signatories designated below to include all concurrences.

_____ 08/16/2011        _____ 08/16/11
ANTHONY W. PERRY    Date          BRIAN E. MCGRATH    Date
Complainant                       Management Official

Initials:

_____ Complainant                _____ Management Official

_____ Complainant's Representative      _____ Management's Representative

08/22/11  11:00 FAX 301 457 2875          LEGAL OFFICE                                    ☒007

JOHNNY T. ZUAGAR                08/10/2011                  RONDA J. BROWN        8/22/11
Complainant's Representative        Date        RONDA J. BROWN              Date
                                                Management's Representative

CONCURRENCES:

ROY CASTRO                      8/22/11
Equal Employment Opportunity Officer      Date

TED A. JOHNSON                  8/11/11
Acting Chief, Human Resources Division    Date

BRIAN D. DiGIACOMO              8-22-11
Chief, Employment and Labor Law Division  Date

Initials:

_____ Complainant                       _____ Management Official

_____ Complainant's Representative      RJB  Management's Representative

Page 6 of 6

## CERTIFICATE OF SERVICE

For timeliness purposes, it shall be presumed that the parties received the foregoing *DECISION AND ORDER ENTERING JUDGMENT* within five (5) calendar days after the date it was sent *via* first class mail. I certify that on *September 12, 2011* the foregoing *ORDERS* was sent *via* first class mail to the following:

Anthony W. Perry
5907 Croom Station Road.
Upper Marlboro, MD 20772

Ronda J. Brown, Esq.
United States Department of Commerce
Legal Office
Bureau of Census
4600 Silver Hill Road, 8H048
Suitland, MD  20746

U.S. Department of Commerce
14th & Constitution Avenue, NW
Office of Civil Rights
Room 6012, HCHB
Washington, DC 20230

LeMar Anderson
Legal Technician