Exhibit 3 Pg. 1

 **U.S. OFFICE OF SPECIAL COUNSEL**

Report of Prohibited Personnel Practices
OSC File Nos. MA-12-4640 and MA-13-1126

███████████████

Investigation and Prosecution Division Attorney

███████████████

Complaints Examining Unit Attorney

September 16, 2013

By providing this report to the Department of Commerce (Commerce) for the sole purpose of aiding its determination of whether to take corrective or disciplinary action, the U.S. Office of Special Counsel (OSC) does not waive any protections or privileges that may apply to information disclosed in the report or to the sources of that information. In addition, neither the report nor the information contained herein may be disclosed to any individual not deemed essential to the determination of whether to take corrective or disciplinary action, unless OSC consents in writing to such disclosure. Specifically, it is requested that Commerce not disseminate any information provided by OSC to the subject officials of this investigation to potential witnesses in any future litigation that may arise should this matter not be resolved informally. Moreover, if Commerce receives a Freedom of Information Act (FOIA) request to which this report is responsive, Commerce shall not release the report to the requester, but rather promptly advise OSC of the FOIA request and advise the FOIA requester that OSC will provide a reply with respect to the report. Please contact OSC immediately and return this report if Commerce objects in any way to these conditions. Questions regarding this paragraph should be directed to OSC's Office of General Counsel at (202) 254 — 3600.

**REPORT OF PROHIBITED PERSONNEL PRACTICES**

**OSC CASE NOS. MA-12-4640 and MA-13-1126**

## I. INTRODUCTION

This Prohibited Personnel Practices Report (Report) contains the investigative findings in Office of Special Counsel (OSC)[1] File Nos. MA-12-4640 and MA-13-1126. These complaints were filed on behalf of two former Department of Commerce, Office of Inspector General (OIG) employees, hereafter referred to as John Doe 1 and John Doe 2, or collectively, the whistleblowers.[2] The complaints allege that the whistleblowers were coerced into signing separation agreements containing non-disparagement provisions preventing them from going to OSC, Congress, or the media in retaliation for their perceived whistleblowing and engagement in the Equal Employment Opportunity (EEO) process. OSC's investigation uncovered strong evidence of retaliation warranting corrective and disciplinary action.

Pursuant to 5 U.S.C. §§ 1214 and 1215, OSC is charged with independently investigating prohibited personnel practice (PPP) retaliation cases and, if warranted, seeking appropriate corrective and disciplinary action. This investigation concerns three types of PPPs: whistleblower retaliation (5 U.S.C. § 2302(b)(8)), retaliation for the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation (5 U.S.C. § 2302(b)(9)), and taking a personnel action in violation of a law, rule, or regulation implementing a merit system principle (5 U.S.C. § 2302(b)(12)) (collectively, protected activity). The non-disparagement provisions at issue essentially functioned as "gag clauses" which prevented the whistleblowers from making protected disclosures to OSC, Members of Congress, or the media. The use of gag clauses to chill employees from engaging in further whistleblowing runs directly counter to the purpose and intent of the Whistleblower Protection Act. While the Department of Commerce, at OSC's request, ensured that going forward the gag provisions would not be enforced, the willful retaliation in this case warrants additional action to discipline the wrongdoers and to deter future retaliation. Agency officials must be held accountable for committing PPPs, especially retaliation for engaging in protected activity.

This Report summarizes OSC's investigative and legal findings in these cases. OSC provides this Report to assist the Department of Commerce and the Department of Commerce OIG in determining the appropriate corrective and disciplinary action in these matters. OSC is not waiving any protections or privileges that may apply to the information included in this Report or the sources of that information.

---

[1] OSC investigates allegations of prohibited personnel practices and is authorized to seek corrective action from the Merit Systems Protection Board to remedy abuses of the merit system, and to initiate disciplinary action against civilian government officials who commit prohibited personnel practices. In establishing OSC, Congress emphasized OSC's mandate to protect whistleblowers. S. Rep. 95-969, at 24 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2746.

[2] John Doe 1 filed the complaint identified as OSC File No. MA-13-1126. John Doe 2 is considered a primary witness in this investigation. Due to the sensitivity of these cases, John Doe 1 and John Doe 2 have requested that they not be identified by name in this report.

The evidence demonstrates that the whistleblowers were coerced into signing the separation agreements at the heart of this case. Moreover, the record shows that OIG management knew that both employees had engaged in protected activity, and several witnesses described the employees as "perceived whistleblowers" who were trying "to report the abuse" within the OIG.

The two primary management officials involved in the separation agreements were Richard C. ("Rick") Beitel, Principal Assistant Inspector General for Investigation and Whistleblower Protection (PAIGI), and Wade Green, Chief Counsel to the OIG. PAIGI Beitel and Mr. Green engaged in retaliatory acts after being informed that the whistleblowers had obtained new positions outside of the OIG. In short, Wade Green and PAIGI Beitel worked together to ensure that the whistleblowers would leave the OIG on Mr. Green's and PAIGI Beitel's terms—quietly and with no recourse to make protected disclosures about the OIG. After the whistleblowers found jobs at other federal agencies, PAIGI Beitel drafted unfounded, failing performance appraisals as leverage to get the employees to sign separation agreements. While there were numerous departing OIG employees in 2011, only the whistleblowers were issued failing interim appraisals or presented with separation agreements containing non-disparagement clauses, indicating that these actions were taken because of protected activity and/or perceived whistleblowing.

Mr. Green drafted the separation agreements and negotiated the gag clauses. OIG management used its authority, including the threat of failing performance ratings and delayed release dates, to effect these separation agreements. In return, the employees gave up their right to make disclosures to OSC, Congress, or the media and they withdrew their pending EEO complaints and/or Freedom of Information Act (FOIA) requests. The whistleblowers would not have signed such agreements if not for the retaliatory and coercive acts by management.

Section II sets forth the relevant facts OSC gathered in its investigation. Section III provides a legal analysis of the alleged PPPs in this matter. Section IV sets forth OSC's recommendations regarding the respective culpability of the two subject officials. Finally, Section V concludes this report.

## II.   SUMMARY OF RELEVANT FACTS

### A. Background

Todd Zinser was appointed Inspector General (IG) of the Department of Commerce (Commerce) on December 26, 2007, following Senate confirmation. His appointment succeeded Johnny Frasier, who resigned from the position after concerns of fiscal improprieties and whistleblower reprisal were raised by Congress and OSC.

Prior to IG Zinser's arrival, the OIG was fragmented between employees who supported IG Frasier and those who were involved in the investigations concerning his alleged wrongdoing. Several members of IG Frasier's senior staff, including his Chief

Counsel and Assistant Inspector General for Investigations (AIGI), left the OIG within the first two years of IG Zinser's tenure.

IG Zinser filled several of the OIG Senior Executive Service (SES) positions with former colleagues from the Department of Transportation, Office of Inspector General (DOT OIG), where he was employed from 1991 to 2007. Because these selections involved unusual circumstances and were effected with little transparency, many OIG employees and witnesses in OSC's investigation believed the selections violated the merit system principles. One of these selections was the hiring of Rick Beitel in October 2009 for a temporary detail from DOT OIG, and his later selection for the Principal Assistant Inspector General for Investigation and Whistleblower Protection (PAIGI) position in or around June 2010.[3]

## B. Protected Activity and Adverse Actions

This section provides the significant facts relating to the reprisal allegations, arranged in approximate chronological order.

### 1. *Protected Activity*

#### a. *John Doe 1*

##### 1. *EEO:*

John Doe 1 filed an EEO complaint with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ on or around June 14, 2011. In his complaint, he alleged discrimination based on age and disability. ▓▓▓ ▓▓▓▓ forwarded a summary of John Doe 1's allegations to IG Zinser, ▓▓▓▓▓▓▓ PAIGI Beitel, and Mr. Green on or around June 30, 2011. In her e-mail, she explained that John Doe 1 was in the "informal or pre-complaint" EEO process.

On July 1, 2011, Mr. Green forwarded ▓▓▓▓▓▓▓▓ June 30, 2011, e-mail to IG Zinser, ▓▓▓▓▓▓ and PAIGI Beitel. He asked them to review John Doe 1's complaint and to provide him with their recollection of events so that he could formulate a response on behalf of the OIG.[4]

---

[3] Rick Beitel accepted a detail to Commerce OIG, in part because of an ongoing EEO complaint filed against him at the DOT OIG. During PAIGI Beitel's detail, IG Zinser petitioned OPM for another SES position. The request claimed that PAIGI Beitel would create a whistleblower protection division for the OIG. From 2009 to the present, no designated staff has been hired for whistleblower protection, and these duties are collateral to PAIGI Beitel's function as the PAIGI. Nevertheless, the hiring was a non-competitive transfer, and OSC did not find that this selection violated any of the PPPs.

[4] It is unusual for an agency to provide a written response at the informal stage of the EEO process.

████████ testified that IG Zinser "made disparaging comments" about John Doe 1 filing an EEO complaint and that he believed that IG Zinser was "angry" that John Doe 1 filed the complaint. PAIGI Beitel testified that "there was mutual consensus that the complaint had no merit." Filing an EEO complaint is protected activity under 5 U.S.C. § 2302(b)(9).

### 2. *FOIA Request:*

On August 9, 2011, John Doe 1 submitted a FOIA request to Mr. Green. In his request, John Doe 1 asked for copies of all documents relating to the hire of an independent computer forensics firm, which was tasked with identifying and searching the e-mail files of OIG employees in June or July 2011. John Doe 1 was concerned that the forensics firm was hired through a sole-source contract and believed that responsive documents to his FOIA request would potentially implicate IG Zinser, ████████ PAIGI Beitel, and/or Mr. Green in Federal Acquisition Regulation (FAR) violations or violations of other laws, rules, or regulations.

### b. *John Doe 2*

#### 1. *EEO:*

In or around June 2011, John Doe 2 drafted an EEO complaint alleging discrimination based on age, race, and veteran status. In the draft complaint, he reported "a pattern of abusive conduct and hostile management practices directed towards [him] and other OI [Office of Investigation] managers." He specifically discussed hiring improprieties, mismanagement of PAIGI Beitel's Office of Special Investigations (OSI), and concerns about a firearms investigation.

Although John Doe 2 did not file his EEO complaint, Mr. Green testified that he knew that John Doe 2 "had an informal [EEO complaint] ... if not, he had a threatened one, I think." ████████ additionally testified that he discussed a draft complaint with IG Zinser, Mr. Green, and possibly PAIGI Beitel. He was unsure if it was an EEO complaint or a complaint to the Council of the Inspectors General on Integrity and Efficiency (CIGIE).

#### 2. *FOIA Request:*

John Doe 2 submitted a document request in or around July 2011 for documents related to an acquisition of MP5 fully-automatic submachine guns (MP5) and the OIG's Special Purpose Firearms (SPF) policy. The OIG Office of Counsel (OC) refused to comply with this request. The following month, through his attorney, John Doe 2 submitted a FOIA request for these documents, including various drafts of the SPF policy and e-mail communications between himself and several OIG supervisors and attorneys related to the drafting and supervisory/counsel review process for that policy. John Doe 2 requested documents that he believed would show that he did not unilaterally change the SPF policy to circumvent the prior OIG approval process. John Doe 2 testified that

he submitted the draft SPF policy to counsel in 2009 for review. John Doe 2 believed that it was an abuse of authority by OIG management to hold him responsible for changes to the SPF policy that were reviewed by OIG counsel and more senior OIG management officials, and that the requested documents would support this belief.

### 3. *Draft CIGIE Complaint:*

In or around May 2011, John Doe 2 drafted a CIGIE complaint and provided a copy to several co-workers for their review and comment. The complaint concerned his belief that IG Zinser, Mr. Green, PAIGI Beitel, and ██████████ were "engaged in a pattern of abusive conduct toward employees, favoritism and prohibited personnel practices in the discipline, hiring and selection of managers and other employees." Although this complaint was never submitted to CIGIE, ███████ testified that he discussed John Doe 2's draft EEO complaint or draft CIGIE complaint with IG Zinser, Mr. Green, and possibly PAIGI Beitel.

### c. *John Doe 1 and John Doe 2 were Perceived Whistleblowers*

John Doe 1's and John Doe 2's participation in the above activities led to the perception that they were whistleblowers. When asked whether he/she would describe John Doe 1 and John Doe 2 as perceived whistleblowers, a witness responded, "[Y]eah absolutely, yeah." The witness further testified that "everybody knew ... that there were all kinds of different avenues that they [John Doe 1 and John Doe 2] were trying to go down to report the abuse." The witness noted that these avenues included EEO complaints. The witness testified that he/she believed that PAIGI Beitel and others "went apoplectic" when John Doe 1 filed a FOIA request based on the office atmosphere the day the FOIA request was filed. ██████████ a Senior Analyst with the OIG, also testified that he would describe John Doe 1 and John Doe 2 as perceived whistleblowers and that non-disparagement language was added to their separation agreements to keep them quiet.

## 2. *PAIGI Beitel and Wade Green Refused to Provide Timely Release Dates to the Whistleblowers*

John Doe 1 and John Doe 2 both accepted positions outside of the OIG in August 2011. ██████████ OIG Senior Human Resources (HR) Specialist, e-mailed PAIGI Beitel on August 12, 2011, concerning John Doe 1's acceptance of a position at another federal agency. In his e-mail, he told PAIGI Beitel that the agency had requested an August 28, 2011, release date, and asked if PAIGI Beitel approved the release date or wanted to counter with a different date. PAIGI Beitel forwarded ██████████ e-mail to IG Zinser, ██████████ Assistant Inspector General for Administration (AIG), and Mr. Green later that day. Mr. Green immediately responded that OIG "invokes our 30 day right."

Exhibit 3  Pg. 7

Several days later, on August 15, 2011, PAIGI Beitel e-mailed John Doe 1's first-level and second-level supervisors, ███████████████████ to inform them that John Doe 1 had accepted a position with another federal agency and that he would be "coordinating with HR and OC on the release date; same with John Doe 2." ████████████ responded that he had already spoken with John Doe 1 and ████████ ████████ OIG HR Specialist, and had approved John Doe 1's request for an August 27, 2011, release date based on John Doe 1's minimal workload. PAIGI Beitel then replied that he "just asked ████ to hold off for the time being pending internal coordination." PAIGI Beitel later forwarded the e-mail chain to ███████████████ supervisor.

████████████ counseled ███████████ for providing John Doe 1 with a release date before obtaining PAIGI Beitel's approval. In her August 15, 2011, e-mail to AIG Leiphart, ███████████ explained that ████████ had approved the August 27, 2011, release date, and that she was used to "calling the immediate supervisor for the release date." She additionally testified that, prior to John Doe 1, the release date process did not require SES approval or involvement.

On August 29, 2011, ████████████ e-mailed her staff, including ██████████ and ████████████ that "[i]f John Doe 2 gets a release date, HR staff needs to let Wade Green know ASAP before proceeding with further action."

████████████ testified that she was relaying requests from the front office and that she assumed that they were considering some sort of action if OC was involved. However, other OIG employees being investigated by OC were given release dates without SES interference.

In fact, another OI supervisor was being investigated by OC for alleged Government Owned Vehicle (GOV) violations. This supervisor did not engage in any protected activity or make protected disclosures. His release date was not delayed by Mr. Green or PAIGI Beitel. The OC was also investigating an OI Special Agent for her alleged role in the acquisition of Glock handguns and shotguns. This employee did not engage in protected activity or make protected disclosures. Her release date was not delayed by Mr. Green or PAIGI Beitel

### 3. *The Whistleblowers Were Issued Failing Interim Performance Appraisals*

On August 24, 2011, almost two weeks after John Doe 1 informed the OIG that he had obtained a new position, PAIGI Beitel presented John Doe 1 with a failing interim performance appraisal. The regular performance cycle ended on September 30, 2011. PAIGI Beitel rated John Doe 1 as a "Level 1" performer, with a total score of 115/500 points.

The following month, again weeks after John Doe 2 informed the OIG that he had obtained new employment, PAIGI Beitel gave him a failing interim performance

---

5 ███████████████████████

appraisal. He was also rated a "Level 1" performer with a total score of 100/500 points. Unacceptable performance, such as a "Level 1" rating can be cause for removal under 5 C.F.R. Part 752 or placement on a Performance Improvement Plan (PIP) under 5 C.F.R. Part 432.

The evidence indicated that in 2011, despite the high number of departing employees, only the whistleblowers were issued failing interim appraisals. In fact, no other departing employee received any appraisal at all, much less a career-threatening failing appraisal. Thus, issuing a rating to a departing employee outside of the regular rating cycle was highly unusual. As noted in section "c." below, PAIGI Beitel, who was aware of the whistleblowers protected activity, acknowledged that he was primarily responsible for coming up with the idea to issue failing interim ratings to the whistleblowers.

   a.  *2011 Interim Failing Rating is Unfounded*

   1.  *Summary Rating Narratives Did Not Accurately Describe Whistleblowers'*
       *Performance for the 2010 – 2011 Performance Period*

   a.  *John Doe 1:*

In the interim failing appraisal, in his summary rating narrative for John Doe 1, PAIGI Beitel discussed alleged performance deficiencies that occurred "in the current and previous rating periods." The majority of these alleged deficiencies involved John Doe 1's failure to timely close four investigations. PAIGI Beitel stated that John Doe 1 kept these cases open "during current and previous rating periods" to justify his "robust staffing level and/or to avoid scrutiny from the upcoming CIGIE peer review." Even though John Doe 1 credibly denied that this was his intention, PAIGI Beitel included his theory in John Doe 1's appraisal. .

PAIGI Beitel also cited John Doe 1's failure to "properly use OIG's authorized system of records for case management (IG CIRTS)." However, PAIGI Beitel knew that John Doe 1's unit's primary focus was providing assistance to open investigations and that IG CIRTS was not used to track investigation support. In fact, PAIGI Beitel directly received John Doe 1's weekly spreadsheet of work performed. This spreadsheet was created to track his work in lieu of IG CIRTS. PAIGI Beitel also cited John Doe 1 for not providing his spreadsheet to OC for legal review. However, PAIGI Beitel never instructed John Doe 1 to submit his spreadsheet to OC prior to his August 24, 2011, interim rating, even though he had received a copy of the weekly spreadsheet for several months.

Finally, PAIGI Beitel held John Doe 1 responsible for not being timely placed on a performance plan. He stated, "[I]f [John Doe 1] thought he was not on an approved plan, he should have asked his former supervisor to provide an approved plan and elevated the issue within OIG as necessary." The evidence indicates that John Doe 1 notified his previous supervisor, ████████████, on several occasions that he was not on an

approved performance plan, and reported to ████████ on May 26, 2011, that he did not believe he was on a "signed plan despite asking for one several times." He further noted that, although he was not on an approved plan, ████████ did give him a signed mid-year review. John Doe 1 forwarded this e-mail chain to PAIGI Beitel later that day, prior to PAIGI Beitel citing the lack of an approved performance plan as a basis for the failing interim appraisal.

Collectively, the evidence does not support any of the cited bases for the retaliatory interim appraisal issued to John Doe 1 after his announced departure from the OIG.

   *b. John Doe 2:*

PAIGI Beitel similarly discussed alleged performance deficiencies that occurred outside of the performance period in his summary rating narrative for John Doe 2. His narrative concentrated on three areas: (1) the CIGIE peer review; (2) OIG policies; and (3) the acquisition of MP5 fully automatic submachine guns (MP5s).

Specifically, PAIGI Beitel held John Doe 2 responsible for his alleged failure to track recommendations from the 2008 CIGIE peer review. PAIGI Beitel wrote that John Doe 2 was "shirking what clearly were his responsibilities," even though the record demonstrates that OIG senior management never informed John Doe 2 that he was expected to track these recommendations. Accordingly, John Doe 2 was held responsible in a 2011 interim performance appraisal for a duty that he was never instructed to perform and that was not included in his performance plan in any year following the 2008 CIGIE peer review. Moreover, since PAIGI Beitel contended that John Doe 2 should have performed these tracking functions beginning in 2008, the majority of these alleged violations occurred outside of the 2010-2011 performance period, and should have not been included in the interim appraisal.

PAIGI Beitel further claimed that John Doe 2's Quality Assurance Review (QAR) report, drafted in preparation for the 2011 peer review, was deficient because it stated that OIG was "fully compliant" on several QAR entries without providing qualifying notations. When John Doe 2 was questioned about these entries, the record indicates that he agreed to provide qualifying notations. ████████ a former Department of Justice SAC hired by OIG on a temporary basis to prepare for the 2011 peer review, testified that John Doe's QAR had identified deficiencies, but that the real problem was lack of direction from OIG management.

In addition, the interim failing performance appraisal cited John Doe 2 for failing to accurately report an OIG recovery. However, the recovery took place in a previous performance period, and John Doe 2's prior performance appraisals, which occurred prior to his protected activity, did not address this issue. The interim failing performance appraisal cited John Doe 2 for not conducting a revision of the OIG's Government Owned Vehicle (GOV) policy. The record indicates that he was never tasked with conducting such a revision by his chain of command, and PAIGI expected the revisions to be done *sua sponte* by John Doe 2.

PAIGI Beitel concentrated most of his critique in the failing interim appraisal on John Doe 2's role in the OIG's acquisition of MP5s and his revision of OIG policy related to that acquisition. Specifically, PAIGI Beitel cited John Doe 2 for acquiring the MP5s without IG approval, and for deleting the requirement for IG approval from the OIG policy. However, the evidence indicates that OIG management was aware that John Doe 2 informed his first-level supervisor about the acquisition, and thus reasonably assumed that his management appropriately notified IG Zinser. PAIGI Beitel attributed all responsibility for the MP5 acquisition and policy change to John Doe 2, even though several other employees were involved. In what became a highly charged matter in the OIG, the lowest level employee involved was held accountable in an interim failing appraisal for an issue that other managers knew of and for which they held greater responsibility. Finally, both of these events occurred in 2009, well outside of the 2010-2011 performance period.

Collectively, the evidence does not support any of the cited bases for the retaliatory, interim appraisal issued to John Doe 2 after his announced departure from the OIG.

### c. *Rick Beitel was Primarily Responsible for Interim Performance Appraisals*

Although ▮▮▮▮▮▮ signed the whistleblowers' interim performance appraisals, the weight of the evidence shows that PAIGI Beitel was primarily responsible for drafting and issuing the interim appraisals. ▮▮▮▮▮▮ testified that PAIGI Beitel wrote the interim appraisals. Although he did not disagree with PAIGI Beitel's assessment of the whistleblowers' performance, he felt the ratings were "harsh." He further testified that he signed the appraisals as the approving official, and believed that, as the approving official, his role was to defer to the rating official's judgment. He testified that he "recognized that he had little to no power or authority to do anything" concerning the treatment of the whistleblowers, and that he was "actively looking for another job." ▮▮▮▮ ▮▮▮▮ additionally testified that, in retrospect, he felt he could have "come out stronger" in disagreeing with PAIGI Beitel's interim performance ratings for the whistleblowers.

PAIGI Beitel testified that both he and ▮▮▮▮▮▮ felt that the interim appraisals were appropriate, and that the issuance of the appraisals was "our idea, but I certainly take a measure of ownership of that." He further testified that "it was a decision obviously that I made ... you know, I prepared it, signed it."

### 2. *The Summary Rating Narratives are not Based on the Whistleblowers' Performance During the 2010-2011 Performance Period*

The Code of Federal Regulations provides that "a rating of record shall be based only on the evaluation of actual job performance for the designated appraisal period." *See* 5 C.F.R. § 430.208(a)(1). As mentioned above, the majority of the whistleblowers' alleged performance issues cited in PAIGI Beitel's summary narratives occurred outside of the 2010-2011 appraisal period. All of the cited cases in his summary narrative for

Exhibit 3 Pg. 11

John Doe 1 were investigated and resolved during prior appraisal periods – some as early as 2006 – and were not reviewed and rated during those periods, prior to John Doe 1's protected activity. Similarly, many of the issues raised in PAIGI Beitel's summary narrative for John Doe 2 occurred in previous rating periods, including the MP5 acquisition and associated policy change, and were not reviewed and rated during those periods and prior to John Doe 2's protected activity.

A key witness familiar with the OIG rating process testified that OIG senior staff "constantly do performance appraisals for things that happen outside of the performance period ... particularly during this period when they're trying to nail people on stuff." The witness further testified that PAIGI Beitel did so in an effort to discourage employees from reapplying to the OIG or to deter legal action. The witness testified that PAIGI Beitel specifically told him/her that he would "write this really negative appraisal and we'll put it in our drop file so that ... if anything happens where [the employee] sues us or whatever the case may be, we can bring [it] out." OSC found this witness highly credible.

3. *There Was No Legitimate Basis to Issue the Whistleblowers Interim Performance Appraisals*

Although one witness estimated a seventy percent OIG employee attrition rate from May 2011 to December 2012, of the departing employees only the whistleblowers were given "interim" or "close-out" performance appraisals. PAIGI Beitel testified that he and ████████ decided to write interim performance appraisals for the whistleblowers because the Office of Personnel Management (OPM) OIG peer review team was coming in and there were a "number of deficiencies that the various OIG senior management, senior leadership reviews had disclosed and identified" and that it was "something that we needed to memorialize appropriately."

This testimony appears disingenuous because several employees, including one manager, who were also described as poor performers were not given interim appraisals when they left OIG. More significantly, PAIGI Beitel drafted John Doe 1's and John Doe 2's failing performance appraisals *after* they gave notice that they were leaving the OIG. If there were legitimate concerns about the whistleblowers' performance, PAIGI Beitel and/or ████████ should have addressed these deficiencies when they occurred, and/or should have taken steps to place John Doe 1 and John Doe 2 on PIPs. Moreover, since interim appraisals are not typically included in employees' Official Personnel Folders (OPFs), providing John Doe 1 and John Doe 2 with interim appraisals would not effectively warn new employers of their alleged performance deficiencies.

4. *The Whistleblowers Have Historically Been - and Currently Are - Highly Rated Federal Employees*

For the majority of their extensive government careers, the whistleblowers have received the highest numerical rating, "Level 5", or "Outstanding" performance reviews. John Doe 1 was consistently rated 500/500 – the highest rating possible under the OIG's

performance system. Under ████████████, John Doe 1's and John Doe 2's ratings dropped slightly, but never below a "Fully Successful" level.

Before departing the OIG in or around May 2011, ████████████provided the whistleblowers and his other subordinates mid-year progress reviews. On April 26, 2011, ████████████rated John Doe 1 as performing at Level 3 or higher on all critical elements, providing that he was performing his assigned duties well. ████████████ provided John Doe 2 with a mid-year progress review on or around April 26, 2011, also rating him as performing at Level 3 or higher on all critical elements. These mid-year progress reviews were issued only four months before PAIGI Beitel's interim appraisals, and prior to the whistleblowers' protected activity. PAIGI Beitel asserted that he did not endorse ████████████ reviews, but provided no credible basis for issuing the interim appraisals to the whistleblowers and no other departing OIG employees.

Since leaving OIG for other federal agencies, the whistleblowers have been again rated as "Level 5" or "Outstanding" employees, and have received 500/500 total performance points.

### 4. *The Whistleblowers Executed Separation Agreements in Order to Leave the OIG with Clean Performance Records*

Mr. Green placed undue pressure on the whistleblowers to sign separation agreements before they could be released from their OIG positions. Even though numerous employees left the OIG for positions with other federal agencies during this timeframe, the whistleblowers were the only OIG employees presented with separation agreements[6] and were coerced into signing the agreements under the threat of interim failing performance appraisals.

The separation agreements, which Mr. Green and his staff drafted, reviewed, edited, and negotiated, required John Doe 1 and John Doe 2 to withdraw their FOIA requests and John Doe 1's EEO complaint and to agree to release their rights to future administrative relief before the EEO, Merit Systems Protection Board (Board), and Congress. The separation agreements additionally contained the non-disparagement provisions/gag clauses at issue. These provisions provided that John Doe 1 and John Doe 2 could not:

> [D]isparage the Agency in any communications to any person or entity, including but not limited to **Members of Congress and their staff, the Office of Special Counsel, and the media.** However, nothing in this Agreement shall prevent, prohibit or impair [John Doe 1 and John Doe 2] from responding truthfully to direct questions posed to him in writing or in the course of a formal hearing before any legislative, executive, or judicial body. (Emphasis added).

---

[6] An OC employee, Employee X, executed a 'settlement agreement' containing similar non-disparagement language in 2011. A discussion of this agreement is located on page 14 of this Report.

12

Exhibit 3 Pg. 13

In exchange for withdrawing their EEO complaints and/or FOIA requests, releasing their rights for any future administrative relief, and waiving their rights to contact Members of Congress and/or the media or file complaints with OSC, John Doe 1 and John Doe 2 received release dates to leave the OIG and guarantees that their new agencies would not see their failing interim performance appraisals. PAIGI Beitel and Mr. Green made it clear that if they did not execute separation agreements, their new agencies would be provided with copies of the failing interim appraisals, which could potentially devastate their careers as federal employees.

    *a.*   *The Non-Disparagement Provisions Prevented the Whistleblowers From Making Protected Disclosures to OSC, Congress, or the Media*

Both John Doe 1 and John Doe 2 testified that they interpreted the non-disparagement provisions in their separation agreements as prohibiting them from filing complaints with OSC, Congress, or the media. John Doe 1 testified that his separation agreement "says that I'm not allowed to file any complaints or anything like this." As reason for not filing a complaint with OSC, he testified, "even though I firmly believe that I had grounds to do so, [I didn't file a complaint] because I believe and I still, and I still do to some extent, that my hands are tied and I could not come to [OSC] and file a complaint because of that stupid separation agreement." John Doe 2 testified that "the day I went in to sign that separation agreement I had never been more scared in my life." He explained that he believed the separation agreement prevented him from filing complaints and that "it wasn't worth the risk of bringing [complaints to OSC or Congress]... I just saw them coming after me."

Wade Green testified that the non-disparagement provisions did not interfere with the employees' whistleblowing rights because those rights are something that "everybody knows you have and that can't be interfered with." He further testified that disparagement is "different from whistleblowing," because it is "about truthfulness, veracity," and stated that this definition of disparage is "common in the IG community." Mr. Green did not define disparage in the separation agreements, however, and made no effort to explain to John Doe 1, John Doe 2, or their respective counsels, that it was not the OIG's intention to prevent them from blowing the whistle.

In contrast, the evidence indicates that Mr. Green intended to prevent the whistleblowers from contacting Congress or the media, or from filing complaints with OSC. Mr. Green's stated understanding of the scope of the non-disparagement language is not supported by the text of the provision when read in its entirety. The second half of the non-disparagement provision, states:

    *However, nothing in this Agreement shall prevent, prohibit or impair [John Doe 1 and John Doe 2] from responding truthfully to direct questions posed to him in writing or in the course of a formal hearing before any legislative, executive, or judicial body.*

Exhibit 3 Pg. 14

This section carves out instances when John Doe 1 and John Doe 2 would be allowed to contact Congress, OSC, or the media under the terms of the agreement. By specifically listing parameters for permissible contact with these bodies, it indicates that all other contact, including making protected disclosures, is prohibited under the agreement.

Second, Mr. Green provided no evidence to suggest that his stated definition of "disparage" was commonly used within the OIG, or necessary to include in the whistleblowers' separation agreements. In fact, a former OC employee directly contradicted the definition put forth by Mr. Green, testifying that "disparage" is a "negative statement" that "does not have to be false." Moreover, Mr. Green offered no credible basis to conclude that either John Doe 1 or John Doe 2 had made any false accusations against the OIG. To the contrary, witnesses consistently described the whistleblowers as men of integrity. Mr. Green presented no evidence suggesting a need to insert the non-disparagement provision into the agreement, even if it was limited to untrue statements.[7] In contrast, as described above, the whistleblowers had engaged in protected activity. The weight of the evidence suggests that Mr. Green's intent was to prohibit further protected activity, rather than inaccurate statements.

Third, the non-disparagement provision was extremely important to Mr. Green. Indeed, the evidence shows that he insisted that the non-disparagement provisions remain in the separation agreements. The non-disparagement language was initially drafted for use in a settlement agreement between the OIG and another employee who engaged in protected activity (Employee X).[8] This agreement was negotiated between Mr. Green and Employee X's attorney. Employee X's attorney removed the non-disparagement language twice, and both times, Mr. Green reinserted it. Mr. Green testified that he "certainly put [the non-disparagement provision] in there" and "probably required that it stay in there as a negotiation point." Significantly, Mr. Green also removed a provision drafted by Employee X's attorney, which would have allowed for his client "to file an EEO or Special Counsel complaint." Accordingly, the weight of the evidence suggests that the scope of the agreement precluded protected activity, such as an EEO or Special Counsel complaint, and not only untruthful statements.

Finally, Mr. Green demonstrated a motive to chill protected communications by whistleblowers. To illustrate, in an e-mail to ███████ dated November 17, 2010, Mr.

---

[7] It is worth noting that under 5 U.S.C. § 2302(b)(8), a disclosure does not need to be accurate in order to be protected. This subsection of the statute provides that, for a disclosure to be protected, an employee or applicant must "reasonably believe" that he or she is disclosing a violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. Accordingly, a false or incorrect disclosure could be protected if the employee or applicant had a reasonable belief that the disclosure was true, based on their professional opinion or experience. Therefore, even if "disparage" is defined as a false, untruthful or inaccurate statement, the non-disparagement provisions in the whistleblowers' separation agreements would still prevent them from making lawful protected disclosures to OSC and others.

[8] This settlement agreement is not specifically discussed herein because it differs greatly from those in the separation agreements at issue. For example, Employee X agreed to a $25,000 buy-out payment and was allowed to retire early with a clean record. In addition, the OIG produced substantial evidence going back several years that Employee X had legitimate performance problems.

Green stated the importance of protecting IG Zinser's and the OIG's reputations, and provided advice on how to manage OI employees. He told ██████████

> *If there is one thing you can fix in your first year it would be to improve how OI plays with others. It would be one thing if they just self-destructed—but it won't be that clean. When they hit that wall at 100 MPH it will splash on [Todd Zinser] the OIG as an agency, and all our reputations—and we never would have had an opportunity to stop or mitigate the damage because we have no visibility into OI. It is my job to safeguard the Client from these events—and I will.*

The evidence indicates that Mr. Green inserted non-disparagement provisions into the whistleblowers' separation agreements because, as OI employees, he was concerned that they would damage IG Zinser's reputation, his reputation, and the OIG.

b.  *The Whistleblowers Were Given Separation Agreements Because They Engaged in Protected Activity*

Three OI managers were identified as having performance deficiencies in 2011. Each of these managers was being investigated by the OC for alleged violations of the SPF and/or GOV policies. Nevertheless, only two managers—John Doe 1 and John Doe 2— engaged in protected activity. Unlike the whistleblowers, the third manager, who did not engage in protected activity or whistleblowing, was not required to execute a separation agreement containing a non-disparagement provision and was not given a failing interim performance appraisal before his departure from the agency. Because all three of these managers had alleged performance issues and were being investigated for purported infractions, the only difference between them was that the third manager was not a perceived whistleblower and did not engage in any protected activity.

The fact that the non-disparagement provisions specifically list Congress, the media, and OSC, further shows that Mr. Green intended to prevent John Doe 1 and John Doe 2 from whistleblowing. In addition to an OIG, the main avenues for federal employees to make protected disclosures are through OSC, Congress, or the media. By preventing the whistleblowers from initiating contact with these bodies, it appears that Mr. Green intended to interfere with the whistleblowers' ability to make disclosures against the OIG.

c.  *PAIGI Beitel and Wade Green Appear to Have Coordinated on the Provisions of the Separation Agreements*

PAIGI Beitel provided John Doe 1 with John Doe 1's failing interim performance appraisal on August 24, 2011, the same day that Mr. Green presented him with the separation agreement. As discussed above, PAIGI Beitel decided to give John Doe 1 an interim performance appraisal after he learned that John Doe 1 had accepted a position with another federal agency. PAIGI Beitel presented John Doe 2 with his failing interim

15

performance appraisal on September 16, 2011, the same day that John Doe 2 left the OIG for a position with another agency.

Section 3 of John Doe 1's separation agreement provides that, in consideration for agreeing to the non-disparagement provision and allowing the OIG to advertise to fill his position, the OIG agrees "to refrain from placing any copies of the close out appraisal completed upon [John Doe 1's] separation from the OIG in his Official Personnel File." The OIG further agreed to "effectuate [John Doe 1's] transfer from his position in OIG on August 28, 2011 to permit him to enter onto duty in a new federal position on that day." Without these provisions, John Doe 1 would have little to no incentive to sign the separation agreement.

John Doe 2's separation agreement, executed on September 6, 2011, mirrored John Doe 1's. Like John Doe 1, John Doe 2 agreed to the non-disparagement provision in exchange for an earlier release date and a guarantee that the OIG would not take adverse action against him. John Doe 2's agreement also contained an additional term in Section (3)(d), that the OIG would "reflect that any transfer by [John Doe 2] from the Agency to another agency will be reflected as voluntary and for personal reasons and to process all relevant personnel actions so that [John Doe 2's] transfer out of the Agency is reflected as 'voluntary and for personal reasons' or its equivalent." Although John Doe 2 received his failing interim appraisal after he had executed his separation agreement, these terms reveal PAIGI Beitel's and Mr. Green's intention to take action against John Doe 2 if he refused to sign the agreement. These actions could not be taken without coordination between Mr. Green and PAIGI Beitel.

PAIGI Beitel denied coordination between himself and Mr. Green. However, he testified, "OC and Wade knew that we were ... planning to do these appraisals," and that "[the appraisals] went through our Office of Counsel" for review and comment. PAIGI Beitel testified, "Wade [Mr. Green] did ask ... that we get him a copy of ... the interim rating. Actually his office had ... reviewed it [the interim rating] along with, later, subsequently, [John Doe 2's]." He further testified, "he [Mr. Green] did ask to have a copy of it [John Doe 1's interim appraisal] once it was done." Mr. Beitel additionally acknowledged that John Doe 1's interim appraisal and the separation agreement work together and were "contemporaneous." The fact that the separation agreements and failing interim performance appraisals were issued contemporaneously indicates that the appraisals were used to compel the whistleblowers to sign the separation agreements containing the non-disparagement provisions.

d. *Wade Green Did Not Provide the Whistleblowers' Separation Agreements to the Office of General Counsel for Legal Review*

████████████ Commerce Employment and Labor Law Division, Office of General Counsel (OGC), and ██████████████████ OGC, testified that, prior to December 2012, their office reviewed and approved every settlement agreement

Exhibit 3 Pg. 17

entered into on behalf of Commerce, including settlement agreements involving the OIG.[9]

Both ████████ and ████████ testified that Mr. Green did not submit John Doe 1's and John Doe 2's separation agreements to OGC for legal review per standard practice. In fact, ████████ and ████████ testified that they first received John Doe 1's separation agreement from the Commerce Office of Civil Rights in or around November 2012, and learned of John Doe 2's separation agreement during OSC's investigation. To their knowledge, John Doe 1's and John Doe 2's separation agreements were the first legal agreements entered into by the OIG without OGC approval or concurrence.

Mr. Green testified that John Doe 1's and John Doe 2's separation agreements were not routed through OGC "because it was based on the template that OGC had approved for [a previous settlement agreement], and I felt that was good enough." The referenced settlement agreement had key differences with those signed by the whistleblowers. It involved an employee who was already on a PIP, and received fair consideration for entering into the agreement, to include a $25,000 voluntary buy-out and early retirement. In contrast, as discussed, the whistleblowers only received timely release dates and notice that their new employers would not be given copies of their failing interim performance appraisals. The only similarity between the agreements was the non-disparagement provision, which, as previously discussed, was originally drafted by Mr. Green for inclusion in Employee X's settlement agreement. In addition, the non-disparagement provision in Employee X's settlement agreement differed from the provisions in John Doe 1's and John Doe 2's separation agreements, because it also prohibited the OIG from "disparaging" the employee.

Although ████████ and ████████ both reviewed and signed Employee X's settlement agreement, they both testified that, to their knowledge, OGC had never in its practice included such non-disparagement provisions in any Commerce settlement agreement. Both testified to their belief that such provisions could chill whistleblowing. They further testified that Mr. Green did not use the OGC settlement agreement template. ████████ testified that he was "dumbfounded" that the non-disparagement provision was in Employee X's settlement agreement and that he signed it as an OGC department representative. He believed it was an oversight and should not have been included in any Commerce settlement agreement.

---

[9] OGC derives its authority to review all settlement agreements on behalf of the agency from Department of Commerce Department Organization Order 10-6, which describes the Office of General Counsel. Mr. Guenther testified that he has always relied on Section 4.01.b, which delegates to the General Counsel responsibility for "[t]he preparation, or examination for legal form and effect, of all legal instruments, such as contracts, cooperative agreements, leases, licenses, and bonds, entered into by the Department," to support the requirement that his office must concur in settlement agreements and resolution agreements.

Exhibit 3  Pg. 18

   e.   *PAIGI Beitel and Wade Green Signed John Doe 1's and John Doe 2's*
        *Separation Agreements*

PAIGI Beitel signed the whistleblowers' separation agreements as "Management
Official," and Mr. Green signed the agreements as "Counsel to the Inspector General."
By signing the agreements, PAIGI Beitel and Mr. Green represented that they reviewed
the agreements and agreed to the terms.

██████████ and IG Zinser did not sign the agreements. IG Zinser testified that, prior
to OSC's investigation, he had not reviewed the whistleblowers' separation agreements
and was unaware of the non-disparagement provisions contained within them. ██████████
testified that he first learned of the whistleblowers' separation agreements during OSC's
investigation. Both Mr. Green and PAIGI Beitel testified that they neither discussed the
terms of the separation agreements with IG Zinser, nor showed him a copy of the
agreements.

## III.   LEGAL ANALYSIS

There is compelling evidence of whistleblower retaliation warranting corrective
action for John Doe 1 and disciplinary action against PAIGI Beitel and Mr. Green.[10]

## A.  Legal Standard: 5 U.S.C. §§ 2302(b)(8) and (b)(9):

It is a prohibited personnel practice to take or threaten to take a personnel action
against an employee because of any disclosure of information that the employee
"reasonably believes" evidences a violation of law, rule or regulation, gross
mismanagement, a gross waste of funds, an abuse of authority, or a substantial and
specific danger to public health or safety. 5 U.S.C. § 2302(b)(8). It is also a prohibited
personnel practice to take or threaten to take a personnel action against any employee or
applicant for employment because of: (1) the filing of an appeal, complaint, or grievance
right granted by law, rule, or regulation; (2) testifying for or otherwise lawfully assisting
any individual in filing an appeal, complaint, or grievance right granted by law, rule, or
regulation; or (3) cooperating with or disclosing information to the Inspector General of
an agency or the Special Counsel. 5 U.S.C. § 2302(b)(9).

## B.  Burden of Proof for Corrective and Disciplinary Action

### 1.  *Corrective Action*

To prove violations of 5 U.S.C. §§ 2302(b)(8) or (b)(9) of the Whistleblower
Protection Act (WPA) warranting corrective action, OSC must demonstrate with
preponderant evidence that: (1) a protected disclosure of information was made or the
employee engaged in protected activity; (2) the proposing or deciding officials had actual
or constructive knowledge of the protected activity; (3) official(s) with authority to take,

---

[10] Although OSC's investigation demonstrated evidence of whistleblower retaliation against John Doe 2, he
did not formally file a complaint with OSC, and therefore, OSC cannot seek corrective action on his behalf.

recommend, or approve a personnel action took or threatened to take personnel actions;[11] and (4) the protected disclosure or protected activity was a contributing factor in the personnel action at issue. *See Eidmann v. Merit Sys. Prot. Bd.,* 976 F.2d 1400, 1407 (Fed Cir. 1992) (explains (b)(8)) and Section 101(b)(1) of S. 743, the Whistleblower Protection Enhancement Act of 2012 (Pub. L. 112-199) (amending 5 U.S.C. § 1221(e)(1) to apply to cases involving protected activity under (b)(9)).[12]

Once OSC establishes a *prima facie* case of whistleblower reprisal, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action absent the disclosure. *Whitmore v. Dep't of Labor,* 680 F.3d 1353, 1364 (Fed. Cir. 2012). Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. It is a higher standard of proof than preponderance of the evidence, and as the Federal Circuit pointed out in *Whitmore,* "is reserved to protect particularly important interests in a limited number of cases." 5 C.F.R. § 1209.4(d), *Whitmore,* 680 F.3d at 1367.

### 2. *Disciplinary Action*

In any case in which the Board finds that an employee has committed a PPP under 5 U.S.C. §§ 2302(b)(8) or (b)(9)(A)(i), (B), (C), or (D), the Board may impose disciplinary action if it finds that the activity protected under these sections was a significant motivating factor, even if other factors also motivated the decision, for the employee's decision to take, fail to take, or threaten to take or fail to take a personnel action, unless that employee demonstrates by a preponderance of the evidence that the employee would have taken, failed to take, or threatened to take or fail to take the same personnel action in the absence of such protected activity. Section 106 of S. 743, the Whistleblower Protection Enhancement Act of 2012 (Pub. L. 112-199) (amending 5 U.S.C. § 1215(a)(3)).

## C. Establishment of *Prima Facie* Cases of Reprisal

### 1. *Protected Activity*

John Doe 1 filed an EEO complaint on or around June 14, 2011, which constitutes protected activity under 5 U.S.C. § 2302(b)(9). He also submitted a FOIA request on or around August 9, 2011, for documents concerning alleged computer surveillance in possible violation of FAR regulations. The evidence also shows that PAIGI Beitel and Mr. Green viewed John Doe 1 as a possible or perceived whistleblower under 5 U.S.C. § 2302(b)(8) because the FOIA requested information could potentially implicate

---

[11] PAIGI Beitel and Mr. Green both exercised the personnel action authority required under 5 U.S.C. §§ 2302(b)(8) and (b)(9).

[12] The Board has held that, if the evidence establishes that subject officials would have taken the personnel action in the absence of the protected disclosures, the significant factor test cannot be met. *See generally Special Counsel v. Costello,* 75 M.S.P.R. 562, 611 (1997).

IG Zinser, PAIGI Beitel, and/or Mr. Green in wrongdoing if, for example, regulations were not followed, as the whistleblowers reasonably believed.

John Doe 2 submitted a document request in July 2011 and a FOIA request in August 2011 for documents or other information concerning the MP5 acquisition and SPF policy. As with John Doe 1's FOIA request, these requests concerned sensitive issues that John Doe 2 reasonably believed could inculpate IG Zinser, PAIGI Beitel and/or Mr. Green in misconduct. John Doe 2 also drafted an EEO complaint and a CIGIE complaint in or around June 2011. These FOIA requests and draft complaints gave the appearance that John Doe 2 was concerned about issues at the OIG and had either engaged in, or was considering engaging in, protected activity.

The perception of whether an employee is a whistleblower is sufficient to establish engagement in protected activity. *King v. Dep't of the Army*, 116 M.S.P.R. 689, 695-696 (2011). The Board found that whether a perceived whistleblower "made a protected disclosure is immaterial," and focused instead on whether the agency *perceived* the employee to be a whistleblower, *i.e.*, whether agency officials appeared to believe that the employee engaged or intended to engage in whistleblowing activity. *Id.*

Here, the record is replete with evidence showing that Mr. Green, PAIGI Beitel, IG Zinser, and ████████ perceived John Doe 1 and John Doe 2 as whistleblowers based on the substance of their FOIA requests and EEO complaints. As discussed above, several witnesses described them as "perceived whistleblowers." This perception is further demonstrated by the inclusion of the gag clauses in their separation agreements and the requirements that they withdraw their FOIA requests and EEO complaints.

### 2. *Knowledge*

Shortly after receiving John Doe 1's EEO complaint, ████████ contacted Mr. Green on June 30, 2011, to notify him of the complaint and to invite him to provide a written response. Even though John Doe 1's EEO complaint was in the informal stage, Mr. Green forwarded ████████ e-mail to IG Zinser, ████████, and PAIGI Beitel—the named subject officials in the complaint—and asked them to "formulate [their] recollection of the events described" in order to "respond on behalf of the Agency." Accordingly, Mr. Green, PAIGI Beitel, IG Zinser, and ████████ all had knowledge of John Doe 1's engagement in protected activity.

Although John Doe 2 did not file his draft EEO complaint or submit his draft CIGIE complaint, ████████ testified that he discussed a draft complaint of John Doe 2's with Mr. Green, IG Zinser, and PAIGI Beitel. Mr. Green further testified that he believed that John Doe 2 had either filed an informal EEO complaint or had threatened to do so. This testimony indicates that, even though he did not actually file his EEO complaint or submit his CIGIE complaint, OIG management viewed him as a perceived whistleblower.

In addition, as OIG Chief Counsel, Mr. Green processed all agency FOIA requests. He testified that he had knowledge of John Doe 1's and John Doe 2's FOIA requests, and

that his office sent out FOIA search requests to individuals identified as potentially having responsive documents or information. A key witness testified that PAIGI Beitel and others "went apoplectic" when John Doe 1 filed a FOIA request. Thus, the evidence indicates that Mr. Green and PAIGI Beitel had knowledge of the FOIA requests.

### 3. *Personnel Actions Were Taken Against John Doe 1 and John Doe 2 Because of Their Perceived Whistleblowing and/or Engagement in Protected Activity*

The evidence clearly shows that John Doe 1's and John Doe 2's EEO complaints and/or perceived whistleblowing significantly factored into the personnel actions OIG management took or threatened.

#### a. *Failing Interim Performance Appraisals*

The failing interim performance appraisals, as chapter 43 performance evaluations, constitute personnel actions under 5 U.S.C. § 2302(a)(2)(A)(viii), or at a minimum, threatened personnel actions.

As discussed above, PAIGI Beitel issued John Doe 1 and John Doe 2 failing interim performance appraisals in conjunction with their separation agreements. These appraisals were drafted and issued after OIG management learned that John Doe 1 and John Doe 2 had accepted positions with other federal agencies. The timing and content of these appraisals shows that they did not reflect PAIGI Beitel's honest assessment of their performance. Both employees had received outstanding performance evaluations in previous years, and had recently received satisfactory appraisals. Neither had been placed on a PIP. The failing appraisals were issued neither at the usual time nor in the usual manner. The unfounded failing appraisals reflected that, despite recent satisfactory performance, John Doe 1's and John Doe 2's performance had suddenly dropped to failure in every element.

PAIGI Beitel issued the whistleblowers failing interim performance appraisals approximately one month after they engaged in protected activity, *i.e.*. engaging in the EEO process and/or submitting FOIA requests potentially implicating OIG management in wrongdoing. The law presumes that a disclosure is a contributing factor in a personnel action when the official who took or recommended the action had knowledge of the protected disclosure and took the personnel action within a period of time that would lead a reasonable person to conclude that the disclosure was a contributing factor. *Reid v. Merit Sys. Prot. Bd.,* 508 F.3d 674, 678-79 (Fed. Cir. 2007). The Board has held that a connection exists between a disclosure and a personnel action even in cases where the personnel action occurs more than a year after the disclosure. *See e.g., Inman v. Dep't of Veterans Affairs,* 112 M.S.P.R. 280, 283-4 (2009) (personnel action occurred 15 months after disclosure); *Redschlag v. Dept of Army,* 89 M.S.P.R. 589, 626-27 (2001) (personnel action occurred 18 months after disclosure).

Here, based on the knowledge-timing test, the whistleblowers meet the contributing factor standard. The failing performance ratings were issued approximately one month

Exhibit 3 Pg. 22

after John Doe 1 and John Doe 2 filed EEO complaints and/or submitted FOIA requests. Accordingly, the protected activity was a contributing factor in the retaliatory ratings. 5 U.S.C. § 1221(e)(1).

      *b.  Non-Disparagement Provision/Gag Clauses*

     The separation agreements' non-disparagement provisions constitute a personnel action under 5 U.S.C. 2302(a)(2)(A)(xi).  As set forth below, the provision significantly changed the whistleblowers' "duties, responsibilities, or working conditions."

     Specifically, it is a fundamental condition of federal employment that an employee has a right, and an ethical duty, to report wrongdoing to appropriate authorities. *See* Whistleblower Protection Act of 1989, Pub. L. No. 101-12, Sec. 2(b) (1989) (purpose of the WPA is "to strengthen and improve protection for *the rights of Federal employees,* to prevent reprisals, and to help eliminate wrongdoing within the Government[.]") (emphasis added); 5 C.F.R. § 2635.101(b)(11) (2012) ("Employees *shall disclose* waste, fraud, abuse, and corruption to appropriate authorities.") (emphasis added); *see also* E.O. 12674, Sec. 101(k)(1989)(same).[13]

     Contractually requiring an employee to give up that fundamental right, or not to perform that required duty, constitutes a "significant change in duties, responsibilities, or working conditions" within the meaning of 5 U.S.C. § 2302(a)(2)(A) (defining "personnel action").  The legislative history of the 1994 WPA amendments indicates that the term "any other significant change in duties, responsibilities, or working conditions" should be interpreted broadly, to include "any harassment or discrimination that could have a chilling effect on whistleblowing or otherwise undermine the merit system." *Covarrubias v. Social Sec. Admin.*, 113 M.S.P.R. 583, ¶ 15 n.4 (citing 140 Cong. Rec. H11, 421 (daily ed. Oct. 7, 1994) (statement of Rep. McCloskey); *Roach v. Department of the Army*, 82 M.S.P.R. 464, ¶ 24 (1999)).  The non-disparagement provisions in John Doe 1's and John Doe 2's separation agreements have a chilling effect on whistleblowing.

     Under the *per se* knowledge/timing test, the whistleblower's perceived whistleblowing was a contributing factor in Mr. Green's issuance of the separation agreements.  Mr. Green, who coerced the whistleblowers into signing the separation agreements, had knowledge of their protected activity and presented the separation agreements in close temporal proximity to their protected activity.

---

[13] Federal employees also have a statutory obligation to report criminal wrongdoing by other employees to the Attorney General. 28 U.S.C. § 535(b) (2012).  In addition, there are a variety of other statutes and regulations that mandate particular types of reporting and/or reporting by certain categories of employees. *See, e.g.,* 48 C.F.R. § 3.104-7 (2011) (violations of the Federal Acquisition Regulation); 31 U.S.C. §§ 1351, 1517(b) (2012) (violations of the Antideficiency Act); 38 C.F.R. § 1.201 (2011) (employee's duty to report violations of Veterans Affairs laws or regulations); 45 C.F.R. §§ 73.735-1301, -1302 (2011) (employee's duty to report violations of fraud, waste or abuse in programs of the Department of Health and Human Services); 40 U.S.C. § 611 (2006) (General Services Administration).

### c. *Per-se Retaliation*

Non-disparagement provisions/ gag clauses have been deemed *per se* retaliation in analogous circumstances. For example, as discussed in "Enforcement Guidance on non-waivable employee rights under Equal Employment Opportunity Commission (EEOC) enforced statutes":

> *Agreements that attempt to bar individuals from filing a charge or assisting in a Commission investigation run afoul of the anti-retaliation provisions because they impose a penalty upon those who are entitled to engage in protected activity under one or more of the statutes enforced by the Commission. By their very existence, such agreements have a chilling effect on the willingness and ability of individuals to come forward with information that may be of critical import to the Commission as it seeks to advance the public interest in the elimination of unlawful employment discrimination.*

Enforcement Guidance, EEOC Notice No. 915.002 (April 10, 1997), *available at* http://www.eeoc.gov/policy/docs/waiver.html (emphasis added).

EEOC has consistently recognized in federal sector cases that an agency's restraint of or interference with the EEO process, including attempts to chill EEO activity through prior restraint, constitutes *per se* retaliation for protected EEO activity – *even though no personnel action has been taken and no protected activity has occurred.* For example, in *Jasper v. Runyon,* the Postmaster stated generally at a supervisors' meeting that too many managers were filing EEO complaints and that these filings would do the managers no good. The Commission found that such a statement would have a potentially chilling effect on the filing of EEO complaints. Based on its duty to insure the integrity of the EEO process, the Commission found that the Postmaster's statement constituted *per se* retaliation. *Jasper v. Runyon,* EEOC Request No. 05920370, 1992 WL 1374793, at *4 (Aug. 7, 1992).[14]

OSC reasonably believes that an agency's prior restraint or interference with whistleblowing and/or going to OSC constitutes *per se* retaliation under 5 U.S.C. § 2302(b)(8) and/or (b)(9), and thus a prohibited personnel practice. The non-disparagement provisions in the separation agreements on their faces constitute a prior restraint against a signing employee's whistleblowing and/or going to OSC. Moreover,

---

[14] *See also Donahue v. Holder,* EEOC Appeal No. 0120073680, 2009 WL 591068, *1 (Feb. 26, 2009) (finding *per se* reprisal where manager made statements at meeting that employees had the right to challenge his recent assignments and "could file grievances or EEO complaints, but they will lose"); *Bensing v. Danzig,* EEOC Appeal No. 01970742, 2000 WL 33541925, *3-4 (Oct. 3, 2000) (supervisor's objections to employee's contacts with EEO office and union representatives constituted *per se* reprisal); *Simpson v. Rubin,* EEOC Request No. 05930570, 1994 WL 1841189, *5 (March 11, 1994) (agency policy that precluded employee from serving in acting supervisory capacity solely because employee was an EEO counselor constituted *per se* reprisal); *Marr v. Widnall,* EEOC Appeal No. 01941344, 1996 EEOPUB LEXIS 2637, *18 (June 27, 1996) (finding unlawful interference where supervisor attempted to dissuade witness from testifying in EEO matter by calling her to private meeting in smoking area and stating that it was "in [her] best interest not to get involved.").

23

since the non-disparagement provisions also restrain or interfere with a signing employee's exercise of the right to petition Congress, the agreements also constitute a *per se* violation of 5 U.S.C. § 2302(b)(12), and thus a prohibited personnel practice. As the Second Circuit reasoned in similar circumstances: "Although the act of inducing an employee to relinquish his rights as provided by the [Energy Reorganization Act] through means of a settlement agreement is less obvious than more direct action, such as termination, it is certainly aimed at the same objective: keeping an employee quiet." *Connecticut Light & Power v. Secretary of Labor*, 85 F.3d 89, 95-96 & n.5 (2d Cir. 1996) (affirming Dep't of Labor ruling that act of offering settlement agreement which would restrict individual from reporting unlawful conduct to the government violated anti-retaliation provision of Energy Reorganization Act of 1974).

Here, the evidence demonstrates that Mr. Green included the non-disparagement provisions in the whistleblowers' separation agreements with the specific intention of keeping the whistleblowers quiet. He drafted the separation agreements that clearly provided that the whistleblowers' new employers would receive copies of their failing interim performance appraisals unless they agreed to waive their rights to make disclosures to OSC, Congress, and the media.

## D.  OIG Cannot Meet its Rebuttal Burden

In order to rebut a *prima facie* case of reprisal under 5 U.S.C. § 2302(b)(8), the OIG must show by "clear and convincing" evidence that it would have issued John Doe 1's and John Doe 2's failing interim performance appraisals and executed separation agreements containing non-disparagement provisions even if they had not engaged in protected activity.

The "clear and convincing" evidentiary standard imposes a high burden on the agency that is difficult to satisfy.  In *Whitmore*, the Federal Circuit quoted the following from the WPA legislative history:

> *"Clear and convincing evidence" is a high burden of proof for the Government to bear.  It is intended as such for two reasons.  First, this burden of proof comes into play only if the employee has established by a preponderance of the evidence that the whistleblowing was a contributing factor in the action — in other words, that the agency action was "tainted."  Second, this heightened burden of proof required of the agency also recognizes that when it comes to proving the basis for an agency's decision, the agency controls most of the cards — the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases.  In these circumstances, it is entirely appropriate that the agency bear a heavy burden to justify its actions.*

The evidence demonstrates that the OIG will not be able to meet this high burden.  First, the OIG will not be able to show that John Doe 1's and John Doe 2's interim performance appraisals were justified.  As discussed in section II(b)(6) above, PAIGI Beitel decided to draft and issue the interim performance appraisals after John Doe 1 and

John Doe 2 gave notice that they had accepted positions with other federal agencies. They were the only departing OIG employees given "interim" or "close-out" appraisals, despite the fact that numerous employees left the OIG in 2011. The appraisals were, in part, based on events that occurred outside of the performance period, and the ratings do not appear to be based on their actual performance, especially considering the fact that they were given satisfactory progress reviews less than four months earlier. Moreover, PAIGI Beitel's testimony that the interim appraisals were drafted to explain the OI's alleged issues to the peer review committee is not credible, in that several reports had already been drafted by himself and ██████ to address these alleged concerns.

The OIG has also asserted that John Doe 1 and John Doe 2 were represented by counsel when they executed their separation agreements and that they willingly entered into the agreements. Whether John Doe 1 and John Doe 2 were represented by counsel, however, does not by itself establish that the agreements were not coercive.

To prove coercion, John Doe 1 and John Doe 2 must show that: (1) they involuntarily accepted the terms of the agreements; (2) circumstances permitted no other alternative; and (3) such circumstances were the result of coercive acts. *See Kent v. Dep't of the Air Force,* 2013-3034, 2013 WL 1352582, *2 (Fed. Cir. April 5, 2013); *Candelaria v. U.S. Postal Service,* 31 M.S.P.R. 412, 413 (1986). Here, there is sufficient evidence to establish that the OIG coerced John Doe 1 and John Doe 2 into signing the separation agreements.

First, the evidence indicates that John Doe 1 and John Doe 2 involuntarily accepted the terms of the separation agreements. The Federal Circuit has noted that the most probative evidence of involuntariness is the length of time between the employer's alleged coercive act and the action. *Terban v. Department of Energy,* 216 F.3d 1021, 1024 (Fed. Cir. 2000).[15] Here, Mr. Green provided John Doe 1 with his separation agreement—the same day PAIGI Beitel gave him his failing interim performance appraisal—just four days before he was expected to begin his new position at a different federal agency. John Doe 2 received his separation agreement before receiving his failing interim performance appraisal; however, the terms of his agreement denote that he would not be given a timely release date, that OIG would potentially tell his future employer that his departure from OIG was not voluntary, and that some adverse action would likely be taken against him if he failed to sign the separation agreement. He received his failing interim performance evaluation on his last day with OIG.

Next, the complainants had no alternative but to sign the agreements. If they did not sign them immediately, their release dates to their new employers would be postponed, and their new employers would receive the failing performance appraisals. Potentially, the new employers had the option of rescinding the employment offers. Additionally, if the whistleblowers chose not to sign the agreements and instead challenged the failing appraisals, the agency made clear its intent to postpone the release dates and issue the failing appraisals. Unlike in *Kent,* where the employee remained free

---

[15] While *Terban* involves retirement, it has also been cited in cases involving settlement agreements. *See Parrott v. Merit Sys. Prot. Bd.,* 519 F.3d 1328, 1334 (Fed. Cir. 2008).

Exhibit 3 Pg. 26

to refuse to sign a settlement agreement and insist on a ruling by the administrative judge on his removal, John Doe 1 and John Doe 2 would have suffered immediate, negative consequences if they refused to sign the agreements. *Id* at *3.

Finally, the failing interim performance appraisals and the separation agreements were the result of coercive acts. In *Bowie v. U.S. Postal Serv.*, the Board held that "a threatened action by an agency is 'purely coercive' if an employee can show that the agency knew or should have known that the reason for the threatened action could not be substantiated." *Bowie*, 72 M.S.P.R. 42, 44 (1996) (threatened removal in settlement discussion before the Board) (citing *Schultz v. United States Navy*, 810 F.2d 1133, 1136-37 (Fed.Cir.1987) (employee's resignation was involuntary where agency improperly denied leave and threatened adverse action for AWOL).[16]

In this case, Mr. Green told John Doe 1 and John Doe 2 that if they entered into the separation agreements, the OIG would agree not to provide their new employers with copies of their failing interim performance appraisals. He further threatened that if they refused to sign the separation agreements, the OIG would not provide their requested release dates, and would instead hold them at OIG for the maximum time allowed, despite the fact that they had minimal work to perform and no outstanding projects.

Equally significant, the failing interim performance appraisals were unfounded. Prior to these appraisals, John Doe 1 and John Doe 2 worked at the agency for many years and had never received appraisals below "Fully Successful". Their performance at the time these failing appraisals were issued was at least at the "Fully Successful" level. The OIG knew that it could not substantiate the failing interim appraisals. In addition, the ratings were issued out of cycle. It is not the OIG's common practice to issue "interim" or "close-out" ratings before an employee leaves the agency. In fact, no employee, with the exception of John Doe 1 and John Doe 2, has received a close-out appraisal. The evidence shows that the failing performance appraisals were presented to John Doe 1 and John Doe 2 solely to coerce them into signing the separation agreements, and thus, prevent them from engaging in further protected activity.

In addition, the OIG did not have a legitimate reason to threaten to postpone John Doe 1's and John Doe 2's release dates. The evidence shows that there was no reason to require John Doe 1 and John Doe 2 to remain at the agency. They no longer had work to complete and would be lingering at the agency with nothing to do. PAIGI Beitel did not assert that he or anyone at the OIG was considering postponing the release dates for some legitimate reason, such as the need for John Doe 1 and John Doe 2 to complete an assignment. Where an agency's action does not have a solid or substantial basis in personnel practice or principle it is an unjustifiable coercive act. *See Michael Roskos v. the United States*, 549 F.2d 1386 (Fed. Cir. 1977) (where there was no acceptable good-of-the-service rationale for employee's reassignment, the reassignment was a coercive act

---

[16] The Board has applied *Schultz* in the context of a settlement agreement. See *Merriweather v. Department of Transportation*, 64 M.S.P.R. 365, 371 (1994), *aff'd*, 56 F.3d 83 (Fed.Cir.1995) (last chance agreement).

Exhibit 3 Pg. 27

and employee's subsequent retirement was involuntary); *Caveney v. Office of Administration*, 57 M.S.P.R. 667 (1993) (employee's retirement was involuntary where the reassignment preceding retirement had no solid or substantial basis in personnel management or management principles). The failing interim performance appraisals and threats to postpone the whistleblowers' release dates have no substantial basis in personnel practice or principle, and are thus coercive acts. Lastly, the whistleblowers were targeted for disparate treatment. A similarly situated employee who did not engage in protected activity was not issued a failing interim performance appraisal or a separation agreement when he departed the OIG during the same time period.

Accordingly, for all of these reasons, the OIG cannot meet its burden of showing by "clear and convincing" evidence that it would have issued John Doe 1 and John Doe 2 failing interim performance appraisals and separation agreements, absent their perceived whistleblowing or participation in protected activity.

## E. Significant Factor Burden-Mosaic of Retaliation

OSC's investigation uncovered compelling evidence of a pattern of retaliation against the complainants for whistleblowing, perceived whistleblowing, and engaging in protected activity. Evidence showing a pattern or "convincing mosaic" of retaliation can be used to prove the significant factor element in a retaliation case. Such mosaic includes pieces of evidence that "[w]hen taken as a whole, provide strong support if all [pieces] point in the same direction...." *Crump v. Dep't of Veterans Affairs*, 114 M.S.P.R. 224, 229-230 (2010). As a general rule, this mosaic has been defined to include three general types of evidence: (1) evidence of suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of retaliatory intent might be drawn; (2) evidence that employees similarly situated to the appellant have been better treated; and (3) evidence that the employer's stated reason for its actions is pretextual. *Rhee v. Dep't of Treasury*, 117 M.S.P.R. 640, 653 (2012) (quoting *Kohler v. Department of the Navy*, 108 M.S.P.R. 510, 515 (2008)).

There is strong evidence of suspiciously close timing between John Doe 1's and John Doe 2's protected activity and the interim failing appraisals and separation agreements. John Doe 1 and John Doe 2 engaged in protected activity over a period of several months from May through September 2011. The whistleblowers were issued "Level 1" interim appraisals and presented with separation agreements containing non-disparagement language in August and September 2011. The proximity between the protected activity and the agency's actions is very close—including actions taken within just days or weeks of the protected activity—giving rise to a strong inference of retaliation.

In addition, John Doe 1 and John Doe 2 were treated less favorably than a similarly situated employee. Like John Doe 1 and John Doe 2, another OI manager was identified as having performance deficiencies in 2011 and was being investigated by the OC for alleged violations of agency policy. This manager, however, was not required to execute a separation agreement containing a non-disparagement provision and was not given a

Exhibit 3 Pg. 28

failing interim performance appraisal before his departure from the agency. Unlike John Doe 1 and John Doe 2, this manager did not engage in protected activity. The only difference between these three OI managers was that John Doe 1 and John Doe 2 engaged in protected activity.

Moreover, there is evidence that the agency's stated reasons for its actions are pretextual. The interim appraisals do not accurately describe John Doe 1's and John Doe 2's performance and primarily address issues outside of the 2010-2011 appraisal period. In addition, PAIGI Beitel's reasons for issuing the appraisals are pretextual. He testified that one reason for issuing the failing interim appraisals was to explain deficiencies to the OPM OIG peer review team. However, this explanation also seems disingenuous considering there were several other employees who were not similarly given interim appraisals when they left OIG, despite their poor performance. In sum, PAIGI Beitel did not find it necessary to document the poor performance of other departing employees who were not whistleblowers.

The agency's stated reasons for executing separation agreements containing non-disparagement language was also pretextual. Mr. Green testified that he inserted the non-disparagement language to prevent John Doe 1 and John Doe 2 from being untruthful about the OIG, not to prevent them from blowing the whistle. As noted above, there is no evidence that John Doe 1 or John Doe 2 were dishonest or deceitful; rather, witnesses consistently described them as men of integrity. In addition, while numerous employees left the OIG for employment with other agencies, John Doe 1 and John Doe 2 were the only employees presented with separation agreements. It is suspect that Mr. Green was not concerned with preventing other allegedly poor performing employees from "disparaging" the OIG. Here, the suspicious timing, evidence that similarly situated employees were treated more favorably, and evidence that the agency's stated reasons for its actions were pretextual demonstrates a convincing mosaic of retaliation.

## F. The Separation Agreements Violate 5 U.S.C. § 2302(b)(12) as Violations of the Lloyd-LaFolette Act

It is also a prohibited personnel practice to take a personnel action if taking such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles. 5 U.S.C. § 2302(b)(12). An employee's right to petition Congress is protected under the Lloyd-LaFollette Act of 1912, 5 U.S.C. § 7211. Several legislators explicitly cited "gag rules" that forbade federal employees to communicate directly with Congress on pain of dismissal as the reason for enacting the Lloyd-LaFollette Act. *Bush v. Lucas*, 462 U.S. 367, 382-84 & nn.19-24 (1983). The non-disparagement provisions in the separation agreements, on their face, violate the Lloyd-LaFollette Act, and thereby 5 U.S.C. § 2302(b)(12).[17] *See* 5 U.S.C. § 2302(b) ("This subsection shall not be construed to authorize the withholding of information from Congress or the taking of any personnel action against an employee who discloses information to the Congress.").

---

[17] The Lloyd-LaFollette Act implements 5 U.S.C. § 2301(b)(9).

28

## IV.   CULPABILITY OF RESPONSIBLE OFFICIALS AND RECOMMENDATIONS

There is compelling evidence that OIG management engaged in a series of adverse actions against the complainants in retaliation for their protected activity and/or perceived whistleblowing and to chill future whistleblowing. The evidence shows that Mr. Green drafted and/or reviewed, negotiated, and insisted on the inclusion of the non-disparagement language in the separation agreements. However, he did not, and could not, act alone. Without PAIGI Beitel's failing interim performance appraisals, the agency would have lacked leverage to coerce the whistleblowers into signing the separation agreements, in which they waived their rights to make protected disclosures to OSC, Members of Congress, and the media.

Although there is inconsistent testimony regarding the involvement of Mr. Green, PAIGI Beitel, and other members of OIG senior management, the weight of the testimony and documentary evidence demonstrates that Mr. Green and PAIGI Beitel were the key players in drafting the separation agreements, signing the agreements, and issuing the failing interim performance appraisals. More significantly, the evidence shows that Mr. Green and PAIGI Beitel manifested the strongest motive to retaliate against John Doe 1 and John Doe 2.

### A. Wade Green

The record is replete with evidence establishing that Wade Green retaliated against the whistleblowers. He admitted to drafting or directing that an OC attorney draft the whistleblowers' separation agreements, and signing the agreements. He testified that he drafted and/or reviewed the non-disparagement provisions, and that he insisted that they remain in the agreements. Importantly, in negotiating Employee X's settlement agreement—the agreement upon which the non-disparagement provisions in the whistleblowers' separation agreements were based—he removed a provision drafted by Employee X's attorney, which would have allowed for his client "to file an EEO or Special Counsel complaint."

The evidence also shows that Mr. Green reviewed John Doe 1's and John Doe 2's failing interim performance appraisals before drafting the separation agreements, and included the provisions that the failing appraisals would not be provided to John Doe 1's and John Doe 2's future employers if they agreed to the terms of the agreements. Mr. Green also made clear to John Doe 1 and John Doe 2 that the OIG would hold them for 30 days if they refused to sign the agreements—despite the fact that their workloads were minimal and there was no justification to delay their release dates.

The evidence demonstrates that Mr. Green was motivated to retaliate against the whistleblowers for two reasons: (1) he wanted to protect IG Zinser, himself, and the OIG from potential damaging statements and (2) he wanted the whistleblowers to withdraw their EEO and FOIA requests. The documents sought from the requests could potentially implicate him and/or IG Zinser or PAIGI Beitel in wrongdoing.

Mr. Green testified that if OSC found a violation based on the separation agreements, he accepted responsibility for the violation due to his position as "Chief Legal Officer." As such, particularly for an Inspector General's office, Mr. Green would have been familiar with the WPA and should have prevented violations of the Act by the OIG. Instead, the evidence shows that he used his position to draft separation agreements containing non-disparagement provisions aimed at keeping whistleblowers quiet, and used retaliatory failing performance appraisals as leverage to compel the whistleblowers to sign the agreements.

Based on the preceding, OSC recommends that Commerce take substantial disciplinary action against Wade Green.

## B. PAIGI Beitel

The record is also replete with evidence establishing that PAIGI Beitel retaliated against the whistleblowers by drafting their unfounded failing interim performance appraisals. The evidence indicates that he coordinated with Mr. Green on the separation agreements. Specifically, he drafted and provided Mr. Green with copies of their failing interim performance appraisals. In addition, he testified that the interim appraisals and the separation agreements work together and are "contemporaneous." Finally, in his capacity as an OIG management official, he signed the separation agreements containing the non-disparagement provisions.

The evidence demonstrates that PAIGI Beitel was motivated to retaliate against the whistleblowers for their engagement in protected activity and/or their perceived whistleblowing. In particular, he was named as a subject official in John Doe 1's EEO complaint, and, according to a key witness, went "apoplectic" when John Doe 1 submitted a FOIA request concerning sensitive documents that could potentially implicate him in wrongdoing.

PAIGI Beitel's behavior is particularly egregious based on his position as the OIG's expert on whistleblower protection. He has worked on whistleblower issues for well over a decade, has received training on prohibited personnel practices, and was allegedly selected for an SES position at OIG in order to establish a whistleblower protection unit. Based on this knowledge and experience, PAIGI Beitel was clearly familiar with the WPA and should have taken steps to prevent retaliatory actions.

As to the appropriate penalty for PAIGI Beitel, because he neither drafted nor was consulted on the non-disparagement provision, his involvement in the separation agreements was less than Mr. Green's. Thus, OSC recommends that a lower level of discipline be taken against PAIGI Beitel.

## C. Todd Zinser and █████████

There is insufficient evidence to establish that IG Zinser reviewed the separation agreements prior to OSC's investigation or was informed about the non-disparagement

Exhibit 3  Pg. 31

clauses.  Wade Green testified that he neither provided IG Zinser with a copy of the separation agreements, nor informed him that the separation agreements contained non-disparagement provisions.  PAIGI Beitel additionally testified that IG Zinser was not involved with the drafting or issuance of the whistleblowers' failing interim performance appraisals.  IG Zinser did not sign any of these documents, and OSC found no documentary evidence showing IG Zinser's knowledge or involvement with the whistleblowers' interim performance appraisals or separation agreements.  Accordingly, OSC has insufficient evidence to seek disciplinary action against IG Zinser for a violation of 5 U.S.C. §§ 2302(b)(8), (b)(9), or (b)(12).

Similarly, OSC has insufficient evidence to establish that ████████committed a prohibited personnel practice.  Although ████████signed the whistleblowers' interim performance appraisals, the evidence indicates that his role in these appraisals was minor as compared to PAIGI Beitel's.  Further, ████████credibly testified that he was unaware of the whistleblowers' separation agreements prior to OSC's investigation.  Although ████████failed to protect the whistleblowers from retaliatory actions, there is insufficient evidence to seek disciplinary action against him for a violation of 5 U.S.C. §§ 2302(b)(8), (b)(9) or (b)(12).

## V.  CONCLUSION

Congress included protection for whistleblowers in the Civil Service Reform Act to assure federal employees "will not suffer if they help uncover and correct administrative abuses."  S. Rep. No. 95-969, at 8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2730.  In this matter, OSC's investigation uncovered willful, concerted acts of retaliation that necessitate disciplinary action.  Holding management accountable for engaging in prohibited personnel practices is essential to assuring employees that they can blow the whistle or engage in other protected activity without fear of reprisal.

Accordingly, and for the reasons set forth herein, the Department of Commerce should take appropriate disciplinary action against PAIGI Beitel and Mr. Green for their retaliatory actions in violation of 5 U.S.C. §§ 2302(b)(8), (b)(9), and (b)(12).